**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

STATE OF WASHINGTON; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; and STATE OF WISCONSIN,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF EDUCATION; and LINDA MCMAHON, in Her Official Capacity as United States Secretary of Education,

Defendants.

NO.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

# I.    INTRODUCTION

1.    This lawsuit relates to actions that Defendants, the Department of Education and Secretary Linda McMahon, have decided to take against mental health grants within Plaintiff States that are currently protected by a permanent injunction in *Washington v. U.S. Department of Education*, Case No. 2:25-cv-01228-KKE (W.D. Wash.). Plaintiff States secured this injunction after Defendants unlawfully discontinued the grants by applying new, unpublished priorities pursuant to an internal directive.

2.    The Department of Education persists in its illegal plan to deny critical mental health funding to public school students based on these new priorities even though a permanent injunction has been issued by this Court to stop it, and even though the underlying rationale upon which its plan is premised has been held unlawful. Defendants say they can do this because the *Washington* injunction enjoined "discontinuances," and now, the Department plans to "terminate" the grants at issue. But though the precise mechanism by which the Department plans to end the protected grants may have changed, its illegality has not.

3.    In *Washington*, Defendants filed a motion for clarification on June 10, 2026, seeking a ruling that the *Washington* injunction does not address Defendants' grant termination authority. Defendants announced that if they receive a favorable ruling by July 30, 2026, they will begin terminating "some or all" of the protected grants on July 31, 2026. Plaintiffs disagree with Defendants' interpretation and have asked Judge Evanson to clarify that the injunction bars Defendants from terminating the protected grants for failing to effectuate the same new, unpublished priorities that were the basis for Defendants' unlawful discontinuances. Judge Evanson set the *Washington* motion for hearing on July 24, 2026.

4.    Plaintiff States bring this Complaint protectively, because while the *Washington* injunction should prevent the Department from implementing the vacated and enjoined Directive procedure "through any means," including termination, *Washington*, Dkt. # 269, the Court might hold otherwise, leaving the grants vulnerable to immediate and unlawful termination. Should

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

that happen, this lawsuit is necessary to secure a new injunction that prevents the precise irreparable harm from grant terminations that this Court in *Washington* already held supported preliminary and permanent relief from grant discontinuances.

5. The programs at issue were prompted by tragic, high-profile school shootings, after which Congress dramatically increased funding for mental health services in high-need, low-income, and rural schools pursuant to the Mental Health Service Professional Demonstration Grant Program (MHSP) and the School-Based Mental Health Services Grant Program (SBMH) (collectively referred to as "Programs"). This legislation came at a critical time when our youth were experiencing a mental health crisis, a crisis that continues today. The Programs tackled several aspects of this problem, including the lack of funds for hiring and retaining school-based mental health professionals, difficulty recruiting mental health professionals to work in rural and high-need school districts, and a well-recognized workforce shortage. Although this crisis continues, the Department has been on a mission for over a year to end funding for a subset of MHSP and SBMH grants within Plaintiff States based on its belief that the grants do not effectuate Defendants' new priorities because they support diversity, equity, and inclusion (DEI).

6. Defendants issued a series of internal directives to ferret out and uproot these DEI-adjacent grants. On February 5, 2025, Defendants issued a Directive on Department Grant Priorities, titled "Eliminating Discrimination and Fraud in Department Grant Awards" (February Directive), asserting that "[i]llegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education," and ordering staff to re-review and terminate grants that "fund discriminatory practices—including in the form of DEI," because such grants were "deemed inconsistent with these priorities." The February Directive cited 2 C.F.R. § 200.340(a)(4) as the basis for termination. In April 2025, Defendants then implemented the February Directive by discontinuing Program grants within Plaintiff States under a different

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

regulation, 34 C.F.R. § 75.253, rather than terminating these grants under 2 C.F.R. § 200.340(a)(4).

7.    Shortly thereafter, Defendants memorialized the February Directive-based discontinuance process in a June 5, 2025, internal directive titled "Non-Competing Continuation Discretionary Grant Award Review Policy" (June Directive), which directed Department staff to "review all grant awards to advance the Administration's priorities" and end funding for grants that were "inconsistent with" the Department's view of "Federal civil rights requirements" because they supported purportedly unlawful DEI. The June Directive expressly required staff to review "the approved grant application (inclusive of the GEPA 427 statement)," referring to the equity statements that Congress requires grant applicants to provide under the General Education Provisions Act (GEPA), 20 U.S.C. § 1228a. In accord with these Directives, Defendants identified grants within Plaintiff States that Defendants believed supported DEI, discontinued them, and denied grantees' requests to reconsider the discontinuances.

8.    Although Defendants' actions were motivated by their view that these grants purportedly include "DEI" activities that are somehow inconsistent with federal civil rights laws, Defendants made no attempt to comply with procedural requirements under those laws, such as advising grantees of their alleged failure to comply with federal civil rights requirements, working with grantees to secure voluntary compliance, providing grantees an opportunity for hearing and making an express finding on the record if compliance cannot be secured by voluntary means, or providing a full written report to Congress and waiting thirty days before the action takes effect.

9.    Plaintiff States, harmed from losing these grants both as grant recipients and through the increased Medicaid and state education agency expenditures and strain from the loss of grant-provided services, filed suit and secured a permanent injunction in *Washington v. U.S. Department of Education*, No. 2:25-cv-01228-KKE (W.D. Wash.), from the Department's unlawful implementation of its new priorities to end Program grants within their states. Pursuant

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

to the injunction, Defendants made new continuation decisions and issued continuation awards, ultimately continuing most of the grants and grantees covered by the injunction (the "Protected Grants" and "Protected Grantees"). Although Defendants stated they continued the Protected Grants for the full 2026 budget period (January 1 through December 31, 2026), Defendants provided only six months of funding and said they would make additional funding determinations after a mid-year review.

10.    Having already lost that lawsuit for unlawfully attempting to discontinue the Protected Grants under 34 C.F.R. § 75.253 based on the new, unpublished Directive priorities, Defendants have now announced their plan to terminate "some or all" of the Protected Grants under 2 C.F.R. § 200.340 based on the same unlawful, unpublished priorities and have moved for clarification in *Washington* to allow them to do so. Defendants' plan to circumvent the permanent injunction by targeting the grants protected by the *Washington* injunction for termination pursuant to the February and June Directives[1] (rather than making additional funding determinations) is referred to as the "*Washington* Plan."

11.    Although Plaintiff States maintain that the *Washington* injunction prohibits Defendants from terminating grants based on the same unpublished priorities and oppose Defendants' pending clarification motion, Plaintiff States file this lawsuit protectively, in the event the Court in *Washington* determines Defendants are not enjoined from terminating the Protected Grants under *Washington*'s permanent injunction. In that event, a new preliminary injunction or temporary restraining order will be necessary, as, under the *Washington* Plan, Department staff will begin terminating "some or all" of the Protected Grants on July 31, 2026, if they receive a favorable ruling on the clarification motion. An injunction or a restraining order would be appropriate under those circumstances, because the Department's Directives and the *Washington* Plan are unlawful for a multitude of reasons.

---

[1] Just as the February Directive relating to terminations caused Defendants to discontinue grants, the June Directive related to continuations likely informs the *Washington* Plan to terminate grants for supporting DEI activities.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

4

12. For instance, just as in *Washington*, the Directives and the *Washington* Plan violate the Administrative Procedure Act (APA) because Defendants did not undergo notice and comment rulemaking for their new priorities, as required by GEPA. *See Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1245 (9th Cir. 2026) (holding Defendants' use of unpublished priorities in February Directive violated rulemaking requirements).

13. The Directives and the *Washington* Plan also violate the APA because they lack reasoned decision-making and are contrary to law. By singling out the Protected Grants for alleged discrimination because the grant applications apparently contain statements about DEI, Defendants have countermanded Congress's directive that grant applicants describe "the steps such applicant proposes to take to ensure equitable access to, and equitable participation in," the grant project activities when applying for a grant. 20 U.S.C. § 1228a(b). By directing Department staff to prepare to terminate "some or all" Protected Grants without first working with grantees to secure voluntary compliance or providing grantees an opportunity for a hearing, Defendants have violated procedural protections that Congress mandated prior to grant withholdings under GEPA and when a grantee has allegedly violated federal anti-discrimination laws under Title VI and Title IX. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. §§ 1234d, 1682. Defendants seek to escape judicial review under these statutes by asserting their extra-statutory grant terminations can only be challenged in the Court of Federal Claims.

14. Additionally, the February Directive and the *Washington* Plan are unlawful because Defendants misuse and plan to misuse their authority under 2 C.F.R. § 200.340 in several ways.

15. First, Defendants' February Directive attempts to justify termination under Section 200.340(a)(4), based on new priorities, when only, at most, the original priorities that were in place when the grants were initially selected can be relevant to termination decisions. *See Washington v. U.S. Dep't of Commerce*, 812 F. Supp. 3d 1169, 1183 (W.D. Wash. 2025) ("A plain reading of this provision demonstrates that termination is proper only when the 'award

itself no longer effectuates the program goals or agency priorities,' and does not extend to *changes* in program goals or agency priorities.") (emphasis added). To the extent the *Washington* Plan involves terminating grants on this basis, it too is unlawful.

16.    Second, Defendants' February Directive does not instruct staff to confirm that grants must "clearly and unambiguously" include Section 200.340(a)(4) in the grant award's terms and conditions. 2 C.F.R. § 200.340(b); *see* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) (explaining "the language" of § 200.340(a)(4) needs to be included in the "terms and conditions of the award"). The terms and conditions of the Protected Grants do not include the language of this termination provision. To the extent the *Washington* Plan involves terminating grants without meeting this requirement, it too is unlawful.

17.    Third, Defendants' February Directive and the *Washington* Plan cannot use Section 200.340(a)(4) to terminate Protected Grants because such termination is not authorized by law. *See, e.g.*, *Pacito v. Trump*, 169 F.4th 895, 937 (9th Cir. 2026) (rejecting the government's reliance on Section 200.340(a)(4) because it authorizes termination only "to the extent authorized by law"); *Washington v. DHS*, No. 2:25-cv-1401-BJR, 2026 WL 1469538, at *9 (W.D. Wash. May 26, 2026) ("[T]he [termination] regulation . . . permits termination on that basis only where such termination is otherwise authorized by law."); *City of Chicago v. DHS*, 815 F. Supp. 3d 727, 755 (N.D. Ill. 2025) ("[S]ection 200.340 does not permit the agency to decline to follow a statute simply because its priorities have changed.").

18.    Moreover, Defendants' Directives and the *Washington* Plan violate the Spending Clause by springing new, impossibly vague conditions on grantees after they had accepted their awards.

19.    Defendants' unlawful actions will cause immediate, devastating, and irreparable harm to Plaintiffs. If the Directives and the *Washington* Plan are not set aside, Plaintiff States' educational agencies will be forced to lay off the very same professionals that Congress intended

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

6

to recruit, hire, and retain in rural and high-need school districts when it appropriated Program funds. Plaintiff States' institutes of higher education will be forced to terminate financial support for the very same graduate students that Congress intended to support through scholarships, paid internship opportunities, and training so they could pursue careers in school-based mental health—drying up a workforce pipeline Congress recognized needed development. And Plaintiff States' Medicaid agencies will have increased expenditures on mental health services and Plaintiff States' educational agencies will have increased expenditures on educational services for students with unmet mental health needs, due to the loss of grant-provided services within Plaintiff States. Each of these harms has already been held by this Court to support standing and to constitute irreparable harm sufficient to justify injunctive relief. *Washington*, Dkt. # 269 at pp. 9, 31.

20.    Accordingly, Plaintiffs bring this action against the Department and United States Secretary of Education Linda McMahon seeking to: vacate and set aside Defendants' Directives and the *Washington* Plan as applied to the Protected Grants; preliminarily and permanently enjoin Defendants from implementing or enforcing the Directives or the *Washington* Plan against the Protected Grants or reinstituting the Directives or the *Washington* Plan for the same or similar reasons; and declare that the Directives and the *Washington* Plan violate the APA and that under 2 C.F.R. § 200.340 Defendants may not use new priorities to terminate grants or terminate grants before meeting procedural requirements imposed by law, including 20 U.S.C. § 1232i(b), 20 U.S.C. § 1234d, 42 U.S.C. § 2000d-1, 20 U.S.C. § 1682, and their implementing regulations.

## II.    JURISDICTION AND VENUE

21.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

7

22.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, preliminary and permanent injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–02, and 5 U.S.C. §§ 705–06.

23.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are an agency of the United States Government, and an officer sued in their official capacity. Plaintiff State of Washington is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Western District of Washington.

### III.    PARTIES

**A.    Plaintiffs**

24.     Plaintiff State of Washington, represented by and through the Attorney General, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action on the State's behalf.

25.     Plaintiff State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California, who is the chief law enforcement officer of California and authorized to sue on the State's behalf.

26.     Plaintiff State of Colorado is a sovereign state of the United States of America. Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action on the State's behalf.

27.     Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Gen. Stat. § 3-125 to pursue this action on behalf of the State of Connecticut.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

8

28.    Plaintiff the State of Delaware is a sovereign state of the United States of America. Delaware is represented by and through its Attorney General, Kathleen Jennings. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to Del. Code Ann. tit. 29, § 2504, on behalf of the State.

29.    Plaintiff State of Illinois is a sovereign state of the United States. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. *See* 15 Ill. Comp. Stat. 205/4.

30.    Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to Me. Rev. Stat. Ann. tit., 5 § 191.

31.    The State of Maryland is a sovereign state in the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents and Maryland's public institutions. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

32.    Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States. Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action on its behalf.

33.    Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

9

34.    Plaintiff State of New Mexico, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Raúl Torrez is the chief legal officer of the State of New Mexico. He is authorized to prosecute all actions and proceedings on behalf of New Mexico when, in his judgment, the interest of the State requires such action. N.M. Stat. Ann. § 8-5-2(B). Likewise, he shall appear before federal courts to represent New Mexico when, in his judgment, the public interest of the state requires such action. N.M. Stat. Ann. § 8-5-2(J). This challenge is brought pursuant to Attorney General Torrez's statutory authority.

35.    Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to sue on the State's behalf.

36.    Plaintiff State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action on the State's behalf.

37.    Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island and is authorized to institute this action on the State's behalf.

38.    Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

39.    Plaintiff States are recipients of the Protected Grants through their universities, state education agencies, and/or school districts. Plaintiff States' Medicaid agencies and state education agencies would also bear additional expenditures, should any Protected Grant within their state lose Program funding.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

10

**B.      Defendants**

40.      Defendant United States Department of Education is a cabinet agency within the executive branch of the United States government that has been created by Congress. 20 U.S.C. § 3411.

41.      Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest-ranking official. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity. 20 U.S.C. § 3412.

## IV.      FACTUAL ALLEGATIONS

**A.      Congress's Creation and Funding of Mental Health Programs in Schools**

42.      Congress created the two Programs at issue here, MHSP and SBMH, in response to profound losses Americans have suffered from school shootings.

43.      On February 14, 2018, a former student shot and killed fourteen students and three staff members at a high school in Parkland, Florida.

44.      Following the Parkland tragedy, Congress used its National Activities for School Safety, Elementary and Secondary Education Act, 20 U.S.C. § 7281(a)(1)(B), authorization to create the MHSP. Congress intended for this program to "to address the shortages of mental health service professionals" in "low-income" public schools, by funding scholarships and clinical training for graduate students providing services in these schools. H.R. Rep. No. 115-952, at 543 (2018), https://www.congress.gov/115/crpt/hrpt952/CRPT-115hrpt952.pdf.

45.      Congress used the same National Activities for School Safety, Elementary and Secondary Education Act, 20 U.S.C. § 7281(a)(1)(B), authorization to establish SBMH in the Department's fiscal year 2020 "to increase the number of qualified, well-trained . . . mental health professionals that provide school-based mental health services to students." Explanatory Statement, *Division A-Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2020*, at 134 (Dec. 16, 2019),

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

11

https://docs.house.gov/billsthisweek/20191216/BILLS-116HR1865SA-JES-DIVISION-A.pdf. This program funded salaries for mental health professionals, allowing state education agencies and local education agencies to hire them directly.

46. In 2022, a gunman shot and killed nineteen students and two teachers at an elementary school in Uvalde, Texas. After this national tragedy, a bipartisan Congress dramatically increased funding through the Bipartisan Safer Communities Act. In this bill, Congress directed the Department to make available an additional $100 million per year for each of MHSP and SBMH for fiscal years 2022 through 2026. Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1342 (June 25, 2022).

**B.      The Department Sets Priorities at the Very Start of a Grant Competition and Then Uses Them to Monitor Performance**

47. The Department's administration of these Programs is governed by the General Education Provisions Act (GEPA) and the Education Department General Administrative Regulations (EDGAR). With limited exceptions, not applicable here, GEPA requires that rules affecting the Department's financial assistance go through the APA's notice-and-comment process. *See* 20 U.S.C. §§ 1221e-4, 1232; *see also* 5 U.S.C. § 553.

48. EDGAR fulfill these statutory requirements by publicly setting the rules for the competitive selection process for new grants. 34 C.F.R. § 75.200 (outlining selection process for new grants).

49. When the Department announces a competition for new grants for a particular fiscal year, it publishes a notice inviting applications (NIA) in the Federal Register that explains, among other things:

- How to apply for a new grant;
- Whether the Secretary plans to approve multi-year projects and, if so, the project period that will be approved;
- The priorities for scoring and selecting grants in the competition;

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

- The selection criteria and factors used to decide which applications will be awarded new grants and how the criteria will be weighed; and

- Any program performance measurements.

*See* 34 C.F.R. §§ 75.100, 75.101, 75.105, 75.110, 75.201.

50. In connection with the NIA, the Department also circulates a grant application package. A grant application package includes "information about the process and content that will be used to evaluate [the] application," "the purpose and goals of the program," and a standard application form. U.S. Department of Education, *Discretionary Grantmaking at ED* (*Discretionary Grantmaking*), at 12–13 (2024)[2] (describing the use of priorities in grant competitions).

51. To make award determinations, the Department scores the quality of each application using the selection criteria and competitive priorities, then ranks the applications and awards new grants. 34 C.F.R. § 75.217; *Discretionary Grantmaking* at 25–26 (describing the use of priorities in grant competitions). The selection criteria are given point values up to the total possible score that the Department announced for that year's grant competition. *See* 34 C.F.R. § 75.201; *Discretionary Grantmaking* at 26–27. Additional points may be earned if applicants meet competitive preference priorities. 34 C.F.R. § 75.105(c); *Discretionary Grantmaking* at 28.

52. After a grant is awarded, the Department holds a post-award conference with the awardee to "establish a mutual understanding of the specific outcomes that are expected, and to clarify measures and targets for assessing the project's progress and results. Information on project outcomes is needed to ensure that the project achieves the objectives stated in the application." *Discretionary Grantmaking* at 31. Performance measures are based on the priorities and program goals published in the NIA and NIA package.

---

[2] Available at: https://web.archive.org/web/20260107025611/https://www.ed.gov/media/document/grant making-ed-108037.pdf (last visited July 9, 2026).

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

53. The Department monitors grantees to ensure that the project is "proceeding as planned, consistent with the approved activities and budget." *Id.* at 38. "The goal of monitoring is to make every project successful. . . . If, in the course of monitoring, ED's staff identify areas of weakness or noncompliance, discover that the grantee is not making substantial progress, or have suggestions for how the grantee might better achieve the program objectives, they will provide technical assistance to help bring the project back on track. Unresolved monitoring findings can result in such actions as additional grant terms and conditions, recovery of funds, a decision to not award a continuation grant, or the termination of a grant." *Id.*

**C.    Program Grant Applicants Complied with the GEPA Equity Directive and Defendants' Priorities to Secure Grant Awards**

54. For each round of Program funding, the Department published an NIA in the Federal Register outlining the priorities and selection criteria for that year's grant competition.

55. State education agencies (SEAs), local education agencies (LEAs), and institutions of higher education (IHEs) applied for MHSP and SBMH grants, addressing equity measures as instructed and tailoring their projects to make their applications competitive based on the Department's published priorities.

56. The NIA packages instructed applicants to address equity measures, because these grants are subject to the GEPA Equity Directive, which requires that applicants:

> develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.

20 U.S.C. §1228a(b); *see also* 34 C.F.R. § 75.210(d). Accordingly, Defendants' application form provided a notice that "**ALL APPLICANTS . . . MUST INCLUDE INFORMATION IN THEIR APPLICATIONS TO ADDRESS [GEPA SECTION 427] IN ORDER TO RECEIVE FUNDING UNDER THIS PROGRAM.**"

14

57. For example, in 2022, one competitive priority for Defendants' MHSP grant competition was to increase the number of qualified school-based mental health services providers from diverse backgrounds. In alignment with this competitive priority and in compliance with the GEPA Equity Directive, Vancouver School District, submitted its Equity Policy, stating it was "committed to educational equity" and would "prioritiz[e] . . . resources to achieve equitable outcomes" and "promote workforce diversity." As a result, the Department awarded Vancouver School District an MHSP grant.

58. Generally, after selecting an applicant for a multi-year Program grant, the Department awarded funding for the first budget year, followed by annual one-year continuation awards awarded at the end of the budget year in December. *See* 34 C.F.R. § 75.251.

**D. Defendants Used New Administration Priorities to Discontinue Grants that Are Supposedly Non-Compliant under Defendants' View of Federal Civil Rights Laws Because the Grants Support DEI**

59. Title VI of the Civil Rights Act of 1964 prohibits discrimination in federally funded programs and activities on the basis of race, color, or national origin. *See* 42 U.S.C. § 2000d. Under Title VI, federal agencies are "authorized and directed to effectuate the provisions of . . . this title . . . by issuing rules, regulations, or orders of general applicability." *Id*. § 2000d-1. Although federal agencies are permitted to terminate federal funding due to a grantee's non-compliance with Title VI, the federal agency must first "advise[] [the grantee] of the failure to comply with the requirement" and attempt to secure compliance "by voluntary means." *Id*. If voluntary compliance fails, the federal agency must secure "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement" before terminating funding, and the termination shall not become effective until thirty days after the agency files a full written report with Congress. *Id*.

60. Similarly, Title IX of the Education Amendments of 1972 prohibits discrimination in federally funded education programs and activities on the basis of sex. *See* 20 U.S.C. § 1681(a). Under Title IX, federal agencies are "authorized and directed to

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

15

effectuate the provisions of . . . this title . . . by issuing rules, regulations, or orders of general applicability." *Id.* § 1682. Although federal agencies are permitted to terminate federal funding due to a grantee's non-compliance with Title IX, the federal agency must first "advise[] [the grantee] of the failure to comply with the requirement" and attempt to secure compliance "by voluntary means." *Id.* If voluntary compliance fails, the federal agency must secure "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement" before terminating funding, and the termination shall not become effective until thirty days after the agency files a full written report with Congress. *Id.*

61.     On February 5, 2025, Defendants issued an internal "Directive on Department Grant Priorities" that instructed Department personnel to re-review grants, "ensuring that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to [the Department's view of federal civil rights] law or to the Department's policy objectives," and asserted new priorities of "merit, fairness, and excellence in education." Grants that did not meet these new priorities would be subject to termination under 2 C.F.R. § 200.340(a)(4).

62.     The February Directive represented a change in the Department's interpretation of Section 200.340(a)(4) and its termination procedure, as the Department's prior policy did not allow termination based on new priorities and required Department staff to work with grantees to address any issues before terminating grants. *See Discretionary Grantmaking* at 39; *cf. Washington*, Dkt. # 269 at pp. 15–16 (holding that the change in continuation procedure resulting from the February Directive constituted a change of position). Defendants made this change without considering grantees' reliance interests in five years of funding that Defendants expressly intended to provide and Defendants' representations and past practices. *Cf. id.* at p. 18 (finding the use of the February Directive to discontinue grants was arbitrary and capricious for failing to consider reliance interests); 34 C.F.R § 75.251(b)(2). Nor did the February Directive acknowledge, let alone direct, Department staff to follow the requirements of Title VI and Title

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

IX, such as the requirement to attempt to secure voluntary compliance before terminating any grants, or the procedural requirements under GEPA. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. §§ 1232i, 1234d, 1682.

63.    Publicly, the Department provided notice of its new interpretation of federal civil rights laws in a now defunct February 14, 2025, Dear Colleague Letter. *See* https://www.ed. gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.    This    Letter    warned educational entities receiving financial assistance that they could lose funding if they failed to comply with measures outlined in the Letter. The Dear Colleague Letter was almost immediately subject to litigation, enjoined, and vacated. *See Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149, 165 (D.N.H. 2025); Memorandum Opinion, *Am. Federation of Teachers v. U.S. Dep't of Educ.*, No. 1:25-cv-00628, (D. Md. August 14, 2025); Order, *Am. Federation of Teachers v. U.S. Dep't of Educ.*, No. 25-2228 (4th Cir. Jan. 22, 2026) (withdrawing appeal).

64.    The February Directive caused Defendants to re-review grant applications and identify grantees whose projects conflicted with its new priorities. On or around April 29, 2025, Defendants applied the February Directive to Program grants. Although the February Directive instructed staff to *terminate* grants inconsistent with Defendants' new priorities under 2 C.F.R. § 200.340(a)(4), Defendants instead used boilerplate notices to *discontinue* Program grants under 34 C.F.R. § 75.253. These notices tracked, verbatim, key portions of the February Directive's language. Of the 339 Program grants eligible for non-competing continuation awards, 233 grants were discontinued, including about 140 grants discontinued within Plaintiff States. Defendants did not discontinue other Program grantees even though they competed with and served the same diversity priorities as the discontinued grants.

65.    The cuts were made public in a social media post from conservative strategist Christopher Rufo, who claimed the money was used to advance "left-wing racialism and discrimination." Collin Binkley, *Trump administration cuts $1 billion in school mental health grants, citing conflict of priorities*, Associated Press (April 30, 2025),

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

17

https://apnews.com/article/school-mental-health-grants-trump-biden-dei-00bec2d96371f023ac 56fe3f32f3e92f.



@christopherrufo, X (April 29, 2025, 8:24 p.m.) https://x.com/christopherrufo/status/1917314 079406055660.

66.     That same day, the Department informed Congress that it only discontinued "certain" grants that "reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration." It claimed that "[t]he prior Administration's preferences are not legally binding" and told Congress that it planned to "re-envision and re-compete" the funds.

67.     On June 5, 2025, Defendants issued a second internal directive titled "Non-Competing Continuation Discretionary Grant Award Review Policy." The June Directive appears to memorialize the process that Defendants used to discontinue Program grants under the February Directive, and it was issued before Defendants addressed Program Grantees' requests for reconsideration. *See generally Washington*, Dkt. # 237-1 (reconsideration responses sent in August and September 2025). Although Defendants included the February Directive in the administrative record for *Washington*, they did not include the June Directive. *See id.*, Dkt. # 208 at p. 13 n.2 (AR index). The *Washington* administrative record was prepared by

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF                        18                  ATTORNEY GENERAL OF WASHINGTON
                                                                      Complex Litigation Division
                                                                      800 Fifth Avenue, Suite 2000
                                                                          Seattle, WA 98104
                                                                            206-464-7744

Department attorneys and certified by a Deputy General Counsel at the Department on November 4, 2025. *See id.*, Dkt. # 202 at p. 2. Now, six months after the *Washington* court entered summary judgment for Plaintiffs, Defendants have revealed the June Directive for the first time in the litigation, claiming that the February Directive "has not been in effect for over a year" and was "superseded" by the one from June. *Id.*, Dkt. ## 447 ¶ 5, 447-1 ¶¶ 5–6; *Washington v. Dep't of Educ.*, No. 26-510, DktEntry # 36.1 at 32 (9th Circuit) (*Appeal*).

68.    The June Directive directed program offices to review grants in connection with continuation decisions to "advance the Administration's priorities of ensuring Federal funds do not support projects that: violate the letter or purpose of Federal civil rights laws; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds."

69.    The June Directive ordered Department staff to "act on any relevant information that may indicate that project activities are inconsistent with Federal civil rights requirements." The June Directive further directed, "[t]o the extent that a grantee uses or has used grant funds in a manner that violates these laws, program offices must make appropriate recommendations, including denial of continuation funding and enforcement action which may include the recovery of funds under section 452 of the General Education Provisions Act (GEPA)."

70.    In performing this review for discriminatory practices, the June Directive expressly ordered Department staff to consider grantees' grant applications, including the GEPA equity statements that all applicants included pursuant to Congress's GEPA Equity Directive and Defendants' instructions. This, too, represented a change in position, as Defendants previously made continuation decisions based on grantee performance, not new priorities. *See, e.g.*, *Washington*, Dkt. # 269 at pp. 13–16. It was also a change from Defendants' previous policies, requiring grantees to set forth equity measures in their grant applications and committing Defendants to working with grantees to address any issues before taking the drastic

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

19

step of ending a grant. Defendants made these changes without considering grantees' reliance interests in five years of funding that Defendants expressly intended to provide and Defendants' representations and past practices. *See id.* at pp. 16–18; 34 C.F.R § 75.251(b)(2). As with the February Directive, the June Directive did not acknowledge, let alone direct, Department staff to follow the requirements of Title VI and Title IX, such as the requirement to attempt to secure voluntary compliance before discontinuing any grants. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682.

71.    For grantees that Defendants discontinued and who requested reconsideration, on information and belief, Defendants followed the June Directive during the reconsideration process. As a result, in Fall 2025, Defendants denied reconsideration requests, because the approved grant applications contained phrases supporting equity.

72.    In accordance with their plan to recompete Program funds, on December 11, 2025, Defendants awarded $208 million in Program funding to new grantees. *See* U.S. Department of Education, *U.S. Department of Education Awards Over $208 Million in Mental Health Grants* (Dec. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-awards-over-208-million-mental-health-grants. These new grantees included a few grantees in Plaintiff States but did not replace all of the services provided by the discontinued grants. For example, Washington dropped from eleven discontinued grants down to two new grants, representing a projected loss of around $25 million grant funding. Nor could the new grants compensate for the additional costs of having to start over at ground zero with new grant projects, rather than reaping the benefits of existing and successful grant projects that had already been set up and simply needed funds to continue providing results.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

**E.    After the Permanent Injunction Enjoined the Discontinuance of the Protected Grants, Defendants Intend to Terminate "Some or All" of the Protected Grants Pursuant to the *Washington* Plan**

73.    In *Washington*, No. 2:25-cv-01228-KKE, sixteen states filed suit challenging the unlawful change in Defendants' discontinuance procedure resulting from the February Directive, as well as the discontinuances that followed.

74.    On December 19, 2025, the Court granted Plaintiffs' motion for summary judgment, and vacated and permanently enjoined the procedure by which the discontinuances were effected, the discontinuances themselves, and the reconsideration denials. *Washington*, Dkt. # 269 at pp. 34–36. It also ordered the Department to make lawful continuation determinations and declared that these determinations were restricted by 34 C.F.R. 75.253(b) to performance and financial data. *Id*. Defendants appealed the judgment and filed their opening appellate brief on June 17, 2026. *Id.*, Dkt. # 357; *Appeal*, DktEntry 36.1.

75.    At a hearing on January 22, 2026, Defendants repeatedly represented that if the Department decided to continue a grantee's program, the grant would be funded for the full year. *See Washington*, Dkt. # 367 at p. 7 (collecting quotes). But instead of issuing continuation awards that funded the year-long budget period, Defendants issued an initial award that only funded six months and told Protected Grantees that Defendants would not provide funding for the remaining six months unless the grantees "provide satisfactory mid-year performance and budget information and show that they are making substantial progress towards fulfilling the goals and objectives of their grant."

76.    For the first time, starting in January 2026, Defendants began incorporating following provision into their grants:

> Grantees must not use federal funds under this project in any manner that violates the United States Constitution, Title VI or Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq. or 42 U.S.C. 2000e et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 504 of the Rehabilitation Act (29 U.S.C. 794), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. 12131 et seq.), the Boy Scouts of America Equal Access Act of 2001 (20 U.S.C. 7905), section 117 of the Higher Education Act of 1965, as amended (20

U.S.C. 1011f), or other applicable federal law. To the extent that a grantee uses grant funds for such unallowable activities, the Department intends to take appropriate enforcement action including under section 451 of the General Education Provisions Act (GEPA), which may include the recovery of funds under section 452 of GEPA.

This provision was lifted almost verbatim from the June Directive.

77.    On information and belief, at about this time, Defendants formulated their *Washington* Plan. Pursuant to this plan, Defendants directed Department staff not to make additional funding determinations despite their prior representations. Instead, the *Washington* Plan provides that starting on July 31, 2026, Department staff will begin making individualized termination decisions and terminating the very grants that the Court in *Washington* enjoined them from unlawfully discontinuing, provided Defendants receive a favorable ruling on their pending motion for clarification by July 30. Although Plaintiffs do not yet know the exact date that Defendants formulated the *Washington* Plan, on June 10, 2026, Defendants publicly announced their plan "to terminate some or all of the grants affected by the [*Washington*] injunction," by moving for an order, in *Washington*, that would clarify that the *Washington* injunction "does not restrict the Department's separate authority to terminate grants under 2 C.F.R. § 200.340." *Washington*, Dkt. # 437 at pp. 1–2; *see also Appeal*, DktEntry 30.1 at 2 (explaining that the Department of Education "intends . . . to terminate some or all of the remaining grants" protected by this Court's injunction). The Department requested the Court's ruling "by July 30, 2026, so that the Department can commence grant agreement terminations on July 31, 2026." *Washington*, Dkt. # 437 at p. 1. According to Defendants, these terminations will render their appeal moot "if all grants are terminated and the terminations are unchallenged." *See Appeal*, DktEntry 30.1 at 3.

78.    Although Defendants told Protected Grantees that they would receive additional funding for the rest of the year following Defendants' newly contrived mid-year check-ins and additional funding determinations, this did not occur. Instead, on June 30, 2026, Defendants sent Protected Grantees a "Notice of Additional Funding." In this notice, Defendants informed the

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

22

grantees that it was considering terminating their grant (with a cite to Defendants' motion for clarification), that challenges to grant terminations belonged exclusively in the Court of Federal Claims, and that terminations would occur no earlier than July 31, 2026, should the Court confirm that the existing permanent injunction does not bar termination. It concluded by providing wind down instructions. Most grantees were given one month of grant funds and given the opportunity to decline the award and instead wind down their grant. On information and belief, only Protected Grantees received these notices—not other grantees who received Program grants that were never discontinued and were not at issue in the *Washington* lawsuit.

79.     By declaring that grant terminations can only be contested in the Court of Federal Claims, the *Washington* Plan unlawfully seeks to deprive Protected Grantees of their procedural rights for grant terminations, including judicial review, under GEPA. *See* 20 U.S.C. §§ 1234(a)(2), 1234d, and 1234g. The Protected Grantees qualify as "recipients," and the Protected Grants qualify as "applicable programs" under 20 U.S.C. § 1231i(1), (2). They therefore qualify for GEPA's procedural protections, which afford notice, an opportunity for hearing, and judicial review before the Department may withhold payments. *Id*. §§ 1234d(b) ("Before withholding payments . . ."), 1234g(a), (b) (staying administrative action until completion of judicial review by the Court of Appeals). "Withholding" includes grant terminations. *Cf.* 20 U.S.C. § 1232i(b) (listing terminations as a type of withholding); 34 C.F.R. § 75.903(c) (applying GEPA hearing procedure to terminations).

80.     By declaring that grant terminations can only be contested in the Court of Federal Claims, the *Washington* Plan unlawfully seeks to deprive Protected Grantees of their procedural rights for grant terminations, including judicial review, based on alleged civil rights violations under 42 U.S.C. § 2000d-1 (Title VI) and 34 C.F.R. § 100.8 (Title VI procedures); and 20 U.S.C. § 1682 (Title IX) and 34 C.F.R. §106.81 (adopting Title VI procedural regulations for Title IX). As recipients of Federal financial assistance, Protected Grantees qualify for these procedural protections, which include notice, opportunity to comply, and a hearing before terminations may

occur. 34 C.F.R. § 100.8. Congress also mandated that agency action, including grant termination, based on an alleged failure to comply with Title VI and Title IX requirements is subject to judicial review:

> Any department or agency action taken pursuant to [42 U.S.C. § 2000d-1 or 20 U.S.C. § 1683] shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to [42 U.S.C. § 2000d-1 or 20 U.S.C. § 1683], any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that chapter.

42 U.S.C. § 2000d-2; 20 U.S.C. § 1683.

81.     The Department has enacted regulations consistent with these procedural requirements. For example, 34 C.F.R. § 75.903 specifies that the effective date of a grant termination may only be "on the latest of" a series of occurrences including "[t]he date of a final decision of the Secretary under part 81" of Title 34 C.F.R., which consists of the GEPA enforcement provisions governed by, among other statutes, 20 U.S.C. § 1234d. By directing that the planned terminations take effect immediately, the *Washington* Plan seeks to terminate Protected Grants earlier than permitted by law.

82.     There are four bases to terminate under 2 C.F.R. § 200.340 and only two are possibly relevant here: (a)(1) for noncompliance with terms or conditions of the grant or (a)(4) based on the Directives' priorities.

83.     Therefore, on information and belief, Defendants plan to terminate "some or all" Protected Grants for noncompliance with the June Directive provision under 2 C.F.R. § 200.340(a)(1); or for failing to effectuate the Directives' unpublished priorities designed to end funding for DEI grants under 2 C.F.R. § 200.340(a)(4). *See Appeal*, DktEntry 36.1 at 9–10 (asserting Defendants could use Section 200.340(a)(4) to end Protected Grants, and that this

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

would be "similar" to discontinuances under 34 C.F.R. § 75.253(a)(5)); *see also* Section IV.F., *infra* (recent terminations of previously discontinued grants in another case).

84.     On information and belief, Defendants plan to terminate "some or all" Protected Grants for alleged non-compliance based on Defendants' view of federal civil rights law, under either Section 200.340(a)(1) or Section 200.340(a)(4), without first following federal procedural requirements under GEPA and federal civil rights law, such as attempting to secure voluntary compliance to cure any legal violations and providing an opportunity for a hearing, before termination.

85.     On information and belief, Defendants plan to make their terminations effective immediately upon delivery to Protected Grantees of the termination notice, contrary to 34 C.F.R. § 75.903(c).

**F.      Defendants' Attempts to Terminate Unlawfully Discontinued Grants and Disregard Federal Civil Rights Procedural Requirements in Other Lawsuits**

86.     The substance of the *Washington* Plan is consistent with Defendants' actions in other grant discontinuance cases.

87.     In *Council for Opportunity in Education v. United States Department of Education* (*COE*), Defendants discontinued grants under eight programs collectively known as "TRIO" programs. *See COE*, No. 1:25-cv-03491-TSC, 2026 WL 120984, at *1 (D.D.C. Jan. 16, 2026). The purpose of the TRIO programs is to combat barriers to higher education faced by students from disadvantaged backgrounds. *Id*.

88.     The TRIO grants, like the SBMH and MHSP grants, are governed by GEPA. Defendants discontinued TRIO grants by sending notices of non-continuation that included the same rationale that Defendants used to discontinue SBMH and MHSP grants:

> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness,

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF                25                ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.

*Id*. at *3.

89. The *COE* court entered a preliminary injunction and ordered Defendants to make new continuation determinations for dozens of unlawfully discontinued grants. *COE*, Dkt. # 42 ¶¶ 1–2. But instead, Defendants continued some grants, discontinued others, and *terminated* more than half. *Id*. ¶ 4. Defendants sent letters stating these already-discontinued grants were being terminated under 2 C.F.R. § 200.340(a)(4) because they "no longer effectuates the program goals or the Department's priorities," effective immediately. *COE*, Dkt. # 47 at p. 6; *see generally id*., Dkt. # 47-9 (termination letters). The letters did not state what those goals or priorities were; they simply quoted a DEI-related passage from the grant application. *See id.*, Dkt. # 47 at pp. 6–8; *id*., Dkt. # 47-9.

90. On information and belief, some of the excerpts quoted in the new termination letters were the same or overlapped with the DEI-related excerpts that Defendants had previously quoted as the basis for discontinuing the TRIO grant in the original notices of non-continuation. On information and belief, these DEI-related excerpts include statements that the grantees included in the application pursuant to the GEPA Equity Directive and the original grant competition priorities. Although the *COE* court had concluded that plaintiffs were likely to succeed on their claim that Defendants were required to follow the federal civil rights procedural requirements under Title VI and Title IX before discontinuing grants, *see COE*, 2026 WL 120984, at *14, Defendants did not follow those requirements before terminating the TRIO grants.

91. The *COE* plaintiffs noted that Defendants issued continuation awards to grants under one of the TRIO programs, known as McNair grants, but terminated grants under the other TRIO programs. *COE*, Dkt. # 47 at p. 3. Defendants' declarant, Murray Bessette, explained that, due to the nature of the McNair program, which included race-based classifications in its

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

authorizing statute, Defendants "determined that a potential termination of the McNair program grantees for race-based project activities could be interpreted as a termination that would require the Department to satisfy the requisite procedures of Title VI." *Id.*, Dkt. # 53-1 ¶ 7. As a result, Defendants continued the McNair grants and directed grantees to operate their "McNair grant awards in a race-neutral manner". *Id.* ¶¶ 8–9. Bessette distinguished the decision to *continue* McNair grants from the decision to *terminate* the other TRIO grants, explaining that the TRIO termination notices "provided a novel explanation of the activities to be performed under the awards that no longer effectuate the program goals or the Department's priorities," and that "[n]one of the notices of termination… indicated that the identified project activities represented a failure or threatened failure to comply with Title VI or Title IX." *Id.* ¶ 6. However, the excerpts that Defendants quoted in the termination letters show that Defendants terminated the other TRIO grants due to Defendants' view that DEI activities are generally inconsistent with federal civil rights law, as reflected in the February and June Directives.

92. In another case, Defendants discontinued magnet school grants to schools within the New York City Public Schools (NYCPS) system. *Bd. of Educ. of City Sch. Dist. of City of New York v. U.S. Dep't of Educ.*, No. 1:25-cv-08547-AS, 2026 WL 948205, at *1 (S.D.N.Y. Apr. 8, 2026). Although Defendants had sought to enforce NYCPS's compliance with Title IX, Defendants did not follow Title IX's procedural requirements before discontinuing the grants. *See id*. at *6. Defendants claimed they did not need to follow Title IX procedures because they discontinued the grants under the continuation regulation's best interest determination, 34 C.F.R. § 75.253(a)(5). *Id*. The court rejected this argument. *See id*. at *6–7.

93. Further, shortly after the Department issued the February Directive, Defendants attempted to use 2 C.F.R. § 200.340(a)(4) to terminate, effective immediately, some other grants authorized by the Elementary and Secondary Education Act of 1965 (ESEA), without complying with GEPA's procedural requirements because Defendants contend they didn't apply. *See, e.g., In re St. Louis University*, No. 25-11-GT, 2025 WL 2256478, at *1–2, *4 (ED. O.H.A. July 10,

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

2025); *In re University of St. Thomas*, No. 25-09-GT, 2025 WL 2256477, at *1–3 (ED. O.H.A. July 10, 2025); *In re Cleveland State University*, No. 25-12-GT, 2025 WL 4740230, at *1, *7–8 (ED. O.H.A. May 15, 2025).[3] The Department's Administrative Law Judges rejected these arguments, concluding that grant terminations are subject to the GEPA procedural requirements, and they exercised jurisdiction under GEPA to hear the grantees' challenges to the grant terminations. *See* 20 U.S.C. § 1234d; *St. Louis*, 2025 WL 2256478, at *5–7; *St. Thomas*, 2025 WL 2256477, at *7–8; *Cleveland*, 2025 WL 4740230, at *9–13.

**G.    OMB's Termination Regulation Does Not Allow Termination Based on New Priorities or Without This Option Expressly Stated in Grants**

94.    The text and rulemaking history of the OMB Uniform Guidance make plain that 2 C.F.R. § 200.340(a)(4) permits termination in only limited circumstances, specifically where the grant can no longer feasibly achieve its original objectives. Section 200.340(a)(4) does not confer upon federal agencies a broad power to terminate grants on a whim based on newly identified agency priorities. Nor does it allow federal agencies to override statutory requirements, as it limits termination "to the extent authorized by law."

95.    Additionally, Section 200.340(a)(4) cannot be used to terminate existing grants if the award terms and conditions do not clearly and unambiguously specify that the award can be terminated when it "no longer effectuates the program goals or agency priorities." That is abundantly clear from the plain text of Section 200.340(a)(4) itself, an adjacent clause of the same regulation, over a decade of rulemaking history, and recent case law.

96.    As with EDGAR, the OMB Uniform Guidance makes clear that priorities are set at the start of a grant competition. 78 Fed. Reg. 78590, 78621–22 (Dec. 26, 2013) (setting forth 2 C.F.R. §§ 200.202, 200.203). As with NIAs, Notices of Funding Opportunities "must include . . . [t]he general purpose of the funding and what it is expected to achieve for the public good"; "[t]he Federal agency's funding priorities or focus areas, if any"; and the "outcomes the

---

[3] Based on the procedural history, the decision's issue date of "May 15, 2025" is a clerical error.

Federal agency expects recipients to achieve." *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30204 (Apr. 22, 2024) (App'x I to Part 200—Full Text of Notice of Funding Opportunity). This required information includes a "program description" that "must include . . . [t]he general purpose of the funding and what it is expected to achieve for the public good"; "[t]he Federal agency's funding priorities or focus areas, if any"; and the "outcomes the Federal agency expects recipients to achieve." *Id.* And once selections are made, federal agencies "must include" in each award all the general terms and conditions as well as any agency- or program-specific terms and conditions. 78 Fed. Reg. at 78623–24 (2 C.F.R. §§ 200.210(b), (c)). The award must also clearly specify the "expected performance" of the grantee as well as "the outcomes intended to be achieved by the program." *Id.* at 78624 (2 C.F.R. § 200.210(d)).

97. While termination is a remedy for noncompliance, the federal agency is required to first determine if "imposing additional conditions" could remedy the failure before taking action to terminate an award. *Id.* at 78637–38 (2 C.F.R. § 200.338).

98. In 2020, OMB added the clause that is now 2 C.F.R. § 200.340(a)(4), as 2 C.F.R. § 200.340(a)(2), to the termination regulation. 85 Fed. Reg. 49506, 49507–08 (Aug. 13, 2020). This clause states an agency may terminate an award if the award "no longer effectuates the program goals or Federal awarding agency priorities." *Id*.

99. OMB explained that "the intent" in adding this clause was "to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals." *Id.* at 49507. For example, the clause permits termination where post-award "evidence reveals that a specific award objective is ineffective at achieving program goals" or where "additional evidence" causes the agency "to significantly question the feasibility of the intended objective of the award." *Id.* at 49507–08. OMB did not suggest, however, that the clause enabled agencies to terminate awards mid-grant due to new agency priorities not contemplated at the time of the grant. To the contrary, in response to comments "express[ing] a concern that [this clause] will provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

cause," OMB firmly stated that the Clause did *not* empower agencies "to terminate grants arbitrarily." *Id.* at 49509.

100.   In 2024, OMB again updated the termination regulation. 89 Fed. Reg. 30046 (April 22, 2024). The 2024 Final Rule renumbered former Section 200.340(a)(2) to current Section 200.340(a)(4). *See id*. at 30089. The 2024 Final Rule also expressly clarified that a federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id*. at 30169; 2 C.F.R. § 200.340(b).

101.   In the 2024 Final Rule, OMB explained that this revision continued to permit termination of an award "pursuant to the terms and conditions of the Federal award," and that "this may include a term and condition allowing termination . . . to the extent authorized by the law, if an award no longer effectuates the program goals or agency priorities." 89 Fed. Reg. at 30089. OMB further explained, "Provided that the language is included in the terms and condition of the award, [the new Section 200.340(a)(4)] continues to allow Federal agencies and pass-through entities with authority to terminate an award in the circumstances described in [the former Section 200.340(a)(2)] in the prior version of the guidance." *Id*. OMB concluded that "the final version of the guidance provides greater clarity on the policy for termination of awards by the Federal agency or pass-through entity by underscoring the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id.*

102.   On information and belief, prior to January 20, 2025, the Department had never invoked 2 C.F.R. § 200.340(a)(4)—or its predecessor, 2 C.F.R. § 200.340(a)(2)—to terminate any discretionary grant award on the grounds that the award does not effectuate new "agency priorities" identified after the time of the award.

**H.   The Directives and the *Washington* Plan Are Final Agency Actions**

103.   Defendants' Directives and the *Washington* Plan each constitute "final agency action" subject to review under the APA.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

104. The February Directive announced new funding criteria and initiated mass review and termination of grants based on those criteria. *See, e.g., S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 59 (D.D.C. 2025); *California v. U.S. Dep't of Educ.*, 2025 WL 3165713, at *6–7 (D. Mass. 2025). It also changed the Department's approach from its long-standing practice of making termination decisions based on changes in the awards that failed to meet established priorities, to one based on established awards failing to meet new priorities. As a consequence of the February Directive, the Protected Grants were identified as failing to meet these new priorities (see April 2025 discontinuances) and now face termination on the same or similar basis, starting on July 31, 2026. It thus meets the definition of final agency action, which must constitute the consummation of an agency's decision-making process from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

105. The June Directive announced new review criteria to be used in continuation awards and directed Department staff to discontinue grants based on those criteria. *See, e.g.,* Complaint ¶¶142–46, *Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 1:25-cv-03514-TSC, 2025 WL 2797678, (D.D.C. Sept. 30, 2025), Dkt. # 1 (discontinuing TRIO grants based on same priorities); Complaint ¶¶ 92–95, *California v. U.S. Dep't of Educ.*, No. 4:26-cv-05549-HSG (N.D. Cal. June 9, 2026), Dkt. # 1. The June Directive continues to apply the same new, unpublished priorities announced in the February Directive, "merit, fairness, and excellence in education," as a basis for funding decisions. It also changed the Department's approach to GEPA equity measures, from requiring and approving them as part of the application review process, to now, using those same measures as a basis for ending funding. As a consequence of the June Directive, the Protected Grants were identified as failing to meet these new priorities (see Fall 2025 reconsideration denials) and now face termination on the same or similar basis, starting on July 31, 2026. Therefore, the June Directive also constitutes final agency action subject to review under the APA.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

106. The *Washington* Plan is definite and certain enough to be a final agency action as well. *See Nat'l Lab. Rel. Bd. v. Siren Retail Corp.*, 99 F.4th 1118, 1123 (9th Cir. 2024) (the requirement for final agency action is applied in a "pragmatic and flexible manner" (quoting *Saliba v. SEC*, 47 F.4th 961, 967 (9th Cir. 2022)). The *Washington* Plan is Defendants' plan to target the Protected Grants and terminate "some or all" of these grants under 2 C.F.R. § 200.340(a)(1) and/or § 200.340(a)(4), for failing to meet the unpublished priorities announced in the February and June Directives. On June 10, 2026, Defendants publicly announced this plan to "terminate some or all of the [Protected Grants]" beginning on July 31, 2026, provided Judge Evanson issues a clarification ruling in their favor by July 30, 2026. *Washington*, Dkt. # 437 at pp. 1–2. The *Washington* Plan has legal consequences, because, if this Court issues a ruling favorable to Defendants by July 30, then starting on July 31, 2026, Department staff will begin to make their individualized termination decisions for each Protected Grant, ultimately terminating "some or all" of the Protected Grants for failing to meet these new agency priorities. The *Washington* Plan is definite and certain enough that Defendants can begin executing the plan the day after the Court's ruling, came to the *Washington* court to seek permission to carry it out, and alerted the Ninth Circuit that their appeal of this Court's summary judgment order may become moot if permission to terminate is granted. It is therefore challengeable under the APA.

## I. Harmful Impact of the Department's Directives and the *Washington* Plan on Plaintiff States

107. Defendants' Directives and the *Washington* Plan will cause Protected Grants to end. The same harm from losing grants due to discontinuances, established in *Washington*, No. 2:25-cv-01228-KKE, will occur if the terminations take place. Plaintiff States established numerous irreparable harms flowing from the permanently enjoined discontinuance decisions, such as the immediate cessation of mental health services to students in rural and underserved parts of Plaintiff States, staff layoffs in Grantee programs, a steep decline in graduate student

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

32

retention in Grant-funded training programs, the termination of ongoing scholarships and research projects, and the dismantling of the workforce development programs in Plaintiff States that the grants were intended to promote. *See, e.g.*, *Washington*, Dkt. # 193 at pp. 16–20; *id.*, Dkt. # 269 at pp. 31–32. These same harms would be caused by the threatened terminations.

108.    Plaintiff States have also demonstrated the irreparable harm that ending any Protected Grant within Plaintiff States inflicts on Plaintiff States' education agencies and mental health systems, for which money damages are inadequate to ameliorate. *See id.*, Dkt. # 269 at pp. 31–32.

109.    Loss of any of the Protected Grants in Plaintiff States will require Plaintiff States to incur additional Medicaid expenditures for students who previously accessed mental health services at school. Further, even supposing that state Medicaid programs could step in immediately to provide care in the event of a termination, which they could not, it would disrupt the provision of effective therapeutic care for students by changing their providers from known and familiar ones, in an environment that means students don't have to leave school to receive services, funded through the grant programs at issue.

110.    For example, the Medicaid Director for the Oregon Health Authority has explained that:

> While community-based services cost the same as similar school-based services, taking youth away from schools to receive services has additional impacts that result in higher levels of cost for the families and the state in transportation, wages lost, and beyond. Youth who do not receive services in a timely manner may require higher levels of care, including crisis intervention services, which come at a higher cost to the state ($112.87 per 15 minutes) than outpatient services, require more state resources, and in rural counties may also place a burden on first responders outside the cost of healthcare services. Delayed initiation of care often results in need for more intensive services in addition to outpatient care. The highest levels of inpatient services may be provided in specialty hospitals or facilities and cost Oregon a daily rate of $972.93 for psychiatric residential treatment services, and $1,630 for secure inpatient residential treatment.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

33

111.    The lack of accessible services at school resulting from the unlawful termination of the Protected Grants would also increase the burden on Plaintiff States to provide an appropriate education to students entitled to mental health services.

112.    For example, the State Superintendent of Education for the Illinois State Board of Education ("ISBE") described the increasing burdens facing his state because of the loss of grant funding:

> In recent years, parents have filed an increasing number of due process hearing requests and state special education complaints with ISBE. To address the growing complaint volume, ISBE has since 2023 contracted with private attorneys to investigate and adjudicate due process complaints. During the 2024–2025 school year, ISBE spent a total of $417,000 responding to due process hearing requests.

> As the shortage of school-based mental health providers Illinois already experiences is exacerbated by the non-continuation of federal grants to Illinois school districts and universities, ISBE anticipates that parents will increasingly request mediation and file state special education and due process complaints in an effort to obtain necessary school-based mental health services for their children.

113.    In sum, Defendants' Directives and the *Washington* Plan will cause immediate and irreparable harm, not only to Plaintiffs, but also their youth experiencing mental health crises, the school-based mental health service provider workforce pipeline, education agencies, mental health care system, and partnering institutions of higher education—as the *Washington* court already concluded. Without vacating and enjoining these unlawful actions, Plaintiffs will suffer immediate and irreparable harm from the loss of critical grants supporting mental health services and a brighter, better, and safer future for their youth.

## V.    CAUSES OF ACTION

**Count I**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**February Directive**
**June Directive**
***Washington* Plan**
**Arbitrary and Capricious**

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

34

114.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

115.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

116.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Directives and the *Washington* Plan are final agency actions subject to review under the APA.

117.    The Directives are arbitrary and capricious because Defendants relied on factors which Congress has not intended it to consider. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). First, pursuant to the GEPA Equity Directive, Congress required grant applicants to describe in their applications the steps they would take to ensure equity in their programs. 20 U.S.C. § 1228a; *see also* 34 C.F.R. § 75.210(d). Yet, pursuant to the Directives and the *Washington* Plan, Defendants will direct Department staff to review Protected Grants' GEPA Equity statements to decide whether to end funding. The Department's consideration of GEPA Equity statements when deciding to terminate is arbitrary and capricious. Second, Congress requires that the Department publish priorities before considering new grant award applications; Congress did not intend for these rules to be applied retroactively to terminate existing grants. 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d); 34 C.F.R. § 75.105; 2 C.F.R. § 200.340(a)(4). The Department's retroactive application of new priorities is arbitrary and capricious.

118.    Additionally, the Directives are arbitrary and capricious because Defendants violated the "[t]he change-in-position doctrine," which prevents agencies from "mislead[ing] regulated entities." *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025). "Under that doctrine, '[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that [they are] changing position,' and 'consider

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

35

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

serious reliance interests.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).

119. Defendants' February Directive changed: (1) its interpretation of 2 C.F.R. § 200.340, as the Department's prior policy did not allow termination based on a change in priorities, and the February Directive directed Department staff to terminate grants based on changed priorities; and (2) its prior policy of giving grantees an opportunity to come into compliance before taking any remedial actions, *Discretionary Grantmaking* at 37.

120. Defendants' June Directive changed: (1) its interpretation of the continuation regulation, as the Department's prior policy required the Department to consider grant performance based on established priorities, and the June Directive directed Department staff to discontinue grants based on new priorities and language in the grant application without any regard to grant performance; (2) its approach of requiring grantees to provide GEPA Equity statements in their grant applications in order to receive funding, to ending funding based on these very same statements; and (3) its prior longstanding policy of working with grantees to resolve any issues and giving grantees an opportunity to come into compliance before taking any remedial actions, *Discretionary Grantmaking* at 37.

121. On information and belief, Defendants' *Washington* Plan changed: (1) their interpretation of 2 C.F.R. § 200.340, as the Department's prior policy did not allow termination based on a change in priorities, and the *Washington* Plan directed Department staff to terminate grants based on changed priorities; (2) its prior policy of giving grantees an opportunity to come into compliance before taking any remedial actions, *Discretionary Grantmaking* at 37; and (3) its prior policy of affording grants covered by GEPA an administrative hearing and appeal prior to terminating grants, 34 C.F.R. § 75.903(c); 20 U.S.C. §§ 1234d, 1234g.

122. In changing their position, Defendants failed all three requirements of the change-in-position doctrine. Defendants provided the public with no explanation. The Directives and the *Washington* Plan were issued in secret. Defendants' Directives and the *Washington* Plan do not

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

36

display an awareness that they were changing their position, nor do they consider grantees serious reliance interests when doing so.

123.    The February Directive has already caused Department staff to identify certain grants in Plaintiff States as being inconsistent with Defendants' new priorities because they supported DEI. Now that the subsequent discontinuances have been ruled unlawful, Defendants intend to use the same policy to terminate some or all of these Protected Grants, causing Plaintiff States substantial injury, including immediate and irreparable harm.

124.    On information and belief, the June Directive has already caused Department staff to identify certain grantees in Plaintiff States as purportedly discriminatory. Now that the subsequent reconsideration request denials have been ruled unlawful, Defendants intend to use the same policy to terminate some or all of these Protected Grants, causing Plaintiff States substantial injury, including immediate and irreparable harm.

125.    On information and belief, the *Washington* Plan has already caused Department staff to notify Protected Grantees that, starting July 31, they intend to unlawfully terminate some or all of their grants without first affording a GEPA hearing, causing Plaintiff States substantial injury, including immediate and irreparable harm.

126.    Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to judgment on this claim and an order holding unlawful, staying and then vacating Defendants' Directives and the *Washington* Plan, as applied to the Protected Grants, and preliminarily and permanently enjoining Defendants from implementing, maintaining, or reinstating the Directives and the *Washington* Plan, or any materially similar policies, as applied to the Protected Grants.

**Count II**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
***Washington* Plan**
**Arbitrary and Capricious**

127.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

128. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

129. The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the *Washington* Plan is a final agency action subject to review under the APA.

130. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Defendants have an obligation to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *U.S. Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (citation omitted).

131. An agency action is also arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation modified).

132. The *Washington* Plan is arbitrary and capricious because it is without reason. Defendants continue to persecute Protected Grantees for meeting the very same "diversity" priorities that were met by other Program grantees that Defendants did not discontinue and that have remained fully funded.

133. The *Washington* Plan is arbitrary and capricious because the Department does not intend to examine the relevant data or articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *See U.S. Dep't of Com.*, 588 U.S. at 773. The relevant data for terminating grants based on non-compliance with program priorities is whether the grants comply with the original grant priorities established through required notice-and-comment rulemaking via publication in the Federal Register. *See* 20 U.S.C. § 1232; 34 C.F.R. § 75.105. Instead, Defendants plan to terminate the Protected Grants based on their failure to effectuate new, unpublished priorities. Further, Defendants rely on language in the grant application, rather than the current operation of the grant, to determine whether the

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

38

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

grant is inconsistent with these new priorities. And although Defendants informed grantees of the *Washington* Plan on June 30, 2026, they have yet to provide an explanation to grantees for why they are planning to terminate grants that have been meeting or exceeding performance measures, let alone a satisfactory explanation.

134.    The *Washington* Plan is arbitrary and capricious because Defendants intend to rely on factors which Congress has not intended it to consider. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Pursuant to the GEPA Equity Directive, Congress required grant applicants to describe in their applications the steps they would take to ensure equity in their programs. Yet, as part of the *Washington* Plan, Defendants intend to review each Protected Grant's GEPA equity statement to decide whether to terminate that grant. Further, given Congress requires the Department to attempt to secure voluntary compliance with federal civil rights law before terminating grants that are purportedly inconsistent with the Department's interpretation of those laws, Congress intended for the Department to consider how the grant is currently operating, not what the grantee said in the initial grant application. The Department's consideration of GEPA equity statements when deciding to terminate is arbitrary and capricious. Second, Congress requires that the Department publish priorities before considering new grant award applications; it did not intend for these priorities to be considered and applied retroactively to terminate existing grants. 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d); 34 C.F.R. § 75.105; 2 C.F.R. § 200.340(a)(4). The Department's plan to retroactively apply new priorities is arbitrary and capricious.

135.    Defendants' *Washington* Plan has caused and will cause Protected Grantees immediate and irreparable harm.

136.    Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to judgment on this claim and an order holding unlawful, staying and then vacating the *Washington* Plan, and preliminarily and permanently enjoining Defendants from implementing, maintaining, or reinstating the *Washington* Plan, or any materially similar policy.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

39

**Count III**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**February Directive**
***Washington* Plan**
**Contrary to Law - 2 C.F.R. § 200.340(a)(4) (2024)**

137.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

138.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

139.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the February Directive and the *Washington* Plan are final agency actions subject to review under the APA.

140.    When a federal agency has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265, 268 (1954). It is contrary to law for an agency to disregard its own regulations and policies. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003); *Wallace v. Christensen*, 802 F.2d 1539, 1552 n.8 (9th Cir. 1986) (an agency is "bound by its own regulations so long as they remain in force"); *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) ("Pursuant to the *Accardi* doctrine, an administrative agency is required to adhere to its own internal operating procedures."); *Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 246 (D.C. Cir. 2003).

141.    Defendants' February Directive and the *Washington* Plan are contrary to law because they violate Defendants' termination regulation.

142.    Defendants rely on 2 C.F.R. § 200.340(a)(4), which only authorizes termination (1) "pursuant to the terms and conditions of the federal award," only (2) "if an award no longer effectuates the program goals or agency priorities," and only (3) "to the extent authorized by law." 2 C.F.R. § 200.340(a)(4) (2024).

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

143.    Defendants' February Directive and the *Washington* Plan fail all three prongs. First, the grant terms and conditions do not allow for this type of termination, and so by directing Department staff to terminate grants irrespective of these terms and conditions without also directing Department staff to review said terms and conditions to first determine if this termination provision was included in the grant terms and conditions, Defendants violated Section 200.340(a)(4). Second, both agency actions violate the termination regulation by terminating grants for failing to meet new priorities, when the regulation only permits termination for failure to effectuate agency priorities that were in place at the time grantees crafted their grant applications and accepted their grant awards. Third, Defendants cannot use Section 200.340(a)(4) to override constitutional and statutory requirements.

144.    Defendants' February Directive and the *Washington* Plan have caused and is causing substantial injury, including immediate and irreparable harm.

145.    Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to judgment on this claim and an order holding unlawful, staying and then vacating the February Directive, as applied to the Protected Grants, and the *Washington* Plan, and preliminarily and permanently enjoining Defendants from implementing, maintaining, or reinstating the February Directive, as applied to the Protected Grants, and the *Washington* Plan, or any materially similar policy.

**Count IV**
**Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (D)**
**February Directive**
**June Directive**
**_Washington_ Plan**
**Notice and Comment**

146.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

41

147.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).

148.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Directives and the *Washington* Plan are final agency actions subject to review under the APA.

149.    The APA requires agencies to follow certain procedures when it decides to issue a rule, including: publishing notice of the proposed rule-making in the Federal Register, 5 U.S.C. § 553(b); and providing a period for interested persons to comment on the proposed rule, which comments will be considered by the agency prior to adopting the rule, *id.* at § 553(c).

150.    "In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decision-making require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979); *see also Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir.1992) ("[T]he notice and comment requirements . . . are designed to ensure public participation in rulemaking."). "Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid." *Idaho Farm Bureau Fed. v. Babbit,* 58 F.3d 1392, 1405 (9th Cir. 1995).

151.    Under GEPA, Defendants are required to follow the APA's notice-and-comment rulemaking procedure when changing the requirements for grants. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

152.    Defendants cannot terminate or discontinue Plaintiffs' grants based on changed priorities, but even if they could, they may not do so without following the proper procedures.

153.    Without having proceeded through notice-and-comment procedures, Defendants' Directives and the *Washington* Plan are procedurally invalid under the APA, because they use new, unpublished priorities to end grant funding.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

42

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

154. Defendants' Directives and the *Washington* Plan have caused and are causing substantial injury, including immediate and irreparable harm.

155. Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to judgment on this claim and an order holding unlawful, staying and then vacating Defendants' Directives and the *Washington* Plan, as applied to the Protected Grants, and preliminarily and permanently enjoining Defendants from implementing, maintaining, or reinstating the Directives and the *Washington* Plan, or any materially similar policies, as applied to the Protected Grants.

**Count V**
**Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A),(D)**
**February Directive**
***Washington* Plan**
**Violations of GEPA Procedural Protections**

156. Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

157. The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

158. The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the February Directive and the *Washington* Plan are final agency actions subject to review under the APA.

159. The February Directive and the *Washington* Plan are governed by the statutes and regulations providing procedural protections to grant recipients of certain financial assistance funds administered by Defendants. *See, e.g.*, 20 U.S.C. §§ 1234(a)(2), 1234i(1), (2), 1234d, and 1234g; 34 C.F.R. § 75.903. The Protected Grants are under an "applicable program" and qualify for these procedural protections, which afford notice, a hearing, and judicial review *before* the Department may withhold payments. *Id*. § 1234d(b) ("Before withholding payments . . ."), § 1234g(a), (b) (staying administrative action until completion of judicial review by the Court

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

of Appeals); 34 C.F.R. § 75.903(c) (termination may only become effective after relevant administrative appeals have concluded).

160.    On information and belief, instead of complying with these procedural protections, Defendants plan to terminate grants, effective immediately, without an administrative hearing or judicial review. The February Directive and the *Washington* Plan make no mention of these procedural protections, let alone direct Department staff to comply with them. Defendants have also erroneously contended GEPA procedural protections do not apply when the Department terminates a grant. *See, e.g.*, *St. Louis*, 2025 WL 2256478, at *1–2; *St. Thomas*, 2025 WL 2256477, at *1–2; *Cleveland*, 2025 WL 4740230, at *7. Defendants have informed Protected Grantees that should Defendants terminate the Protected Grants, grantees can only contest these terminations in the Court of Federal Claims.

161.    Defendants' February Directive and the *Washington* Plan have caused and are causing substantial injury, including immediate and irreparable harm.

162.    Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to judgment on this claim and an order holding unlawful, staying and then vacating Defendants' February Directive and the *Washington* Plan, as applied to the Protected Grants, and preliminarily and permanently enjoining Defendants from implementing, maintaining, or reinstating the February Directive and the *Washington* Plan, or any materially similar policies, as applied to the Protected Grants.

**Count VI**
**Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A),(D)**
**February Directive**
**June Directive**
**Washington Plan**
**Procedural Violations for Alleged Civil Rights Violations**

163.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

44

164.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Directives and the *Washington* Plan are final agency actions subject to review under the APA.

165.    The Directives and the *Washington* Plan are governed by the statutes and regulations governing civil rights protections in federally assisted programs (*see, e.g.*, 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682; 34 C.F.R. § 100.1 et seq.).

166.    Pursuant to the Directives and the *Washington* Plan, Department staff will terminate Protected Grants in part because their projects allegedly violate the terms and conditions of their award under 2 C.F.R. § 200.340(a)(1) because they allegedly "violate the letter or purpose of Federal civil rights law"—relying on a term that was taken from the June Directive and added to the Protected Grants' grant award notices in January 2026.

167.    34 C.F.R. § 75.500 outlines the requirements for grantees to comply with federal civil rights laws and specifically cites Title VI and Title IX.

168.    Title VI prohibits discrimination on the basis of race, color, or national origin in any program receiving federal financial assistance. *See* 42 U.S.C. § 2000d. Further, Title VI authorizes and directs "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant . . . to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U.S.C. § 2000d-1.

169.    In addition to requiring compliance by programs receiving federal funding, Title VI requires an agency administering federal funds to follow specific steps to enforce compliance.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

45

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

170.    Specifically, Title VI provides that no action refusing to grant federal financial assistance "shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." *Id.*

171.    If an agency cannot secure voluntary compliance with Title VI, it may terminate funding. But refusing to provide funding requires "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement." *Id.*

172.    Once the agency has terminated financial assistance, the head of the agency "shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." Any department action terminating financial assistance does not "become effective until thirty days have elapsed after the filing of such report." *Id.* Agency actions under Title VI are subject to judicial review. *Id.* § 2000d-2.

173.    Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681. Title IX's procedural requirements and enforcement mechanisms mirror those of Title VI and also require an agency to first seek voluntary compliance before terminating funding, and subject agency actions under Title IX to judicial review. *See* 20 U.S.C. §§ 1682, 1683.

174.    The Department's regulations outline a detailed process for Title VI compliance. 34 C.F.R. Part 100 "effectuate[s] the provisions of title VI of the Civil Rights Act of 1964." 34 C.F.R. § 100.1.

175.    34 C.F.R. Part 100 "applies to any program to which Federal financial assistance is authorized to be extended to a recipient under a law administered by the Department.

176.    34 C.F.R. § 100.6 provides that "the responsible Department official shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with this part and shall provide assistance and guidance to recipients to help them comply voluntarily with this part."

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

46

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

177.    34 C.F.R. § 100.8 provides that "[i]f there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law."

178.    34 C.F.R. § 100.8(c) provides that "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means," (2) "there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part," and (3) "the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action."

179.    34 C.F.R. § 106.81 applies the Title VI procedural regulations at 34 C.F.R. §§ 100.6-.11 and 34 C.F.R. part 101 to the regulations implementing Title IX.

180.    The Directives and the *Washington* Plan violate these procedural protections. They direct Department staff to end funding for the Protected Grants for allegedly being inconsistent with Defendants' view of federal civil rights requirements without informing grantees about any failure or threatened failure to comply with Title VI or Title IX, without seeking voluntary compliance, without an opportunity for a hearing, and accordingly, without an express finding on the record that any of the grantees failed to comply with Title VI or Title IX, and without a full written report of the circumstances and the grounds for discontinuing or terminating the grants with the Senate Committees on Health, Education, Labor, and Pensions or the House Committee on Education and the Workforce. On information and belief,

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

47

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

Defendants do not plan to comply with these procedural protections under Title VI or Title IX before ending the Protected Grants—consistent with their actions in *COE* and *NYCPS*.

181.   Consequently, Defendants act contrary to law and without observance of procedure.

182.   Defendants' Directives and the *Washington* Plan have caused and are causing substantial injury, including immediate and irreparable harm.

183.   Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to judgment on this claim and an order holding unlawful, staying and then vacating Defendants' Directives and the *Washington* Plan, as applied to the Protected Grants, and preliminarily and permanently enjoining Defendants from implementing, maintaining, or reinstating the Directives and the *Washington* Plan, or any materially similar policies, as applied to the Protected Grants.

**Count VII**
**February Directive**
**June Directive**
***Washington* Plan**
**Substantive Violation of the Spending Clause**

184.   Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

185.   Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

186.   The Spending Clause of the U.S. Constitution, Article I, Section 8, Clause 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

187.   The Spending Clause requires States to have fair notice of the conditions that apply to the disbursement of funds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18, 25 (1981); *Landor v. La. Dep't of Corrs. and Pub. Safety*, 2026 WL 1791277, at *6

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

48

(U.S. June 23, 2026) (conditions may "apply only to those who have knowingly and voluntarily agreed to them"). Agencies must set out funding conditions "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 & n.6 (9th Cir. 2019) (applying Spending Clause constraints to "middleman agencies" charged with administering funds). This requirement flows from the Spending Clause principle that States must "voluntarily and knowingly" accept conditions attached to federal spending. *Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17). States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17). The requirement of unambiguous conditions "enable[s] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17. Defendants' Directives and the *Washington* Plan impose new conditions that fail these requirements in three ways.

188.    *First*, the new priorities announced in the February and June Directives of "merit, fairness, and excellence in education" and to be imposed by the *Washington* Plan are impermissibly ambiguous. *See id*. These terms are so broad they are rife with vagueness and ambiguity. Because Defendants have yet to publish or define these new priorities, giving the opportunity to the public to comment and receive answers from Defendants, it is impossible to discern their meaning. Nor have Defendants provided any clarifying guidance defining more precisely what is meant by these terms. Accordingly, the Directives and the *Washington* Plan are "fatally ambiguous because [they] fail[] to clarify what conduct is proscribed." *See San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 746 (N.D. Cal. 2025) (quotation omitted).

189.    *Second*, Defendants' Directives and the *Washington* Plan retroactively impose their new priorities. To give grantees sufficient notice of the applicable conditions for these awards, the Department had published priorities, requirements, and definitions in the Federal

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

49

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

Register before grantees competed for and accepted their grant awards. *See, e.g.*, 87 Fed. Reg. 47159, 47164–65 (Aug. 2, 2022). The new priorities announced in the February and June Directives and imposed by the *Washington* Plan are retroactive conditions which the Department determined may be applied retroactively to discontinue existing grants.

190.    *Third*, to the extent that the Department now seeks to eliminate equity measures through its Directives and the *Washington* Plan, this anti-equity condition is impermissibly retroactive and unrelated to purpose of the Programs, the GEPA Equity Directive, and the final rulemaking priorities governing the Programs. *See South Dakota v. Dole*, 483 U.S. 203, 207, 209 (1987) ("[C]onditions on federal grants" must be "reasonably calculated to address th[e] particular . . . purpose . . . for which the funds are expended.").

191.    Defendants' Directives and the *Washington* Plan have caused and are causing substantial injury, including immediate and irreparable harm.

192.    For the foregoing reasons, Plaintiffs are entitled to a preliminary and permanent injunction barring Defendants from implementing, maintaining, or reinstating the Directives and the *Washington* Plan, or any materially similar policies, as applied to the Protected Grants, and a declaration pursuant to 28 U.S.C. § 2201, declaring unconstitutional the Directives and the *Washington* Plan and any action taken to enforce or implement them.

**Count VIII**
**Equitable Ultra Vires**
**Conduct Outside the Scope of Statutory Authority Conferred on the Executive**

193.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

194.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327. Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

50

195.    The Department, through its officials, may exercise only the authority conferred by statute and regulations.

196.    Defendants do not have authority to terminate Plaintiffs' grants based on a change in priorities after grants were issued in accordance with the GEPA Equity Directive and final grant program priorities following statutorily required notice and comment process. Defendants' Directives and the *Washington* Plan are contrary to law and outside of Defendants' authority.

197.    The Directives and the *Washington* Plan place new, retroactive, ambiguous, and unrelated conditions on the grants, and the Defendants encroached upon Congress's Spending Clause authority, and thereby acted ultra vires.

198.    Defendants' Directives and the *Washington* Plan have caused and are causing substantial injury, including immediate and irreparable harm.

199.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' Directives and the *Washington* Plan are ultra vires and therefore unlawful.

200.    Plaintiffs are also entitled to a preliminary and permanent injunction barring Defendants from implementing, maintaining, or reinstating the Directives or the *Washington* Plan, or any materially similar policies, as applied to the Protected Grants.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.    Set a hearing on July 24, 2026, to determine, in conjunction with Defendants' motion for clarification in *Washington v. U.S. Department of Education*, No. 2:25-cv-01228-KKE (W.D. Wash.), whether this Court should enter a preliminary injunction or a temporary restraining order;

b.    Pursuant to 5 U.S.C. § 705, stay the Directives and the *Washington* Plan as applied to the Protected Grants;

c.    Pursuant to 5 U.S.C. § 706(2), hold unlawful and vacate the Directives and the *Washington* Plan as applied to the Protected Grants;

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

51

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

d.      Temporarily restrain or issue preliminary injunctive relief and permanent injunctive relief barring Defendants from implementing or enforcing the Directives and the *Washington* Plan as applied to the Protected Grants, or any materially similar policies, pending further orders from this Court, including enjoining Defendants from terminating or withholding federal financial assistance as applied to the Protected Grants without satisfying the requirements under 20 U.S.C. § 1232i, 20 U.S.C. § 1234d, 42 U.S.C. § 2000d-1, 20 U.S.C. § 1682 and their implementing regulations;

e.      Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that 2 C.F.R. § 200.340 (2024) does not independently permit or authorize termination of awarded grants based on agency priorities identified or promulgated after the time of the Federal award;

f.      Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that terminations under 2 C.F.R. § 200.340 (2024) must comply with 20 U.S.C. § 1234d procedural requirements;

g.      Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that 2 C.F.R. § 200.340 (2024) does not independently permit or authorize termination of awarded grants based on an alleged inconsistency with Title VI or Title IX without complying with federal civil rights procedural requirements;

h.      Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' Directives and the *Washington* Plan as applied to the Protected Grants and actions to effectuate the Directives and the *Washington* Plan are unlawful because they violate the APA;

i.      Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' Directives and the *Washington* Plan as applied to the Protected Grants, and actions to effectuate the Directives and the *Washington* Plan, are unlawful because they violate the Spending Clause;

j.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

k.      Award such other relief as this Court may deem just and proper.

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

52

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

DATED this 10th day of July 2026.

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Jennifer K. Chung*
JENNIFER K. CHUNG, WSBA #51583
ELLEN RANGE, WSBA #51334
Assistant Attorneys General
Complex Litigation Division
WILLIAM MCGINTY, WSBA #41868
CYNTHIA ALEXANDER, WSBA #46019
Deputy Solicitors General
Washington State Office of the Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
Jennifer.Chung@atg.wa.gov
Ellen.Range@atg.wa.gov
William McGinty@atg.wa.gov
Cynthia.Alexander@atg.wa.gov

*Attorneys for State of Washington*

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Sarah H. Weiss*
SARAH H. WEISS*
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
Sarah.Weiss@coag.gov

*Attorney for State of Colorado*

ROB BONTA
Attorney General of California

*/s/ Crystal Adams*
CRYSTAL ADAMS*
Deputy Attorney General
NELI PALMA*
Senior Assistant Attorney General
KATHLEEN BOERGERS*
Supervising Deputy Attorney General
KATHERINE MILTON*
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
916-210-7522
Crystal.Adams@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Katherine.Milton@doj.ca.gov

*Attorneys for State of California*

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

53

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
Vanessa.Kassab@delaware.gov

*Attorneys for the State of Delaware*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Andrew Ammirati*
ANDREW AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorney for State of Connecticut*

KWAME RAOUL
Attorney General of Illinois

*/s/ Emily Hirsch*
EMILY HIRSCH*
Assistant Attorney General
ALEEZA STRUBEL*
Complex Litigation Counsel
Office of the Illinois Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-835-0148
Aleeza.Strubel@ilag.gov
Emily.Hirsch@ilag.gov

*Attorney for State of Illinois*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Michael Drezner*
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us

*Attorney for State of Maryland*

AARON M. FREY
Attorney General of Maine

*/s/ Sarah A. Forster*
SARAH A. FORSTER*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Sarah.Forster@maine.gov

*Attorney for the State of Maine*

DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorney for the State of Michigan*

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

54

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

/s/ Adelaide Pagano
ADELAIDE PAGANO*
Assistant Attorney General
YAEL SHAVIT*
Chief, Consumer Protection Division
Office of the Massachusetts Attorney
General
100 Cambridge Street
Boston, MA 02108
617-963-2122
Adelaide.Pagano@mass.gov
Yael.Shavit@mass.gov

Counsel for the Commonwealth of
Massachusetts


LETITIA JAMES
Attorney General of New York

/s/ Rabia Muqaddam
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
MARK LADOV*
Special Counsel
28 Liberty Street
New York, NY 10005
212-416-8240
Rabia.Muqaddam@ag.ny.gov
Mark.Ladov@ag.ny.gov

Attorneys for the State of New York


RAÚL TORREZ
Attorney General of New Mexico

/s/ Aletheia V.P. Allen
ALETHEIA V.P. ALLEN*
Solicitor General
LAWRENCE MARCUS*
Assistant Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
AAllen@nmdoj.gov
LMarcus@nmdoj.gov

Attorney for State of New Mexico


DAN RAYFIELD
Attorney General of Oregon

/s/ Leanne Hartmann
LEANNE HARTMANN*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
971-673-1880
Leanne.Hartmann@doj.oregon.gov

Attorney for State of Oregon


PETER F. NERONHA
Attorney General of Rhode Island

/s/ Kyla Duffy
KYLA DUFFY*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
Kduffy@riag.ri.gov

Attorney for State of Rhode Island


JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Frances Reynolds Colbert
FRANCES REYNOLDS COLBERT*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-266-9226
Frances.Colbert@wisdoj.gov

Attorney for State of Wisconsin


*Pro hac vice application forthcoming

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

55