**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, et al.,<br><br>Defendants. | NO. 2:26-cv-02409<br><br>PLAINTIFFS' EMERGENCY MOTION FOR EXPEDITED PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, TEMPORARY RESTRAINING ORDER<br><br>NOTE ON MOTION CALENDAR: JULY 24, 2026<br><br>ORAL ARGUMENT REQUESTED |



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 3

A. The MHSP and SBMH Grant Programs ........ 3

B. Defendants Discontinued Program Grants within Plaintiff States ........ 4

C. The *Washington* Lawsuit ........ 7

D. Defendants' Plan to Target the Grants in *Washington* ........ 8

E. Harm to Plaintiff States and their Grantees ........ 9

III. LEGAL STANDARD ........ 11

IV. ARGUMENT ........ 11

A. The *Washington* Plan and the Directives are subject to review under the APA ........ 11

1. The February and June Directives are final agency actions ........ 12

2. The *Washington* Plan is final agency action ........ 13

B. Plaintiffs are Likely to Show the Plan and the Directives Are Contrary to Law ........ 15

1. The *Washington* Plan and the Directives require the Department to review Protected Grants based on priorities not set through notice and comment ........ 15

2. Defendants cannot use 2 C.F.R. § 200.340(a)(4) to terminate existing grants based on new priorities ........ 17

3. Defendants unlawfully deprive Protected Grantees of GEPA procedural protections ........ 19

4. The *Washington* Plan and the Directives terminate grants for alleged discrimination without required procedure ........ 21

C. The *Washington* Plan and the Directives Are Arbitrary and Capricious ........ 22

D. Defendants Retroactively Imposed New, Ambiguous Conditions on Awarded Grants in Violation of the Spending Clause ........ 23

E. Injunctive Relief is Necessary to Avoid Irreparable Harm and is in the Public Interest ........ 25

V. CONCLUSION ........ 26




ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

## I. INTRODUCTION

For the past fourteen months, Defendants have tried to unlawfully end over 100 grants providing critical mental health services to public schoolchildren within Plaintiff States—all because Defendants believe these grants support diversity, equity, and inclusion (DEI).[1] After months of protracted litigation, this Court entered a permanent injunction protecting the grants in *Washington v. U.S. Department of Education*, No. 2:25-cv-01228-KKE (W.D. Wash.) (*Washington*). To circumvent this court order, Defendants now seek to take the same illegal actions through a different procedural mechanism, claiming the injunction only prohibits "discontinuing" grants, not "terminating" them. Defendants filed a motion for clarification in *Washington*, seeking permission to begin terminating "some or all" of the grants on July 31, 2026. Plaintiffs oppose their motion, but because termination would cause the same irreparable harm that necessitated the *Washington* injunction, and this harm is imminent, Plaintiffs bring this new suit and motion for a preliminary injunction. Plaintiffs respectfully request the Court set this motion for hearing on **July 24, 2026**, alongside the motion for clarification hearing in *Washington*, and resolve both motions contemporaneously.[2]

Defendants have not revealed whether they plan to claim termination authority under the guise of the grants' alleged failure to effectuate their new priorities under 2 C.F.R. § 200.340(a)(4) (as they have done in other cases) or the grants' alleged inconsistency with federal civil rights law terms under 2 C.F.R. § 200.340(a)(1) (as their communications indicate they might). Either way, Defendants' plan (the *Washington* Plan) targets the *Washington* grants for termination using the same unpublished priorities (provided in internal February and June

---

[1] Plaintiffs are fifteen states who have grants within their states that were continued pursuant to the permanent injunction in *Washington*.

[2] Counsel for Plaintiffs emailed Brian Kipnis (brian.kipnis@usdoj.gov), Defendants' counsel in *Washington*, in advance of filing to notify his office of Plaintiffs' intention to file this motion. *See* Chung Decl. ¶ 3. If the Court does not grant Plaintiffs' concurrently filed motion for expedited briefing schedule, Plaintiffs request the Court consider this a motion for temporary restraining order.

Directives) that *Washington* enjoins for, among other reasons, failing to meet statutory notice-and-comment rulemaking requirements. It therefore shares this defect.

Plaintiff States are also likely to show the *Washington* Plan and the Directives upon which it is based are unlawful for three additional and independent reasons.

*First*, these actions are contrary to law under the APA. Defendants unlawfully use 2 C.F.R. § 200.340 to justify grant termination based on a failure to effectuate new priorities. They also violate binding procedures under the General Education Provisions Act (GEPA) that require the Department to complete certain administrative steps *before* a termination is effective. *See* 20 U.S.C. §§ 1234d, 1234g(a); 34 C.F.R. § 75.903(c). Defendants also plan to terminate grants based on alleged non-compliance with federal civil rights laws without first providing grantees with procedural protections to which they are entitled under those laws, such as an opportunity to come into compliance or for a hearing. *See* 20 U.S.C. § 1682; 42 U.S.C. § 2000d-1.

*Second*, these actions are arbitrary and capricious. They rely on factors that Congress did not intend Defendants to consider, as the terminations are based on applicant equity statements that Congress required grantees to include in their applications. Defendants also violate the change-in-position doctrine, as they provide no explanation for changing their interpretation of the termination regulation or their longstanding policy of working with grantees before ending grants, and Defendants did not consider reliance interests.

*Third*, Defendants' actions violate the Spending Clause because Defendants' unpublished priorities are fatally ambiguous, impermissibly retroactive, and wholly unrelated to the purpose of these grant programs, which were designed to increase school-based mental health services in high-need schools and encourage graduate students and professionals to pursue and maintain these careers—not to discourage these services or careers by making funding volatile.

The Western District of Washington has already found, multiple times, that allowing Defendants to unlawfully end the protected grants will cause irreparable harm to Plaintiffs,



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

grantees, mental health professionals, universities, schools, students, and others who rely on the grants to provide mental health services to children at high-need public schools within Plaintiff States. *See Washington v. U.S. Dep't of Educ.*, 807 F. Supp. 3d 1275, 1289-92 (W.D. Wash. 2025) (*Washington I*); *Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222, 1246-48 (W.D. Wash. 2025) (*Washington II*). The Court should preliminarily enjoin Defendants from carrying out their Directives and implementing the *Washington* Plan.

## II. STATEMENT OF FACTS

### A. The MHSP and SBMH Grant Programs

Following tragic school shootings in Parkland and Uvalde, Congress created and funded the Mental Health Professional Demonstration Grant Program (MHSP) and School-Based Mental Health Services Grant Program (SBMH) (collectively, "Programs") to increase the number of mental health professionals serving the nation's public schools and providing school-based mental health services to students. *See Washington II*, 813 F. Supp. 3d at 1228-30. Using a competitive grant selection process, the Department awarded Program grants to Plaintiff States and other grantees that would fund mental health services at Plaintiff States' public schools. *See id*. at 1230-31.

The Programs are governed by GEPA and the Department's regulations. *See* 20 U.S.C. § 1221(b)(1); 34 C.F.R. § 75.1(a)(1). With limited exceptions, GEPA requires that rules affecting the Department's grant competitions go through notice-and-comment procedures. *See* 20 U.S.C. §§ 1221e-4, 1232; 5 U.S.C. § 553. Rules subject to notice-and-comment include the priorities used to score and select grants. *See, e.g.*, 34 C.F.R. §§ 75.101(a)(4), 75.105(a), 75.217(a); Chung Decl. Ex. A, at 14-16, 27-28 and Ex. B, at 22-24. Accordingly, prior to each year's MHSP and SBMH grant competitions, the Department publishes the grant priorities for that year's competition, reviews comments, and determines the final priorities used to judge the competition. *See Washington II,* 813 F. Supp. 3d at 1230-31; Chung Decl. Ex. A, at 15-16.

Under Section 427 of GEPA, Congress directs the Secretary to require each grant applicant to describe "the steps such applicant proposes to take to ensure equitable access to, and equitable participation in" Program activities. 20 U.S.C. § 1228a(b) (the GEPA Equity Directive). Applicants must specifically address "the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." *Id.* Accordingly, Defendants' application form directed that "**ALL APPLICANTS. . . MUST INCLUDE INFORMATION IN THEIR APPLICATIONS TO ADDRESS [GEPA SECTION 427] IN ORDER TO RECEIVE FUNDING UNDER THIS PROGRAM.**" *Washington*, Dkt. # 202-1 at 1056 (2022 SBMH application); *see, e.g.*, *id.*, Dkt. # 202-18 at 1072 (2024 MHSP application). And the Department considers this statement when evaluating grant applications. *See* 34 C.F.R. § 75.210(d). Plaintiff States and other grantees responded to this instruction by including statements about equity in their applications. *See, e.g.*, *id.*, Dkt. # 202-1 at 1057 (SBMH example); *id.*, Dkt. # 202-18 at 1072-74 (MHSP example).

Between 2022 and 2024, the Department selected and issued Program grant awards with five-year performance periods to more than 100 grants within Plaintiff States. *See generally id.*, Dkt. # 203-1 at 1-6846 (initial grant awards).

### B. Defendants Discontinued Program Grants within Plaintiff States

On February 5, 2025, Defendants issued an internal "Directive on Grant Priorities" that addressed "Eliminating Discrimination and Fraud in Department Grant Awards" (the "February Directive"). Chung Decl. Ex. C. The February Directive stated, "Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." *Id.* at 2. It "direct[ed]" Department staff to "conduct an internal review of … issued grants … to ensur[e] that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives." *Id.* It directed



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Department staff to "terminate[]" any grants that did not survive review, citing its 2 C.F.R. § 200.340(a)(4) authority. *See id*. at 3.

This Directive omitted two statutory frameworks, both of which afford important procedural protections to Program grantees.

*First*, the Department must comply with procedural requirements before terminating or discontinuing grants for alleged civil rights violations. *See* 20 U.S.C. § 1682; 42 U.S.C. § 2000d-1. For instance, Title VI of the Civil Rights Act of 1964, which prohibits discrimination in federally funded programs on the basis of race, color, or national origin, requires the Department to first "advise[] [the grantee] of the failure to comply with" any Title VI requirement and attempt to secure compliance "by voluntary means." 42 U.S.C. §§ 2000d, 2000d-1. If the Department fails, it must secure "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement" before terminating funding, and the termination shall not become effective until thirty days after the Department files a full written report with Congress. 42 U.S.C. § 2000d-1. The Department's regulations implement Title VI's procedures. *See* 34 C.F.R. § 100.8(c). The same procedures apply to allegations of sex discrimination under Title IX of the Education Amendments of 1972. *See* 20 U.S.C. §§ 1681(a), 1682; 34 C.F.R. § 106.81.

*Second*, GEPA imposes notice and procedural requirements when the Department terminates certain grants, including Program grants. *See* 20 U.S.C. §§ 1234d, 1234i. *Before* terminating the grant, the Department must notify the grantee of "the factual and legal basis for the Secretary's belief that the recipient has failed to comply substantially with a requirement of law" and provide an opportunity for an administrative hearing. *Id*. § 1234d(b)-(c).

Instead of citing these statutory procedural protections or directing Department staff to follow them, the February Directive only directed staff to follow a regulatory notice provision and requirements "in the relevant award, agreement, or other instrument." *See* Chung Decl. Ex. C, at 3 (citing 2 C.F.R. § 200.341). The February Directive similarly ignored the



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Department's longstanding policy of requiring staff to work with grantees to address any issues before terminating grants. *See, e.g.*, *id*. Ex. A, at 38; *id.* Ex. B, at 47-48.

Defendants implemented the February Directive as to MHSP and SBMH grants by discontinuing grants effective at the end of their current one-year budget period under 34 C.F.R. § 75.253, rather than terminating the grants under 2 C.F.R. § 200.340(a)(4). On April 29, 2025, Defendants discontinued nearly 150 grantees within Plaintiff States. *See Washington*, Dkt. # 203-1 at 6847-7122.

Unbeknownst to Plaintiffs,[3] around June 5, 2025, Defendants issued another internal directive regarding "Non-Competing Continuation Grant Award Review Policy" (the "June Directive") that memorialized the procedure Defendants had used to discontinue Program grants. *See* Chung Decl. Ex. D. The June Directive directed Department staff to review grant awards based on the same new priorities in the February Directive:

> The Department will review all grant awards to advance the Administration's priorities of ensuring Federal funds do not support projects that: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.
>
> Consistent with these requirements, program offices must act on any relevant information that may indicate that project activities are inconsistent with Federal civil rights requirements.

*Id*. at 2; *cf. Washington II*, 813 F. Supp. 3d at 1232 (quoting April 2025 discontinuation notices with same disjunctive list). Rather than termination, the June Directive directed Department staff to conduct this review when deciding whether to continue a grant. *See* Chung Decl. Ex. D, at 2. The June Directive expressly instructed staff to consider "the approved grant application (inclusive of the GEPA 427 statement)" when conducting this review. *Id*. at 3. Like the February

[3] Defendants omitted the June Directive from *Washington*'s certified administrative record. *See Washington*, Dkt. # 208, at 13 n.2 (cataloguing AR).

Directive, the June Directive did not acknowledge, let alone direct Department staff to follow, notice and procedural requirements under federal civil rights law.

Following the June Directive, Defendants denied multiple grantees' requests to reconsider their discontinuation, quoting purportedly DEI-related excerpts from the grantees' applications as justification. *See Washington*, Dkt. # 237-1 (collection of letters).

**C. The *Washington* Lawsuit**

On June 30, 2025, sixteen states filed a lawsuit challenging the discontinuation of Program grants within their states. *See Washington*, Dkt. # 1. In October 2025, the *Washington* court issued a preliminary injunction that protected the funds of several dozen grantees from being recompeted. *See Washington I*, 807 F. Supp. 3d at 1294-95. The Court found the states showed "numerous irreparable harms flowing from the discontinuation decisions" and that the balance of equities and public interest "easily favor[ed] injunctive relief." *Id*. at 1290, 1292. Defendants sought an emergency stay of the preliminary injunction in the Ninth Circuit, but the appellate court denied the stay. *See Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1138-39 (9th Cir. 2025) (*Washington III*).

On December 19, 2025, the *Washington* court granted summary judgment and a permanent injunction to the states. *Washington II,* 813 F. Supp. 3d at 1249. The Court again found the state "ha[d] submitted unrebutted evidence demonstrating the irreparable harm that the Department's actions have inflicted on Plaintiff States' education agencies and mental health systems" and had shown the balance of equities and public interest weighed in favor of an injunction. *Id*. at 1246, 1248. The *Washington* court vacated Defendants' procedure and discontinuances, ordered Defendants to make new continuation determinations, and enjoined Defendants from "[i]mplementing or enforcing through any means the Directive procedure, the discontinuation notices, or reconsideration denial letters, including recompeting Grant funds, with respect to any discontinued Grant within Plaintiff States." *Id*. at 1249.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Defendants also sought an emergency stay of the permanent injunction, which the Ninth Circuit again denied. *See Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1245 (9th Cir. 2026) (*Washington IV*). On March 2, 2026, Defendants continued most of the grants protected by the *Washington* injunction ("Protected Grants"), extending the budget and project period to December 31, 2026, but obligating only six months of funds. *Washington*, Dkt. # 365 at 2. Defendants stated, "Grantees may receive additional funds following the submission of mid-year performance and budget reports, due June 1, 2026." *Id.*

**D. Defendants' Plan to Target the Grants in *Washington***

Defendants conducted mid-year check-ins for the Protected Grants in April and May. *Washington*, Dkt. # 445 at 1. However, rather than issue additional funding to cover the second half of the 2026 budget period, Defendants now plan to terminate some or all of the Protected Grants. *Id.* at 1-2.

On June 10, 2026, Defendants announced their *Washington* Plan through a motion in *Washington*, seeking clarification that the permanent injunction "does not restrict the Department's separate authority to terminate grants under 2 C.F.R. § 200.340." *Washington*, Dkt. # 437 at 1. Defendants explained that they "intend to move forward with a proposal to terminate some or all of the grants affected by the injunction." *Id.* at 2. Defendants requested a ruling by July 30 "so that the Department can commence grant agreement terminations on July 31, 2026." *Id.* at 1. Defendants also sought an abeyance of the pending summary judgment appeal "[i]n light of the Department's planned termination of the grants," because "[i]f the district court confirms that the terminations may proceed, the terminations will… moot this appeal." *Washington v. U.S. Dep't of Educ.*, No. 26-510, DktEntry. # 30.1 at 3 (9th Cir.) (*Appeal*). The motion for clarification is set for hearing on July 24, 2026.

This is not the first time Defendants have tried to use grant termination to get around a court order enjoining them from unlawfully discontinuing grants. In *Council for Opportunity in Education* (*COE*), Defendants discontinued eight grant programs, collectively known as "TRIO"



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

programs, that combat barriers to higher education faced by students from disadvantaged backgrounds. *See Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 1:25-cv-03491-TSC, 2026 WL 120984, at *1 (D.D.C. Jan. 16, 2026). Defendants discontinued TRIO grants, using the same language as in the MHSP and SBMH notices of non-continuation. *See id*. at *3.

After the *COE* court entered a preliminary injunction and ordered Defendants to make new continuation determinations, Defendants *terminated* more than half of the TRIO grants. Chung Decl. Ex. E, ¶¶ 1-2, 4. Defendants terminated the grants under 2 C.F.R. § 200.340(a)(4), effective immediately, because they "no longer effectuate the program goals or the Department's priorities," supporting this conclusion with only a DEI-related quote from each grant application. Chung Decl. Ex. F, at 6-8; *see generally id*. Ex. G (TRIO termination letters). The *COE* plaintiffs have moved to enforce the preliminary injunction. *See id.* Ex. F.

Plaintiff States each have grants within their states that were continued pursuant to the *Washington* injunction. *See Washington*, Dkt. # 445 at 2-5. Plaintiffs contend the permanent injunction protects their grants from termination. *See id.*, Dkt. # 443. However, Plaintiffs separately seek a preliminary injunction or a temporary restraining order in this new action to protect the grants from termination, should the *Washington* court determine that the permanent injunction does not enjoin Defendants from terminating the Protected Grants.

**E. Harm to Plaintiff States and their Grantees**

If the *Washington* court rules on the pending clarification motion in Defendants' favor, Defendants will terminate "some or all" of the Protected Grants. This loss of funding, expected to be effective immediately, will cause even greater rupture than the irreparable injuries that the *Washington* court has repeatedly found from Defendants' discontinuations. *See Washington I,* 807 F. Supp. 3d. at 1290; *Washington*, Dkt. # 49 at 21-23, 36-40(citing declarations); *and see Washington II,* 813 F. Supp. 3d at 1246-47; *Washington*, Dkt. # 208 at 16-20, 37-41 (citing declarations).



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

These same harms will irreparably injure Plaintiff States and other grantees should Defendants terminate the Protected Grants. *See* Gustafson Decl. ¶¶ 7-9; Beaudoin Decl. ¶¶ 5-7.[4] For instance, SBMH grantees will be forced to lay off mental health clinicians, which will cause grantees to lose the considerable investments of time and resources they have already put into recruiting, retaining, and training these clinicians; the trust and relationships these clinicians have developed with staff and students; and the benefits from having school-based mental health services, such as improved academic performance, student-staff engagement, and emotional and social climates in their schools. *See, e.g.*, Gustafson Decl. ¶ 8; *Washington*, Dkt. # 208 at 17. MHSP grantees will still be unable to meaningfully recruit graduate students for their programs, discouraging candidates from pursuing school-based mental health careers and further shrinking the pipeline; they will also still be unable to fund internship opportunities, damaging their relationships with school districts and making it more difficult for students to receive mental health services. *See, e.g.*, Beaudoin Decl. ¶ 6; *Washington*, Dkt. # 208 at 17.

As recognized in *Washington*, Plaintiff States experience these harms not only as grantees, but also as sovereigns whose mental healthcare systems will be strained if the Protected Grants are no longer funded and students no longer receive mental health services at school. *See Washington II,* 813 F. Supp. 3d at 1246-47; *Washington*, Dkt. # 208 at 18-19 (citing declarations). These harms also include increased costs through each state's share of Medicaid funding due to providing mental health services, and the higher costs of crisis care as students' mental health needs to go untreated. *Washington*, Dkt. # 208 at 18-19. Plaintiff States' education systems will also suffer from the loss of the Protected Grants, including more students with health problems, lower grades and graduation rates, and increased absenteeism, suspensions, and

[4] Plaintiffs submitted over 175 declarations in *Washington*. *See Washington*, Dkt. ## 153, 251, 341, 402 (declaration indices). To avoid overwhelming the docket, Plaintiffs provide two new declarations that are representative of SBMH grantees (Gustafson) and MHSP grantees (Beaudoin), and that, combined with the fulsome record in *Washington*, allow the Court to find the same irreparable harms that arose from Defendants' grant discontinuations, will also arise from Defendants' grant terminations. Should the Court wish, Plaintiffs can provide copies of the *Washington* declarations.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

expulsions. *Id*. at 19-20. These consequences will interfere with Plaintiff States' public education missions and obligations, leading to increased administrative and cost burdens to Plaintiffs. *Id*. at 20; *Washington II,* 813 F. Supp. 3d at 1246-47.

## III. LEGAL STANDARD

Preliminary injunctions and temporary restraining orders are warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65(c); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). All of these factors strongly favor injunctive relief.

## IV. ARGUMENT

Plaintiffs are likely to succeed on the merits of their claims. First, the *Washington* Plan and the Directives are subject to review under the APA. Second, they are each contrary to law. Third, they are arbitrary and capricious. Fourth, they violate the Spending Clause. Plaintiffs are likely to suffer irreparable harm if the *Washington* Plan and the Directives are not enjoined, and a preliminary injunction is in the public interest.

### A. The *Washington* Plan and the Directives are subject to review under the APA

The *Washington* Plan and the Directives are all "final agency actions" subject to review under the APA, 5 U.S.C. § 704. The APA defines "agency action" broadly, *see* 5 U.S.C. § 551(13), and the definition "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citation omitted).[5]

---

[5] This lawsuit seeks prospective relief only, including an injunction to prevent the Department from terminating grants pursuant to its unlawful Directives, and is well within the jurisdiction of this Court. *See, e.g.*, *Washington III*, 161 F.4th at 1140 (holding that district court had jurisdiction because Plaintiffs seek "purely prospective relief regarding multiyear grant discontinuations"); *Washington v. DHS*, No. 2:25-cv-1401-BJR, 2026 WL 1469538 at *6 (W.D. Wash. May 26, 2026) (holding challenge to "[t]ermination [p]olicy" was properly before district court); *California v. Wright*, No. 3:26-cv-01417-RFL, 2026 WL 1915590, at *6 (N.D. Cal. July 2, 2026) (referencing federal agency's concession that injunctive relief to prevent re-termination of cooperative



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Final agency actions (1) "mark the consummation" of agency decision-making, and (2) determine "rights or obligations. . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified). Courts consider "factors such as whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance. . . is expected." *Prutehi Litekyan: Save Ritidian v. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (quotation omitted). Finality is "interpreted in a pragmatic and flexible manner[,]" "focus[ing] on the practical and legal effects of the agency action." *Saliba v. SEC*, 47 F.4th 961, 967 (9th Cir. 2022) (quotation omitted). The *Washington* Plan and the Directives easily meet this test.

**1. The February and June Directives are final agency actions**

The February and June Directives, which instruct Department personnel to evaluate grants against new administration priorities to make termination and discontinuation decisions, are obviously subject to review under the APA. *See Nat. Insts. of Health v. Am. Public Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court or directly in the D.C. Circuit." (citing cases)). They set out new procedures that Department personnel are directed to follow, so they consummate the agency's decision making. *See* Chung Decl. Exs. C, D. And legal consequences flow from them, namely that Program grantees (among others) are subject to discontinuation and termination for failure to align their grant projects *ab initio* with new administration priorities that sprang into existence long after the 5-year grants were awarded. *See id.* Exs. C, D.

---

agreements would need to be sought in district court); *Illinois v. Vought*, 820 F. Supp. 3d 727, 731 (N.D. Ill. 2026) (concluding "final internal guidance articulating a basis to implement grant termination" was "reviewable under the APA"); *City of Chicago v. DHS*, 815 F. Supp. 3d 727, 747 (E.D. Ill. 2025) (allowing challenge to "enjoin[] the government from relying on its stated reasons to withhold payment").



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

For exactly these reasons, the *Washington* court already held the February Directive is final agency action subject to APA review. *Washington II,* 813 F. Supp. 3d at 1237.[6] The June Directive is no different, as it apparently memorialized the procedure that was vacated and enjoined in *Washington*, and Department staff clearly applied it to deny reconsideration requests for protected grantees that were subsequently vacated. *See id.* at 1246-49 (enjoining and vacating, among other things, denials of reconsideration). Moreover, the Department now appears to be applying both the February and June Directives to terminate Protected Grants after the Court declared unlawful, enjoined, and vacated the Department's initial application of the same Directives to discontinue the same grants. *See Washington*, Dkt. # 437 at 2 ("Defendants intend to move forward with a proposal to terminate some or all of the grants affected by the [*Washington*] injunction[.]"); *supra* Section II.D (discussing Defendants' termination of TRIO grants after *COE* court found discontinuances unlawful).

**2. The *Washington* Plan is final agency action**

The *Washington* Plan, which implements the February and June Directives by applying 2 C.F.R. § 200.340 to terminate up to all Protected Grants, is also final agency action subject to APA review.

First, there is no doubt that the *Washington* Plan is consummated. Defendants communicated it to the *Washington* court, grantees, and the Ninth Circuit. *Washington*, Dkt. # 437 at 1-2 (announcing intent "to terminate some or all of the grants affected by the [*Washington*] injunction" and seeking clarification "so that the Department can commence grant agreement terminations on July 31, 2026"); Gustafson Decl. Ex. D, at 2 (notifying grantee that "[t]he Department. . . is considering terminating this grant" and citing Dkt. # 437); *Appeal*, DktEntry # 39.1 (explaining that the Department has a "plan to terminate some or all of the grants" protected by injunction). To the extent that the *Washington* Plan is contingent on

[6] Since a court has already held the February Directive to be a final agency action in litigation between Plaintiff States and Defendants, any claim to the contrary here would be precluded. *See Montana v. United States*, 440 U.S. 147, 153 (1979).

obtaining permission from the Court, that is no obstacle to finality. "[A] federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence—for instance, a future site-specific application, a decision by another administrative agency, or conduct by a regulated party." *Prutehi Litekyan: Save Ritidian*, 128 F.4th at 1110; *Gill v. DOJ*, 913 F.3d 1179, 1185 (9th Cir. 2019) ("An agency action can be final even if its legal or practical effects are contingent on a future event.").

Second, legal consequences clearly flow from it. On top of the straightforward consequence that Protected Grants will be evaluated for termination according to Defendants' *new* priorities, instead of the published priorities that governed their grant applications, the *Washington* Plan implicates a host of other consequences that Defendants have explicitly communicated to grantees. The Department contends that "exclusive jurisdiction for challenges to grant terminations is in the United States Court of Federal Claims." Gustafson Decl. Ex. D, at 2. In fact, this consequence is the very first statement in the Department's letter communicating the *Washington* Plan, showing that one primary aim is to divest this Court of jurisdiction.

The *Washington* Plan also has consequences for grantees' current obligations. Grantees face a choice *now*—whether to voluntarily wind down their projects and "be closed in full compliance," or face potential consequences including not only involuntary termination, but a threat "to repay the government for funds already expended" or even possible ineligibility for future federal grants. *See id*. Ex. D, at 3 (threatening consequences if grantee does not "elect[] to wind down their grant"); 2 C.F.R. § 200.339 (specifying remedies for noncompliance). These legal consequences flow directly from the Department's plan to evaluate each Protected Grant for termination based on the new priorities in the Directives.

It is no matter that *particular* grant-by-grant termination decisions have yet to be made. *See Illinois v. FEMA*, 801 F. Supp. 3d 75, 89 n.6 (D.R.I. 2025) (collecting cases holding that policies affecting grant funding can constitute final agency action even where funding decisions

still need to be made); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) ("Respondents need not assume such risks while waiting for [the agency] to 'drop the hammer' in order to have their day in court."). It is customary in APA litigation to challenge policies separate from their application to individual grants. *E.g.*, *New York v. Trump*, 171 F.4th 1, 23 (1st Cir. 2026) (upholding preliminary injunction against "the immediate and categorical freezing of federal financial assistance"); *Illinois v. Vought*, 825 F. Supp. 3d 721, 729 (N.D. Ill. 2026) ("Plaintiffs' challenge is not to grant-by-grant, award-by-award terminations, but instead to agency-wide policies targeting states."); *cf. supra*, n.5.

### B. Plaintiffs are Likely to Show the Plan and the Directives Are Contrary to Law

#### 1. The *Washington* Plan and the Directives require the Department to review Protected Grants based on priorities not set through notice and comment

Defendants' actions are contrary to law because they apply priorities not set through notice-and-comment rulemaking as criteria for funding decisions.[7] Under GEPA, a "regulation" subject to notice and comment includes "[1] any generally applicable rule, regulation, guideline, interpretation, or other requirement that [2] is prescribed by the Secretary or the Department; and [3] has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program.'" *Washington IV*, 167 F.4th at 1245 (quoting 20 U.S.C. § 1232(a)); *see also* 20 U.S.C. § 1232e-4. The Court has already held that Defendants' application of the February Directive's unpublished criteria to existing grants violated GEPA's rulemaking requirements. *See Washington II,* 813 F. Supp. 3d at 1244-45. Accordingly, Defendants are precluded from rearguing this issue. *See Montana*, 440 U.S. at 153. The same result applies to the June Directive, which imposes the same unpublished priorities. *See* Chung Decl. Ex. D, at 2. To the extent that the *Washington* Plan applies the unpublished criteria from the Directives as a basis for termination, it violates GEPA's rulemaking requirements too.

---

[7] For the same reason, Defendants acted without observance of procedure required by law under 5 U.S.C. § 706(2)(D).

Regardless, as with the vacated and enjoined February Directive, the June Directive prescribed staff to review all grants, including grantees' GEPA equity statements, against the Department's criteria, to identify grants "supporting any discriminatory activities." Chung Decl. Ex. D, at 3. This qualifies as a "generally applicable rule." *See Washington II,* 813 F. Supp. 3d at 1244 ("[T]he Directive ordered an across-the-board re-review of Department grants, including those previously awarded, and measured them against new criteria.").

The June Directive instructed the Department to then take "take appropriate action, which may include non-continuation of the grant." Chung Decl. Ex. D, at 4. It therefore has a "legally binding effect," because it affects funding decisions. *Washington II,* 813 F. Supp. 3d at 1244. Indeed, although Plaintiffs did not know it at the time, Defendants used the June Directive to deny requests to reconsider the original grant discontinuations. The *Washington* court subsequently vacated those actions, but Defendants will now use the June Directive to identify and terminate Protected Grants should the Court fail to enjoin the *Washington* Plan. Defendants' Directives thus trigger GEPA rulemaking requirements which have not been followed. *See id.*; *Washington IV*, 167 F.4th at 1245.

Allowing grant terminations based on unpublished criteria would also run counter to Defendants' grantmaking framework, which requires Defendants to propose and publish program goals and funding priorities at the *outset* of each grant competition, and measure grant performance against those defined goals. 34 C.F.R. §§ 75.105, 75.110, 75.201, 75.253(a)(1); *see also* Chung Decl. Ex. A, at 15-17. The Department accordingly used rulemaking to establish the original priorities applied to the Protected Grants. *See supra* Section II.A. But the Department never used rulemaking to promulgate the new priorities underlying the Directives.

It was required to do so. *See* 20 U.S.C. § 1232(a); 20 U.S.C. § 1221e-4. And "if a statute requires rulemaking, the affected agency must comply." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 565 (2025).



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

**2. Defendants cannot use 2 C.F.R. § 200.340(a)(4) to terminate existing grants based on new priorities**

The *Washington* Plan and the February Directive are also contrary to 2 C.F.R. § 200.340. They direct the termination of grant awards based on new agency priorities, but this regulation only contemplates termination based on, at most, the already-established agency priorities that apply to the grant.

Starting with the plain language, Section 200.340 allows the termination of a grant award, in some circumstances, if the award "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4); *see Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005) (courts construe federal regulations by starting with the plain text of the regulation according to its terms' common meaning). Generally, "the" is a "function word. . . indicating that a following noun or noun equivalent is definite or has been previously specified by context." *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (citation modified); *Gale v. First Franklin Loan Servs.*, 701 F.3d 1240, 1246 (9th Cir. 2012) (explaining "'the'. . . is a word of limitation"). So, "the" program goals or agency priorities means not just any goals or priorities that agencies identify whenever they wish, but rather, the specific goals and priorities applicable to the grant award. In the context of the Programs here, that means the goals and priorities that went through notice-and-comment procedures and that applicants tailored their applications to. *See supra* Section IV.A.

The language also makes clear that Section 200.340 can only be used to terminate when "*an award* no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). "A plain reading of this provision demonstrates that termination is proper only when *the award itself* no longer effectuates the program goals or agency priorities, and does not extend to *changes* in program goals or agency priorities." *Washington v. U.S. Dep't of Commerce*, 812 F. Supp. 3d 1169, 1183 (W.D. Wash. 2025) (emphasis added). The phrase "no longer" implies "once did." *See No Longer*, Merriam-



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Webster.com, https://www.merriam-webster.com/dictionary/no%20longer (last visited July 9, 2026); *No Longer*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/no-longer (last visited July 9, 2026). Applied here, that an award "no longer effectuates" certain program goals or agency priorities means the award "once did effectuate" those goals and priorities. This straightforward reading only works if, as here, the goals or priorities are fixed at the start: a grantee clearly met existing program goals or agency priorities when the agency issued the award, and the grantee must continue to meet those same goals or priorities to satisfy the regulation's language. That reading is impossible, however, if the goals or priorities can be changed midstream, as Defendants claim: a grantee could never have met program goals that did not exist when the agency issued the award.

The regulation's rulemaking history confirms this reading. OMB added this language in 2020 "to ensure that Federal awarding agencies prioritize *ongoing support* to Federal awards that meet program goals." 85 Fed. Reg. 49506, 49507 (Aug. 13, 2020) (emphasis added). In response to comments "express[ing] a concern that [the language] will provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause," OMB firmly stated that the clause does *not* empower agencies "to terminate grants arbitrarily." *Id.* at 49509. But Defendants' interpretation, evinced in their February Directive and Plan, allows for the exact arbitrary, unchecked discretion they previously disavowed.

Defendants' interpretation violates other cannons of construction. It impermissibly renders superfluous the other provisions circumscribing when agencies can terminate existing grants. *See, e.g.*, 2 C.F.R. § 200.340(a)(1)-(3); *Fischer v. United States*, 603 U.S. 480, 498 (2024) ("Although the Government's all-encompassing interpretation may be literally permissible, it defies the most plausible understanding . . . and it renders an unnerving amount of . . . text mere surplusage."); *cf. Washington II*, 813 F. Supp. 3d at 1243 (rejecting interpretation of 34 C.F.R. § 75.253 that "would allow the coherent scheme established in the continuation regulation to be upended by a vague, undefined 'best interest' determination"). This Court should not "permit

the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019). Especially, where, as here, Defendants' interpretation would run afoul of the Spending Clause. *See infra* Section IV.D; *DeBartolo v. Fla. Gulf Coast Bldg. and Const. Trades Council,* 485 U.S. 568, 588 (1988) (construing statute to avoid an interpretation raising grave constitutional concerns).

In sum, 2 C.F.R. § 200.340's language contemplates termination only where an award "no longer effectuates" *established* agency priorities. Defendants' February Directive and their *Washington* Plan, requiring termination of grants "deemed inconsistent with" *new* agency priorities, are thus contrary to law.

### 3. Defendants unlawfully deprive Protected Grantees of GEPA procedural protections

The *Washington* Plan and the February Directive are also contrary to law because termination based on agency priorities is only permitted "to the extent authorized by law," 2 C.F.R. § 200.340(a)(4), and Defendants have directed staff to terminate grants without first complying with GEPA's procedural requirements.

The Programs are authorized under 20 U.S.C. § 7281, which is section 4631 of the Elementary and Secondary Education Act of 1965 (ESEA), as amended. *See, e.g.*, 87 Fed. Reg. 60083, 60084 (Oct. 4, 2022) (program authority for MHSP); 87 Fed. Reg. 60092, 60093 (Oct. 4, 2022) (SBMH). These Programs are, therefore, afforded GEPA procedural protections. *See* 20 U.S.C. § 1234i(2). Under GEPA procedures, the Department may "withhold from a recipient, in whole or in part, further payments" only *after* notice, an administrative hearing, and, should the grantee pursue it, appeal. *See* 20 U.S.C. §§ 1234d(a) and (c), 1234g(a). The Department's regulations implement these procedural requirements. *See* 34 C.F.R. §§ 81.1-.45.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Congress, the Department, and courts have interpreted a "withholding" under 20 U.S.C. § 1234d to include terminations for GEPA programs.[8] *See* 20 U.S.C. § 1232i(b) (listing terminations as a type of withholding); 34 C.F.R. § 75.903(c) (providing that termination is not effective until after a final decision under the GEPA hearing procedure); *Freeman v. Cavazos*, 923 F.2d 1434, 1440 (11th Cir. 1991) ("20 U.S.C. § 1234d describes the procedure for termination of assistance[.]"). However, following the February Directive, Defendants have attempted to terminate other ESEA grants under 2 C.F.R. § 200.340(a)(4), effective immediately, without complying with GEPA's procedural requirements. *See, e.g.*, *University of St. Thomas*, No. 25-09-GT, 2025 WL 2256477, at *1-3 (ED. O.H.A. July 10, 2025);[9] *In re St. Louis University*, No. 25-11-GT, 2025 WL 2256478, at *1-4 (ED. O.H.A. July 10, 2025);[10] *In re Cleveland State University*, No. 25-12-GT, 2025 WL 4740230, at *1-3, *7-8 (ED. O.H.A. May 15, 2026).[11] The Department's Administrative Law Judges have repeatedly rejected Defendants' contention that these requirements don't apply, concluding that grant terminations are withholdings under GEPA and exercising § 1234d jurisdiction to hear grant termination challenges. *See St. Thomas*, 2025 WL 2256477, at *7-8; *St. Louis*, 2025 WL 2256478, at *5-7; *Cleveland*, 2025 WL 4740230, at *9-13.

Nonetheless, Defendants' February Directive fails to acknowledge these GEPA procedural protections, let alone direct Department staff to follow them. *See* Chung Decl. Ex. C. The *Washington* Plan repeats this error. In their recent notice to grantees, Defendants asserted that grant terminations can only be challenged in the Court of Federal Claims. Gustafson Decl. Ex. D, at 2. This flies in the face of the ALJ decisions retaining jurisdiction and ordering the

---

[8] This contrasts with grant discontinuances, which the Department has expressly determined are not afforded this relief. 34 C.F.R. § 75.253(i).

[9] https://www.ed.gov/media/document/oha-2025-09-gt-oj-judges-decision-110442.pdf (last accessed July 7, 2026).

[10] https://www.ed.gov/media/document/oha-2025-11-gt-oj-judges-decision-110441.pdf (last accessed July 7, 2026).

[11] Based on the procedural history, the decision's issue date of "May 15, 2025" is a clerical error. Available at https://www.ed.gov/media/document/oha-docket-no-2025-12-gt-114102.pdf (last accessed July 7, 2026).



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Department to continue funding grants pending a final decision. *St. Thomas*, 2025 WL 2256477, at *13; *St. Louis*, 2025 WL 2256478, at *7; *see also Cleveland,* 2025 WL 4740230, at *19 (granting petitioner's motion for summary judgment and reversing grant termination).

Additionally, it is clear, based on Defendants' briefing and recent practice, that the *Washington* Plan violates 20 U.S.C. §§ 1234d and 34 C.F.R. § 75.903(c), by making any grant terminations effective immediately. *See Washington*, Dkt. # 437 at 1 (requesting ruling by July 30, "so that the Department can commence grant agreement terminations on July 31, 2026"); *cf.* Chung Decl. Ex. G (TRIO grant terminations effective immediately).

#### 4. The *Washington* Plan and the Directives terminate grants for alleged discrimination without required procedure

Similarly, although the *Washington* Plan and the Directives are rooted in Defendants' apparent belief that DEI activities violate federal civil rights law, they do not acknowledge the procedural requirements imposed by these laws, let alone direct Department staff to comply with them. *See* Chung Decl. Exs. C, D. This violates Title VI and Title IX, which require agencies to first attempt to secure voluntary compliance and provide an opportunity for hearing before terminating a grant. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. The agency must also report to Congress thirty days before the terminations become effective. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. GEPA does not displace the requirements of Title VI and Title IX. *See* 20 U.S.C. § 1221(d).

Defendants' recent practices show that Defendants intend to disregard these procedural protections, too. In one case, Defendants discontinued magnet school grants due to alleged Title IX violations. *See Bd. of Educ. of City Sch. Dist. of City of New York v. U.S. Dep't of Educ.*, No. 1:25-cv-08547-AS, 2026 WL 948205, at *1-2 (S.D.N.Y. Apr. 8, 2026). Defendants argued they did not need to follow Title IX's procedures because they discontinued the grants for not being in the government's best interest under 34 C.F.R. § 75.253(a)(5). *See id.* at *6. The court rejected this argument, noting that "there would be little point to the formal procedures Congress



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

mandated" if the Department "could simply withdraw funding under the guise of a 'discretionary' § 75.253(a)(5) determination" when it suspects a Title IX violation. *Id*.

In *COE*, Defendants terminated already-discontinued grants, claiming they "no longer effectuate[d] the program goals or the Department's priorities." Chung Decl. Ex. F, at 7, Ex. G. The termination letters, effective immediately, supported this conclusion with only a DEI-related excerpt from the grant application, showing the termination was motivated by a review for alleged inconsistency with federal civil rights law under the February and June Directives. *See id.* Ex. F, at 6-7, Ex. G. However, Defendants took no steps to seek voluntary compliance before terminating the grants. *See id.* Ex. F, at 15. Defendants cannot rely on the guise of the termination regulation, 2 C.F.R. § 200.340, to ignore the notice and procedure requirements in Title VI and Title IX.

**C. The *Washington* Plan and the Directives Are Arbitrary and Capricious**

Defendants' actions are arbitrary and capricious because they rely on factors Congress did not intend them to consider. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Pursuant to the GEPA Equity Directive, Congress requires grant applicants to describe in their applications how they will ensure equity in their programs. 20 U.S.C. §1228a(b). Under federal civil rights laws, Congress also intended Defendants to consider what the grantees are doing, not what grantees said they would do in their applications. *See* 42 U.S.C. § 2000d-1 (requiring that agency attempt to secure voluntary compliance); 20 U.S.C. § 1682 (same). Yet, Defendants' actions require Department staff to consider the GEPA equity statements as a basis to end Protected Grants, as reflected in the June Directive. *See* Chung Decl. Ex. D, at 3. Defendants already tried to do this once, *see Washington*, Dkt. # 237-1 (reconsideration request denials), and now intend to terminate Protected Grants on this same basis under the *Washington* Plan. *Cf.* Chung Decl. Ex. G (TRIO termination letters). It is also arbitrary and capricious to terminate Protected Grants based on GEPA equity statements

that Defendants themselves instructed the applicants to include, and that Defendants used to evaluate and select the Protected Grants. *See supra* Section II.A; 34 C.F.R. § 75.210(d).

Additionally, the *Washington* Plan and the Directives are arbitrary and capricious because Defendants violated the "[t]he change-in-position doctrine," which "requires agencies to provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Wages & White Lion Invs.*, 604 U.S. at 544 (citation modified). The actions share two common changes in position. First, they instruct Department staff to end funding based on new priorities, rather than established priorities, as was its prior practice. *Cf. Washington II*, 813 F. Supp. 3d at 1237-38. Second, they also changed Department policy by not offering grantees an opportunity to come into compliance before ending funding. *See* Chung Decl. Ex. A, at 38. In changing their position, Defendants provided the public with no explanation and issued the Directives in secret. Additionally, Defendants did not display an awareness that they were changing their position, nor did they consider grantees serious reliance interests when doing so.

**D. Defendants Retroactively Imposed New, Ambiguous Conditions on Awarded Grants in Violation of the Spending Clause**

Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Such relief is appropriate because the Directives violate the Spending Clause. *See* U.S. Const., art. I, § 8, cl. 1.

"Though Congress's power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). States must have fair notice, so they may "voluntarily and knowingly" accept conditions attached to federal spending. *See id.* at 17, 25; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175, n.6 (9th Cir. 2019). States "cannot knowingly accept



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). Thus, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17.

Defendants' actions impose new conditions that fail these requirements in three ways.

*First*, the new priorities of "merit, fairness, and excellence in education" announced in the Directives and imposed by the *Washington* Plan are impermissibly ambiguous. *See id*. These terms are so broad they are rife with vagueness and ambiguity. Nor have Defendants provided any clarifying guidance defining more precisely what is meant by these terms. Accordingly, the actions are "fatally ambiguous because [they] fail[] to clarify what conduct is proscribed." *See San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 746 (N.D. Cal. 2025) (quotation omitted).

*Second*, the *Washington* Plan and the Directives retroactively impose their new priorities. To give grantees sufficient notice of the applicable conditions for these awards, the Department had published priorities, requirements, and definitions in the Federal Register. *See supra* Section II.A. The new priorities are retroactive conditions which the Department have directed staff to apply to terminate existing grants. This retroactive application of Defendants' new priorities violates the Spending Clause. *Cf. Barr*, 929 F.3d at 1175-76 (holding new priorities would not violate Spending Clause because government applied them only prospectively to new grants); *Dep't of Comm.*, 812 F. Supp. 3d at 1187 (applying new priorities to terminate grants likely violated Spending Clause).

*Third*, to the extent that the Department now seeks to eliminate equity measures, this anti-equity condition is impermissibly unrelated to purpose of the Programs, the GEPA Equity Directive, and the final rulemaking priorities governing the Programs. *See South Dakota v. Dole*, 483 U.S. 203, 207, 209 (1987).



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

**E. Injunctive Relief is Necessary to Avoid Irreparable Harm and is in the Public Interest**

Over the past year, Defendants have not meaningfully disputed the harms that Plaintiff States, other Protected Grantees, mental health professionals, graduate students, universities, elementary and secondary schools, and students will experience if Defendants end the Protected Grants. Indeed, "[s]ince April 2025, the Department's conduct has ranged from confusing to contrary to law in multiple ways, and that conduct has resulted in disruptive harm to the Grantees many times over." *Washington v. U.S. Dep't of Educ.*, No. 2:25-cv-01228-KKE, 2026 WL 1429284, at *5 (W.D. Wash. May 21, 2026), *reconsideration denied,* No. 2:25-cv-01228-KKE, 2026 WL 1736200 (W.D. Wash. June 16, 2026).

Plaintiff States presented ample evidence of irreparable harm from the discontinuation of Protected Grants in *Washington*, and these same harms will occur if the *Washington* Plan and the Directives are not enjoined and Defendants are allowed to terminate the Protected Grants. *See* Gustafson Decl., ¶¶ 7-9; Beaudoin Decl., ¶¶ 5-7; *see generally supra*, Section II.E. The *Washington* court repeatedly recognized these irreparable harms justified injunctive relief. *See Washington I,* 807 F. Supp. 3d at 1290; *Washington II,* 813 F. Supp. 3d at 1246-47. The loss of the Protected Grants will lead to a loss of mental health providers at Plaintiff States' public schools (including graduate student interns), loss of the investments that grantees have made in training those providers, loss of the relationships that those providers have built with school staff and students, and loss of mental health services for some of the most vulnerable students within Plaintiff States. *See supra* Section II.E. Plaintiff States' mental health and educational systems will also suffer, and Plaintiffs will incur additional costs from the loss of the Protected Grants. *See id*.

These harms outweigh any potential hardship to Defendants. Further, "the public interest is served by requiring agencies to comply with the APA." *Washington II,* 813 F. Supp. 3d at 1247. The remaining factors tip heavily in favor of an injunction.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

## V. CONCLUSION

The Court should preliminarily enjoin the *Washington* Plan and the Directives and prohibit the Department from implementing or enforcing them against the Protected Grants.

DATED this 10th day of July 2026.

I certify that this memorandum contains 8399 words in compliance with Local Civil Rules.

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Jennifer K. Chung*
JENNIFER K. CHUNG, WSBA #51583
ELLEN RANGE, WSBA #51334
Assistant Attorneys General
Complex Litigation Division
WILLIAM MCGINTY, WSBA #41868
CYNTHIA ALEXANDER, WSBA #46019
Deputy Solicitors General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
Jennifer.Chung@atg.wa.gov
Ellen.Range@atg.wa.gov
William McGinty@atg.wa.gov
Cynthia.Alexander@atg.wa.gov

*Attorneys for State of Washington*

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Sarah H. Weiss*
SARAH H. WEISS*
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
Sarah.Weiss@coag.gov

*Attorney for State of Colorado*

ROB BONTA
Attorney General of California

*/s/ Crystal Adams*
CRYSTAL ADAMS*
Deputy Attorney General
NELI PALMA*
Senior Assistant Attorney General
KATHLEEN BOERGERS*
Supervising Deputy Attorney General
KATHERINE MILTON*
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
916-210-7522
Crystal.Adams@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Katherine.Milton@doj.ca.gov

*Attorneys for State of California*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
Vanessa.Kassab@delaware.gov

*Attorneys for the State of Delaware*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Andrew Ammirati*
ANDREW AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorney for State of Connecticut*

KWAME RAOUL
Attorney General of Illinois

*/s/ Emily Hirsch*
EMILY HIRSCH*
Assistant Attorney General
ALEEZA STRUBEL*
Complex Litigation Counsel
Office of the Illinois Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-835-0148
Aleeza.Strubel@ilag.gov
Emily.Hirsch@ilag.gov

*Attorney for State of Illinois*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Michael Drezner*
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us

*Attorney for State of Maryland*

AARON M. FREY
Attorney General of Maine

*/s/ Sarah A. Forster*
SARAH A. FORSTER*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Sarah.Forster@maine.gov

*Attorney for the State of Maine*

DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorney for the State of Michigan*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Adelaide Pagano*
ADELAIDE PAGANO*
Assistant Attorney General
YAEL SHAVIT*
Chief, Consumer Protection Division
Office of the Massachusetts Attorney General
100 Cambridge Street
Boston, MA 02108
617-963-2122
Adelaide.Pagano@mass.gov
Yael.Shavit@mass.gov

*Counsel for the Commonwealth of Massachusetts*

LETITIA JAMES
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
MARK LADOV*
Special Counsel
28 Liberty Street
New York, NY 10005
212-416-8240
Rabia.Muqaddam@ag.ny.gov
Mark.Ladov@ag.ny.gov

*Attorneys for the State of New York*

RAÚL TORREZ
Attorney General of New Mexico

*/s/ Aletheia V.P. Allen*
ALETHEIA V.P. ALLEN*
Solicitor General
LAWRENCE MARCUS*
Assistant Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
AAllen@nmdoj.gov
LMarcus@nmdoj.gov

*Attorney for State of New Mexico*

DAN RAYFIELD
Attorney General of Oregon

*/s/ Leanne Hartmann*
LEANNE HARTMANN*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
971-673-1880
Leanne.Hartmann@doj.oregon.gov

*Attorney for State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Kyla Duffy*
KYLA DUFFY*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
Kduffy@riag.ri.gov

*Attorney for State of Rhode Island*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Frances Reynolds Colbert*
FRANCES REYNOLDS COLBERT*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-266-9226
Frances.Colbert@wisdoj.gov

*Attorney for State of Wisconsin*