UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | CASE NO. C26-2409-KKE |
| Plaintiff(s), | ORDER GRANTING MOTION FOR |
| v. | TEMPORARY RESTRAINING ORDER |
| UNITED STATES DEPARTMENT OF EDUCATION, et al., | |
| Defendant(s). | |

A group of 15 states ("Plaintiff States") filed this action challenging the Defendant United States Department of Education's plan to terminate a group of grants ("the Grants") that provide mental health services for public-school students in their states no earlier than July 31, 2026. Dkt. No. 1. Plaintiff States also filed a motion for temporary restraining order ("TRO") to enjoin the Department from terminating the grants for allegedly unlawful reasons. Dkt. Nos. 10, 22.[1] Because Plaintiff States have demonstrated that they are entitled to temporary preliminary relief, the Court will grant their motion.

## I. BACKGROUND

Congress created two grant programs, the School-Based Mental Health Services Grant Program and the Mental Health Service Professional Demonstration Grant Program (collectively

---

[1] This order refers to the parties' briefing by CM/ECF page number.

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 1

"the Programs"), in response to evidence demonstrating a mental health crisis in schools, particularly in rural, low-income, high-need areas.  Dkt. No. 1 ¶¶ 5, 42–46.  The Programs fund scholarships and clinical training for graduate students, as well as funding salaries for mental health professionals hired directly by state and local education agencies.  *Id*. ¶ 44–45.  The Department administers the Programs by awarding grants, including multi-year projects.  *Id*. ¶¶ 47–49.

In February 2025, the Department issued guidance instructing agency personnel to review existing grants to ensure that their programs align with the new presidential administration's priorities, and stating that grants that do not meet the new priorities would be subject to termination under 2 C.F.R. § 200.340(a)(4).  Dkt. No. 1 ¶ 61 (referencing Dkt. No. 11-3 ("the February 2025 directive")).  The February 2025 directive identified the Department's new priority of "eliminating discrimination" by ensuring that Department grants "do not support or take part in diversity, equity, and inclusion ('DEI') initiatives" because such efforts "can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education."  Dkt. No. 11-3 at 2.  After that re-review, many Program multi-year grantees received notices of non-continuation in April 2025.  Dkt. No. 1 ¶ 64.  In early June 2025, the Department issued additional guidance instructing agency personnel to review grant awards—explicitly including the equity statement that grant applicants were required to include in their applications—for compliance with the priorities of the new administration.  Dkt. No. 11-4 ("the June 2025 directive").  The June 2025 directive referenced the same priorities identified in the February 2025 directive.  *Id*. at 2 ("The Department will review all grant awards to advance the Administration's priorities of ensuring Federal funds do not support projects that: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 2

merit, fairness and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.").

On June 30, 2025, a group of 16 states filed a lawsuit to challenge the Department's actions with respect to grants serving their states. *See Washington v. U.S. Dep't of Educ.,* No. C25-1228-KKE (W.D. Wash. 2025) ("*Washington* action"). The Court granted Plaintiff States' motion for a preliminary injunction, and later granted their motion for summary judgment and permanent injunction, finding that the Department's re-review procedure culminating in discontinuation decisions was arbitrary and capricious and contrary to law. *Washington* action, Dkt. Nos. 193, 269. The Court vacated the discontinuation notices, instructing the Department to issue new continuation decisions that comply with 34 C.F.R. § 75.253. *Id.*, Dkt. No. 269 at 34–36.

The Department issued new continuation decisions and has awarded funding to most grantees (the "Grantees") through July 31, 2026. Dkt. No. 1 ¶¶ 77–78. In June 2026, the Department informed the Grantees and the Court that no earlier than July 31, 2026, the Department would issue notices terminating "some or all" of the Grants under 2 C.F.R. § 200.340.[2] *Id.* ¶ 77. In response, Plaintiff States filed this lawsuit against the Department,[3] asserting that the Department's termination plan (and the February 2025 and June 2025 directives that led to it) violates the Administrative Procedure Act ("APA") in multiple ways because the plan is arbitrary and capricious, contrary to law, violates notice-and-comment rulemaking requirements, violates the General Education Provisions Act ("GEPA"), violates statutory procedures for addressing

---

[2] The Department filed a motion for clarification in the *Washington* action, asking the Court to "clarify" that its proposed termination plan did not violate the permanent injunction. *Washington* action, Dkt. No. 437. Plaintiff States opposed the motion and requested clarification of their own. *Id.*, Dkt. No. 443. The relief Plaintiff States requested in that opposition brief is narrower than the relief requested in the TRO motion in this case, although the Court heard oral argument on the TRO motion and the motion for clarification together. *See id.*, Dkt. No. 451; Dkt. No. 49. The Court finds that granting the TRO motion in this case moots the motion for clarification in the *Washington* action.

[3] The Department's Secretary Linda McMahon is also a Defendant, but this order refers to Defendants collectively as "the Department."

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 3

alleged civil rights violations; is *ultra vires*; and violates the Spending Clause of the United States Constitution. Dkt. No. 1 ¶¶ 114–200.

Plaintiff States filed a motion for TRO, alleging they are likely to prevail on their APA claim (specifically the contrary to law and arbitrary and capricious theories) and Spending Clause claim. Dkt. No. 10. After considering the parties' briefing, the remainder of the record, and the argument of counsel, the Court will grant Plaintiff States' motion and enjoin the Department from taking further action to unlawfully terminate the Grants.

## II.    ANALYSIS

### A.    Legal Standards

"Preliminary injunctive relief is an extraordinary equitable remedy that is never awarded as of right." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024) (citation modified). "The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)).

To succeed on a motion for preliminary injunction or temporary restraining order, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (explaining that the TRO standard is "substantially identical" to the preliminary injunction standard). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).

With these standards in mind, the Court will address the *Winter* factors to determine whether Plaintiff States are entitled to temporary preliminary relief.

**B.     Plaintiff States are Likely to Succeed on the Merits.**

1. *Plaintiff States Are Likely to Succeed on the Merits of their APA (Arbitrary and Capricious and Contrary to Law) Claims.*[4]

Courts reviewing agency actions must "hold unlawful and set aside" actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are unconstitutional, violate a statute, or fail to follow the required procedures.  5 U.S.C. § 706(2)(A)–(D).

The record contains sufficient evidence to permit the Court to find that Plaintiff States are likely to prevail on their APA claims challenging the Department's actions as arbitrary and capricious and contrary to law.[5]  When viewed in combination, the February 2025 directive, the June 2025 directive, the June 2026 notices sent to Grantees, the Department's second status report issued in the *Washington* action, and the declaration of Murray Bessette filed in the *Washington* action demonstrate that the Department has formulated a plan to re-review Grants for termination based on unlawful reasons.  *See* Dkt. Nos. 11-3, 11-4, 13-4; *Washington* action, Dkt. Nos. 445, 447.

As the Court explained in the *Washington* action, it is unlawful to make funding decisions for approved multi-year Grantees by evaluating their original grant applications against new

---

[4] Because the Court finds that Plaintiff States are likely to succeed on the merits of their arbitrary and capricious and contrary to law APA claims, it need not address whether Plaintiff States are likely to succeed on other claims to find that the first *Winter* factor has been satisfied. *See, e.g.*, *Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, 793 F. Supp. 3d 166, 189 n.6 (D.D.C. 2025).

[5] The Department did not oppose the substance of Plaintiff States' claims on their merits, instead arguing that the Court lacks jurisdiction to hear this case.  Dkt. No. 36 at 9.  The Court will address the Department's jurisdictional argument in the next subsection of this order.

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 5

unpublished priorities not in effect at the time that the Grants were approved. *See Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222, 1245 (W.D. Wash. 2025).[6]  It is likely that the Department's termination plan is based on such an unlawful evaluation because the June 2025 directive instructs Department personnel to complete a re-review of the Grants using the same unpublished priorities identified in the February 2025 directive, and this guidance is apparently still in effect at the Department.  Dkt. No. 13-4; *Washington* action, Dkt. No. 447.  The Court previously enjoined a similar if not substantively identical procedure in the *Washington* action used to discontinue the grants, and the procedure is no more lawful in the termination context here than it was there.

It is also unlawful for the Department to withhold payments from Grantees without first providing the notice and an opportunity for administrative and/or judicial review required under GEPA.[7]  *See* 20 U.S.C. §§ 1234(a)(2), 1234d, 1234g, 1234i(1)–(2); 34 C.F.R. §§ 75.903.  The Department's regulations implement these procedural requirements.  34 C.F.R. § 81.1–.45.  And although the June 2025 directive instructs Department personnel to consider whether Grants violate federal civil rights law (Dkt. No. 11-4 at 2–3), an agency must first attempt to secure voluntary compliance and provide an opportunity for a hearing before terminating a grant on that basis, and must report the violation to Congress 30 days before a termination can be effective.  *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682; 34 C.F.R. §§ 100.8–.11, 106.81.  Given that the Department's June 2026 notice to Grantees indicates that termination could occur as early as the

---

[6] The Ninth Circuit found, in denying the Department's motion for a stay pending appeal, that the Department had "not made a showing it is likely to succeed on the merits of Plaintiff States' claims that the Department's discontinuation notices were contrary to law and arbitrary and capricious under the APA." *Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1245 (9th Cir. 2026).

[7] Neither in briefing nor in response to questioning at oral argument has the Department disputed that the Grants at issue in this case are subject to GEPA procedural protections.  Although Department counsel suggested that there are circumstances under which an "effective immediately" grant termination could be lawful (*Washington* action, Dkt. No. 453 at 31), counsel did not cite authority for that proposition, and the Court is not aware of any such authority.

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 6

last day that the Grant is funded (Dkt. No. 13-4 at 2), it is likely that the Department intends to terminate Grants without advance notice or any of the procedural protections to which Grantees are entitled under either GEPA or federal civil rights statutes.

Because the Department's termination plan likely reflects an unexplained change in Department policy, and the Department's plan likely fails to comply with its own regulations or the statutes identified in this section, and bases terminations on factors Congress did not intend the Department to consider, the Department's termination plan is likely arbitrary and capricious and contrary to law and thus violates the APA. *See Mont. Wildlife Fed. v. Haaland*, 127 F.4th 1, 39 (9th Cir. 2025) ("A change in policy or in a planned agency action may nevertheless be arbitrary and capricious if the agency fails to provide a "reasoned explanation" for the change."); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (defining agency action as "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider"); *Doe v. Noem*, 778 F. Supp. 3d 1151, 1160 (W.D. Wash. 2025) ("It is contrary to law for an agency to disregard its own regulations and policies.").

*2. The Court Has Jurisdiction to Temporarily Enjoin Unlawful Terminations.*

As part of its assessment that Plaintiff States are likely to succeed on the merits of their APA claims, the Court also considers its jurisdiction to hear those claims. The APA waives sovereign immunity for suits "seeking relief other than money damages" against a federal agency, so long as no other statute "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Even if (as here) an APA action does not seek money damages, it may nonetheless contain a contract claim mischaracterized as an APA claim, which would fall outside the APA's waiver of sovereign immunity. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. __, 2025 WL 2415669 (2025) ("*NIH*"); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025). Per the Tucker Act, the exclusive jurisdiction for such claims is found in the Court of Federal Claims:

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 7

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  The Tucker Act likewise deprives district courts of jurisdiction to hear contract claims disguised as constitutional claims.  *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647–48 (9th Cir. 1998).  Courts, including those in the Ninth Circuit, look to factors first identified in *Megapulse, Inc. v. Lewis* to determine whether a claim against the United States is a contract claim in disguise: "(1) 'the source of the rights upon which the plaintiff bases its claims' and (2) 'the type of relief sought (or appropriate).'"  *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

As support for its argument that Plaintiff States' claims are Grant/contract-based, for purposes of the first *Megapulse* prong, the Department notes that if the Grants had never existed, then Plaintiff States would have no claim against the Department.  Dkt. No. 36 at 6.  That the Grantees have a contractual relationship with the Department does not transform any claim between these parties into a contract claim, however.  *See Ass'n of Am. Univs. v. Dep't of Defense*, 806 F. Supp. 3d 79, 93–94 (D. Mass. 2025) (rejecting the Government's argument that "wrongly assumes that any claim between contracting parties arises in contract" (citing, among other things, *Megapulse*, 672 F.2d at 967–68; *NIH*, 606 U.S. __, 2025 WL 2415669, at *2 (2025) (Barrett, J., concurring))).  Plaintiff States insist that the source of their injury arises from violations of statutes, regulations, and the Constitution, rather than any breach of the Grant terms, and thus Plaintiff States contend that their claims do not seek to vindicate contractual rights.  Dkt. No. 37 at 6–7.

The Court agrees with Plaintiff States.  Plaintiff States do not contend that the Grant terms themselves prohibit termination or seek to compel the Department to extend the Grants (Dkt. No.

1 at 35–52), but instead seek to prevent agency action that would violate regulations, statutes, and/or the Constitution. *See id*. at 52–53. Plaintiff States' claims here are similar to those brought in the *Washington* action, and the Ninth Circuit found that the Department was not likely to prevail on its argument that the claims there fell within the Tucker Act's scope. *See Washington v. U.S. Dep't of Ed.*, 161 F.4th 1136, 1139 (9th Cir. 2025). Under the circumstances, the Court is satisfied that Plaintiff States' claims do not sound in contract.

The second *Megapulse* prong asks whether an action seeks contractual relief. Here, as noted earlier in this order, the complaint's prayer for relief does not seek contractual remedies (extension of the grants or money damages): Plaintiff States seek declaratory relief and an injunction against the agency directives that violate the APA and the Constitution. *See* Dkt. No. 1 at 52–53. This form of relief distinguishes this case from *Thakur v. Trump*, where the Ninth Circuit found that a suit seeking vacatur of termination notices *and reinstatement* of terminated grants fell within the scope of the Tucker Act. 163 F.4th 1198, 1204 (9th Cir. 2025). Plaintiff States seek only prospective relief. *See* Dkt. No. 1 at 52–53. Under these circumstances, the Court thus concludes that Plaintiffs do not seek contract remedies. *See Washington*, 161 F.4th at 1140 (finding the Department had not made a strong showing on the merits of its Tucker Act argument "[b]ecause Plaintiff States' claims seek purely prospective relief regarding multiyear grant discontinuations that do not take effect until December 31, 2025").

Because both *Megapulse* prongs favor the Court's exercise of jurisdiction, the Court finds that it likely retains jurisdiction to consider Plaintiff States' claims.

3. *There is Sufficient Evidence of a "Final Agency Action" to Support a TRO.*

The APA provides that only "final" agency actions "for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Only "final" agency actions may be reviewed under the APA, meaning that (1) "the action must mark the 'consummation' of

the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)).

Plaintiff States challenge the Department's termination plan to, as instructed in as the Department's February 2025 directive and the June 2025 directive, re-review existing grants for alignment with new administration priorities and make funding decisions accordingly. Dkt. No. 10 at 3–4. Plaintiff States argue that the February 2025 directive and the June 2025 directive, as well as the Department's plan to re-review the Grants in accordance with those directives to culminate in the termination of some or all of the Grants, are final agency actions subject to judicial review under the APA. *Id*. at 14–17.

The Department does not directly dispute that the February 2025 and June 2025 directives are final agency actions, but cites the Bessette declaration filed in the *Washington* action indicating that the agency has not relied on the February 2025 directive for more than a year (since the June 2025 directive was issued). *See Washington* action, Dkt. No. 447 ¶ 7. Because the Court has already prohibited the Department from implementing the February 2025 directive, and the Department denies that the June 2025 directive has any connection to either the *Washington* action or this case, the Department characterizes Plaintiff States' request to vacate the directives as "both bizarre and moot[.]" Dkt. No. 36 at 10. Curiously, although the Department filed a motion for clarification in the *Washington* action asking the Court to state whether its termination plan violated the injunction entered in that case, the Department contends in this case that the alleged

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 10

termination plan is nothing more than a "mirage" and thus cannot constitute a final agency action. *Id*.

The Court previously found that because Department personnel were ordered to comply with the February 2025 directive, and compliance with that directive had legal consequences—the discontinuation of grants in violation of the process set forth in 34 C.F.R. § 75.253—the policy change established by the February 2025 directive satisfies both requirements of a final agency action subject to judicial review. *Washington* action, Dkt. No. 269 at 12–16.

The Department's current termination plan is startlingly similar: the Department has instructed Program staff to re-review existing Grants for alignment with the administration's new unpublished priorities, with an intent to terminate Grants that do not further those priorities.[8] *See* Dkt. No. 13-4; *Washington* action, Dkt. No. 447. Although the Department continued the Grants for the entirety of 2026 in response to this Court's permanent injunction in the *Washington* action, it only *funded* the Grants through July 31, 2026. It now apparently intends to terminate some or all of them on July 31, 2026, or thereafter. The Department's termination plan is sufficiently final that Grantees and this Court have been notified of it, and the Department sought this Court's blessing to enact it. Indeed, in the *Washington* action, in support of its motion for clarification,

---

[8] At oral argument, the Department disavowed that the June 2025 directive is guiding the termination plan, but when pressed, Department counsel could not identify any policy that had replaced it. *Washington* action, Dkt. No. 453 at 36–37. Rather, when asked what was informing the terminations, Department counsel said it was a "policy decision" that would be made "on the merits of the individual grants." *Id*. When further pressed on the details of the "policy," counsel responded that the Department would assess what the Department "believe[s] the merits [of the grants] to be" and otherwise, he did not know. *Id*. Counsel then confirmed that the terminations were likely to be made at the end of this week and potentially effective immediately. *Id*. at 37. The notion that the Department is making termination decisions based upon a policy without any substance beyond "merit" is implausible. There is no evidence in the record that the June 2025 directive has been superseded. And Grantees were informed in June 2026 that any challenge to the termination of their Grants could be brought only in the Court of Federal Claims, which suggests that the Department has decided that no administrative appeal procedures under GEPA or federal civil rights laws will be followed once the grants are terminated. Dkt. No. 13-4. The Department confirmed this position in its motion for clarification in the *Washington* action, where it represented that Grantees would be funded only through the date of the termination notice and not through the pendency of any administrative process. *See Washington* action, Dkt. No. 437 at 2. These facts further support a preliminary finding of final agency action sufficient to grant Plaintiffs' motion.

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 11

the Department rebuffed Plaintiff States' suggestion that its termination plan was not "concrete" and thus insufficiently particular to allow the Court to determine whether it violates the injunction in that case. *See Washington* action, Dkt. No. 443 at 11, Dkt. No. 446 at 4. The Department cannot have it both ways.

From this Court's vantage point, the documents that are already part of the record satisfy Plaintiff States' burden to show that it is likely that the Department's re-review has been planned and is intended to have legal consequences, and there may be internal Department guidance yet to be uncovered that explicitly describes the procedure in more detail. Plaintiff States need not wait until the Department effectuates terminations to challenge the Department's clear intention to do so. *See, e.g.*, *Illinois v. Vought*, 820 F. Supp. 3d 727, 732 (N.D. Ill. 2026) (preliminarily finding jurisdiction and granting emergency TRO because "plaintiffs have made a sufficient showing that defendants issued internal guidance to terminate public-health grants for unlawful reasons; that guidance is enjoined as the parties develop a record"). According to the Department, no court would have jurisdiction to provide injunctive relief in response to grant terminations after they occur. Thus, Plaintiff States need not simply wait out the termination clock "in order to have their day in court." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 600 (2016) (explaining that a plaintiff may challenge a final agency action before it has been enforced against them).

For these reasons, the Court finds that Plaintiff States are likely to prevail on the merits of their claims, which are amenable to judicial review and fall within the scope of the Court's jurisdiction.

**C.     The Remaining *Winter* Factors Are Also Satisfied.**

The Department does not meaningfully dispute that Plaintiff States are likely to suffer irreparable harm without injunctive relief. Plaintiff States have submitted evidence from

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 12

representative Grantees describing the harms their Programs will suffer without federal funding. Dkt. Nos. 12, 13. The record before the Court in the *Washington* action on this topic is voluminous. *See Washington* action, Dkt. No. 269 at 31–32 (summarizing and citing Grantee declarations detailing harm). This evidence is sufficient to permit the Court to find that Plaintiff States are likely to suffer irreparable harm if the Department's termination plan is not enjoined.

Similarly, the balance of the equities favors Plaintiff States and the public interest is served by enjoining unlawful agency decisions. *See, e.g., League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). Although the Department complains that it "is unlikely to recover any grant funds once they are disbursed" (Dkt. No. 36 at 10), Plaintiff States do not ask this Court to order the Department to pay out any funds. The preliminary relief Plaintiff States request instead enjoins the implementation of an unlawful termination plan. *See* Dkt. No. 10-1.

Because the Court finds that Plaintiff States have made sufficient showings on all of the *Winter* factors, the Court will grant their motion for temporary preliminary relief.

**D.    No Bond Is Required.**

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation modified).

Here, the Court waives the imposition of any bond on Plaintiff States. "In public-interest litigation where the court enjoins unlawful agency action, a nominal bond is appropriate, especially where, as here, the government-defendant fails to provide any evidence that an injunction would

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 13

impose a substantial cost." *Washington v. U.S. Dep't of Transp.*, 792 F. Supp. 3d 1147, 1193–94 (W.D. Wash. 2025) (citation modified). Because, as Plaintiff States note, the Department has not obligated any funds beyond the proposed termination date, and Plaintiff States do not request that the Court order the Department to fund the Grants beyond that date, there is no evidence that granting temporary preliminary relief would require the Department to disburse funds to which Plaintiff States are not entitled.

## IV.    CONCLUSION

For the reasons explained in this order, the Court GRANTS Plaintiff States' motion for TRO (Dkt. No. 10) and ORDERS as follows:

1. Defendants and all their respective officers, agents, servants, employees and attorneys, and any person in active concert or participation with them who receive actual notice of this order are hereby fully enjoined from the following:

   a.    implementing or enforcing through any means the termination plan described in this order against the Grants, specifically by failing to provide any procedural protections to which the Grantees are due under federal statute or regulation, such as those provided by 20 U.S.C. §§ 1234d, 1234g, 1221(d), 1682; 34 C.F.R. §§ 81.1–.45, 100.8–.11, 106.81; and 42 U.S.C. § 2000d-1;

   b.    effectuating terminations by evaluating the Grants for alignment with new priorities that did not exist at the time the Grantee applied for the Grant, for purposes of evaluating whether to withhold funds from the Grantee.

2. Defendants must immediately take every step necessary to effectuate this Order, including clearing any administrative, operational, or technical hurdles to implementation, and notifying the Grantees protected by this injunction.

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 14

3.      This injunction applies to the grants protected by the permanent injunction entered on December 19, 2025, in *Washington v. U.S. Department of Education*, No. 2:25-cv-01228-KKE (W.D. Wash.), Dkt. No. 269.

4.      Defendants' counsel shall provide written notice of this Order within 24 hours to all Defendants, and their employees, contractors, and grantees.

5.      Defendants' counsel shall file a status report within 24 hours, documenting the actions that they have taken to comply with this order, including a copy of the notice and an explanation as to whom the notice was sent.

6.      A bond is not necessary under these circumstances and the Court exercises its discretion not to require one.

7.      This TRO will expire on August 24, 2026.[9]  The courtroom deputy will contact the parties to schedule a preliminary injunction hearing and will inquire whether the parties wish to supplement their briefing before that time.

Dated this 27th day of July, 2026.

Kymberly K. Evanson
United States District Judge

---

[9] "When a TRO is issued with notice and after a hearing … the 14-day limit for TROs issued without notice does not apply." *Miller v. Heimuller*, No. 3:23-cv-293-SI, 2023 WL 2474345, at *2 n.1 (D. Or. 2023) (citing *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 n.1 (D. Or. 2016)). Courts should nonetheless schedule a preliminary injunction hearing no later than 28 days after the date that the court first issues a noticed TRO.  *See id.*

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 15