The Honorable Kymberly K. Evanson

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, et al.,<br><br>Defendants. | NO. 2:26-cv-02409-KKE<br><br>PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION<br><br>NOTED ON MOTION CALENDAR: SEPTEMBER 8, 2026, 1:30 P.M. |



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 2

A. The MHSP and SBMH Grant Programs .......... 2

B. The February and June Directives .......... 4

C. The *Washington* (2025) Lawsuit .......... 7

D. The Termination Plan .......... 8

E. Procedural History .......... 9

F. Harm to Plaintiff States and Grantees .......... 9

III. LEGAL STANDARD .......... 11

IV. ARGUMENT .......... 11

A. The Tucker Act Does Not Bar this Court's Jurisdiction .......... 12

B. The Termination Plan and the Directives Are Subject to Review Under the APA .......... 13

1. The February and June Directives are final agency actions .......... 14

2. The Termination Plan is final agency action .......... 15

C. Plaintiffs Are Likely to Show the Plan and the Directives Are Contrary to Law .......... 17

1. The Termination Plan and the Directives require the Department to review Protected Grants based on priorities not set through notice and comment .......... 17

2. Defendants cannot use 2 C.F.R. § 200.340(a)(4) to terminate existing grants based on new priorities .......... 18

3. Defendants unlawfully deprive Protected Grantees of GEPA procedural protections .......... 20

4. Defendants' actions terminate and refuse to fund grants for alleged discrimination without required procedure .......... 22

D. The Termination Plan and the Directives Are Arbitrary and Capricious .......... 23

E. Defendants Retroactively Imposed New, Ambiguous Conditions on Awarded Grants in Violation of the Spending Clause .......... 24

F. Injunctive Relief Is Necessary to Avoid Irreparable Harm and Is in the Public Interest .......... 25

V. CONCLUSION .......... 26




ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

## I. INTRODUCTION

For the past sixteen months, Defendants have tried to unlawfully end over 100 grants providing critical mental health services to public schoolchildren within Plaintiff States—all because Defendants claim these grants fund discriminatory practices by supporting diversity, equity, and inclusion (DEI).[1] After months of protracted litigation, this Court entered a permanent injunction protecting these grants in *Washington v. U.S. Department of Education*, No. 2:25-cv-01228-KKE (W.D. Wash.) (*Washington* (2025)). Defendants now seek to take the same illegal actions, for the same reason, through a different procedural mechanism, claiming the permanent injunction only prohibits "discontinuing" grants, not "terminating" them.

Defendants sought to begin terminating "some or all" of the protected grants on July 31, 2026 (the Termination Plan), which this Court temporarily enjoined. In line with this Plan, Defendants have refused to provide long-promised additional funding determinations to protected grantees, even though federal civil rights laws require Defendants to comply with strict requirements before terminating or refusing to grant funding based on alleged discrimination—and even though Defendants' refusal to fund the grants will effectively end them, as the new school year is just around the corner. The federal government has waived its sovereign immunity for challenges to grant terminations based on alleged civil rights violations pursuant to Defendants' Directives.

Plaintiff States are likely to show Defendants' Termination Plan and the February and June Directives upon which it is based are unlawful for three independent reasons.

*First*, Defendants' actions are contrary to law because they: (1) failed to meet statutory notice-and-comment rulemaking requirements before applying the same unpublished priorities that *Washington* (2025) enjoins; (2) unlawfully use 2 C.F.R. § 200.340 to justify grant termination based on a failure to effectuate new priorities; and (3) violate binding procedures

[1] Plaintiffs are fifteen states who have grants within their states that were continued pursuant to the permanent injunction in *Washington* (2025).



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

under the General Education Provisions Act (GEPA) and federal civil rights laws that require the Department to comply with procedural protections *before* suspending payments.

*Second*, Defendants' actions are arbitrary and capricious. They rely on factors that Congress did not intend Defendants to consider, as the terminations are based on equity statements that Congress required grantees to include in their applications. Defendants also violate the change-in-position doctrine, as they provide no explanation for changing their interpretation of the termination regulation or their longstanding policy of working with grantees before ending grants, and Defendants did not consider reliance interests.

*Third*, Defendants' actions violate the Spending Clause because Defendants' unpublished priorities are fatally ambiguous, impermissibly retroactive, and wholly unrelated to the purpose of these grant programs, which were intended to increase mental health services in high-need schools and encourage graduate students and professionals to pursue and maintain these careers.

This Court has already found, multiple times, that allowing Defendants to unlawfully end the protected grants will cause irreparable harm to Plaintiffs, grantees, mental health professionals, universities, schools, students, and others who rely on the grants. *See Washington v. U.S. Dep't of Educ.*, 807 F. Supp. 3d 1275, 1289-92 (W.D. Wash. 2025) (*Washington I*); *Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222, 1246-48 (W.D. Wash. 2025) (*Washington II*). The Court should preliminarily enjoin Defendants from carrying out their Directives and implementing the Termination Plan, including terminating or refusing to make additional funding determinations without first complying with statutory requirements.

## II. STATEMENT OF FACTS

### A. The MHSP and SBMH Grant Programs

Following tragic school shootings in Parkland and Uvalde, Congress created and funded the Mental Health Professional Demonstration Grant Program (MHSP) and School-Based Mental Health Services Grant Program (SBMH) (collectively, "Programs") to increase the



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

number of mental health professionals serving the nation's public schools. *See Washington II*, 813 F. Supp. 3d at 1228-30. Using a competitive grant selection process, the Department awarded Program grants to Plaintiff States and other grantees, funding mental health services at Plaintiff States' public schools. *See id*. at 1230-31.

The Programs are governed by GEPA and the Department's regulations. *See* 20 U.S.C. § 1221(b)(1); 34 C.F.R. § 75.1(a)(1). With limited exceptions, GEPA requires that rules affecting the Department's grant competitions go through notice-and-comment procedures. *See* 20 U.S.C. §§ 1221e-4, 1232; 5 U.S.C. § 553. Rules subject to notice-and-comment include the priorities used to score and select grants. *See, e.g.*, 34 C.F.R. §§ 75.101(a)(4), 75.105(a), 75.217(a); Dkt. #11-1 at 14-16, 27-28; Dkt. #11-2 at 22-24. Accordingly, prior to each year's MHSP and SBMH grant competitions, the Department publishes the grant priorities for that year's competition, reviews comments, and determines the final priorities used to judge the competition. *See Washington II,* 813 F. Supp. 3d at 1230-31; Dkt. #11-1 at 15-16.

Under Section 427 of GEPA, Congress requires each grant applicant to describe "the steps such applicant proposes to take to ensure equitable access to, and equitable participation in" Program activities. 20 U.S.C. § 1228a(b) (the GEPA Equity Directive). Applicants must specifically address "the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." *Id.* Accordingly, Defendants' application form directed that "**ALL APPLICANTS. . . MUST INCLUDE INFORMATION IN THEIR APPLICATIONS TO ADDRESS [GEPA SECTION 427] IN ORDER TO RECEIVE FUNDING UNDER THIS PROGRAM.**" *Washington* (2025), Dkt. #202-1 at 1056 (2022 SBMH application); *see, e.g.*, *id.*, Dkt. #202-18 at 1072 (2024 application). The Department considers this statement when evaluating grant applications. *See* 34 C.F.R. § 75.210(d). As instructed, Plaintiff States and other grantees included statements about equity in their applications. *See, e.g.*, *Washington* (2025), Dkt. #202-1 at 1057; *id.*, Dkt. #202-18 at 1072-74.

Between 2022 and 2024, the Department selected and issued more than 100 Program grant awards with five-year performance periods to grantees within Plaintiff States. *See id.*, Dkt. #203-1 at 1-6846.

**B. The February and June Directives**

On February 5, 2025, Defendants issued an internal "Directive on Grant Priorities" that addressed "Eliminating Discrimination and Fraud in Department Grant Awards" (the "February Directive"). Dkt. #11-3. The February Directive stated, "Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." *Id.* at 2. It "direct[ed]" Department staff to "conduct an internal review of… issued grants…to ensur[e] that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives." *Id.* It directed Department staff to "terminate[]" any grants that did not survive review, citing its 2 C.F.R. § 200.340(a)(4) authority. *See id.* at 3.

This Directive omitted two statutory frameworks, both of which afford important procedural protections to Program grantees.

*First*, the Department *must* comply with procedural requirements before terminating or discontinuing grants for alleged civil rights violations. *See* 20 U.S.C. § 1682; 42 U.S.C. § 2000d-1. For instance, Title VI of the Civil Rights Act of 1964 prohibits discrimination in federally funded programs based on race, color, or national origin. 42 U.S.C. § 2000d. Before "termination of or refusal to grant or to continue [federal financial] assistance," Title VI requires the Department to first notify the grantee and attempt to secure compliance "by voluntary means." *Id.* § 2000d-1. If the Department fails, it must secure "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement" before terminating funding, and the termination shall not become effective until thirty days after the Department files a full written report with Congress. 42 U.S.C. § 2000d-1. The Department's



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

regulations implement Title VI's procedures. *See* 34 C.F.R. § 100.8(c). The same procedures apply to allegations of sex discrimination under Title IX of the Education Amendments of 1972. *See* 20 U.S.C. §§ 1681(a), 1682; 34 C.F.R. § 106.81. GEPA imposes additional requirements when the grantee is a local educational agency. *See* 20 U.S.C. § 1232i(b).

The congressional record makes clear these procedural requirements protect not only grantees, but also the school children who would suffer the consequences of any loss of federal grant funding. *See, e.g.*, 110 Cong. Reg. 7059-60 (1964). Title VI's supporters repeatedly explained: "Fund cutoff is a last resort, to be used only if all else fails to achieve the real objective—the elimination of discrimination in the use and receipt of Federal funds." *Id.* at 7059 (statement of Sen. Pastore).

*Second*, GEPA imposes notice and procedural requirements when the Department terminates or otherwise withholds payments "in whole or in part" from certain grants, including Program grants. *See* 20 U.S.C. §§ 1234d, 1234i. *Before* withholding payments, the Department must notify the grantee of "the factual and legal basis for the Secretary's belief that the recipient has failed to comply substantially with a requirement of law" and provide an opportunity for an administrative hearing. *Id.* § 1234d(b)-(c); *see also, e.g.*, 34 C.F.R. §§ 81.1-.45. A termination is not effective until the Secretary's final decision following the hearing procedure. 34 C.F.R. § 75.903(c).

The February Directive similarly ignored the Department's longstanding policy of requiring staff to work with grantees to address any issues before terminating grants. *See, e.g.*, Dkt. #11-1 at 38; Dkt. #11-2 at 47-48.

Defendants implemented the February Directive as to Program grants by discontinuing nearly 150 grants within Plaintiff States under 34 C.F.R. § 75.253, rather than terminating the grants under 2 C.F.R. § 200.340(a)(4). *See Washington* (2025), Dkt. #203-1 at 6847-7122. Defendants have since stated the grants were discontinued because they "advance the sorts of DEI programs that the Department disfavors…regardless of whether they were flatly illegal or



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

merely inconsistent with the spirit of the civil rights laws"—confirming Defendants adopted the February Directive "to effectuate the provisions of [Title VI]" as interpreted by Defendants. *Washington v. U.S. Dep't of Educ.*, No. 26-510, (9th Cir.) (*Appeal*), DktEntry #36.1 at 36; 42 U.S.C. § 2000d-1.

Unbeknownst to Plaintiffs, around June 5, 2025, Defendants issued another internal directive regarding "Non-Competing Continuation Grant Award Review Policy" (the "June Directive") that memorialized the procedure Defendants used to discontinue Program grants. *See* Dkt. #11-4. The June Directive directed Department staff to review grant awards based on the same new priorities in the February Directive:

> The Department will review all grant awards to advance the Administration's priorities of ensuring Federal funds do not support projects that: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.
>
> Consistent with these requirements, program offices must act on any relevant information that may indicate that project activities are inconsistent with Federal civil rights requirements.

*Id*. at 2. The June Directive further confirmed the Department was imposing these new priorities pursuant to, and in order to effectuate, its new interpretation of federal civil rights laws. *See id.* at 3-4 (citing, *inter alia*, Title VI and Title IX).

Rather than termination, the June Directive directed Department staff to apply this review to discontinue grants. *Id.* at 2. The June Directive expressly instructed staff to consider "the approved grant application (inclusive of the GEPA 427 statement)" when conducting this review. *Id*. at 3. Like the February Directive, the June Directive did not acknowledge, let alone direct Department staff to follow, notice and procedural requirements under federal civil rights law or GEPA. A Department official, Murray Bessette, testified, "[a]ll program offices… received training on implementation of the [June Directive] between June through July 2025." Dkt. #38-1¶ 4.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Following the June Directive, Defendants denied grantees' requests to reconsider their discontinuation, quoting purportedly DEI-related excerpts from the grant applications as justification. *See* Suppl. Chung Decl. Ex. A.

**C. The *Washington* (2025) Lawsuit**

On June 30, 2025, sixteen states filed a lawsuit challenging the discontinuation of Program grants within their states. *See Washington* (2025), Dkt. #1. In October 2025, this Court issued a preliminary injunction that protected some funds from being recompeted. *Washington I*, 807 F. Supp. 3d at 1294-95. The Court found the states showed "numerous irreparable harms flowing from the discontinuation decisions" and that the balance of equities and public interest "easily favor[ed] injunctive relief." *Id*. at 1290, 1292. Defendants sought an emergency stay of the preliminary injunction in the Ninth Circuit, which was denied. *Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1138-39 (9th Cir. 2025) (*Washington III*).

On December 19, 2025, the Court granted summary judgment and a permanent injunction to Plaintiffs. *Washington II,* 813 F. Supp. 3d at 1249. The Court again found that Plaintiff States "ha[d] submitted unrebutted evidence demonstrating the irreparable harm that the Department's actions have inflicted on Plaintiff States' education agencies and mental health systems" and had shown the balance of equities and public interest weighed in favor of an injunction. *Id*. at 1246, 1248. The Court vacated Defendants' procedure and discontinuances, ordered Defendants to make new continuation determinations, and enjoined Defendants from "[i]mplementing or enforcing through any means the Directive procedure, the discontinuation notices, or reconsideration denial letters, including recompeting Grant funds, with respect to any discontinued Grant within Plaintiff States." *Id*. at 1249.

Defendants also sought an emergency stay of the permanent injunction, which the Ninth Circuit again denied. *Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1245 (9th Cir. 2026) (*Washington IV*). On March 2, 2026, Defendants continued most of the grants protected by the *Washington* (2025) injunction (Protected Grants), extending the budget and project period to



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

December 31, 2026, but obligating only six months of funds. Suppl. Chung Decl. Ex. B, at 3. On April 23, 2026, Mr. Bessette testified, "The Department intends to make additional funding determinations…[after] the completion of their Mid-Year Check-In but no later than July 1, 2026." Suppl. Chung Decl. Ex. D ¶ 4.

**D. The Termination Plan**

Defendants conducted mid-year check-ins for the Protected Grants in April and May. Suppl. Chung Decl. Ex. C, at 2. However, rather than issue additional funding, Defendants instead planned to terminate some or all of the Protected Grants. *Id*. at 2-3.

On June 10, 2026, Defendants announced their Termination Plan through a motion seeking clarification that the permanent injunction "does not restrict the Department's separate authority to terminate grants under 2 C.F.R. § 200.340." *Washington* (2025), Dkt. #437 at 1. Defendants "intend[ed] to move forward with a proposal to terminate some or all of the grants affected by the injunction," and these terminations would be in effect upon notice. *Id*. at 2. Defendants also sought an abeyance of the pending summary judgment appeal "[i]n light of the Department's planned termination of the grants," because "[i]f the district court confirms that the terminations may proceed, the terminations will… moot this appeal." *Appeal*, DktEntry #30.1 at 3. On June 30, Defendants notified Protected Grantees about the pending terminations. *See* Dkt. #13-4.

Although Defendants have disclaimed reliance on the two Directives, they have not disputed the Termination Plan includes the same two unlawful features: (1) terminating grants based on new unpublished priorities and (2) terminating grants based on Defendants' interpretation of federal civil rights laws without complying with statutory procedural protections. This is consistent with Defendants' approach in other grant discontinuance cases, such as *Council for Opportunity in Education v. U.S. Department of Education*, No. 1:25-cv-03491-TSC, 2026 WL 120984 (D.D.C. Jan. 16, 2026) (*COE*). *See, e.g.*, Dkt. #11-7 (terminating unlawfully discontinued grants, effective immediately, pursuant to 2 C.F.R.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

§ 200.340(a)(4)); *cf. Bd. of Educ. of City Sch. Dist. of City of New York v. U.S. Dep't of Educ.*, No. 1:25-cv-08547-AS, 2026 WL 948205, at *6 (S.D.N.Y. Apr. 8, 2026) (*NYCPS*) (rejecting argument that Defendants did not need to follow Title IX procedures because they discontinued grants based on best interest determination); *President & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 126 (D. Mass. 2025) (rejecting argument that the defendants, including Department of Education, did not need to follow Title VI procedures because they claimed termination under 2 C.F.R. § 200.340(a)(4)).

Plaintiff States each have grants within their states that were continued pursuant to the *Washington* (2025) injunction. *See* Suppl. Chung Decl. Ex. C, at 3-6.

**E. Procedural History**

Plaintiffs brought this lawsuit and filed a motion for temporary restraining order on July 10, 2026. *See* Dkt. ##1, 10, 22. The Court issued a TRO on July 27, 2026. Dkt. #50. The Court found that Defendants' Termination Plan was a final agency action subject to review under the APA, that the Tucker Act did not bar the Court's jurisdiction, that the Termination Plan was likely arbitrary and capricious and contrary to law, and that Plaintiff States would be irreparably harmed absent an injunction. *See generally id.* "[T]he TRO will not expire until [this motion for] preliminary injunction is resolved." Dkt. #60 at 3. Defendants have since refused to make additional funding determinations and have moved for a stay of the TRO so they can terminate Protected Grants. *See* Suppl. Chung Decl. ¶¶ 7-8; Dkt. #67 ¶ 2.

**F. Harm to Plaintiff States and Grantees**

If the TRO is allowed to dissolve without a preliminary injunction taking its place, Defendants will terminate "some or all" of the Protected Grants. This loss of funding, expected to be effective immediately, will cause even greater rupture than the irreparable injuries that this Court repeatedly found from Defendants' discontinuations. *See Washington I,* 807 F. Supp. 3d. at 1290; *Washington* (2025), Dkt. #49 at 21-23, 36-40 (citing declarations); *and see Washington II,* 813 F. Supp. 3d at 1246-47; *Washington* (2025), Dkt. #208 at 16-20, 37-41 (citing

declarations). To make matters worse, Defendants now threaten that, upon termination, they plan to deny reimbursement for approved activities that grantees conducted prior to termination, in violation of their prior statements and regulations. *See* Dkt. 67 ¶¶ 2-3; Dkt. 13-4 at 2 (allowing grantees to "use carryover funds… during your full 12-month continuation period"); *id*. at 3 (providing instructions for wind-down that include "liquidating funds expended on approved activities through the end of the project and budget period"); *see, e.g.*, 2 C.F.R. § 200.344(c)-(f).

These same harms will irreparably injure Plaintiff States and other grantees should Defendants terminate the Protected Grants. *See* Dkt. #13 ¶¶ 7-9; Dkt. #12 ¶¶ 5-7.[2] For instance, SBMH grantees will be forced to lay off mental health clinicians, which will cause grantees to lose the considerable investments of time and resources they have already put into recruiting, retaining, and training these clinicians; the trust and relationships these clinicians have developed with staff and students; and the benefits from having school-based mental health services, such as improved academic performance, student-staff engagement, and emotional and social climates in their schools. *See, e.g.*, Dkt. #13 ¶ 8; *Washington* (2025), Dkt. #208 at 17. MHSP grantees will still be unable to meaningfully recruit graduate students for their programs, discouraging candidates from pursuing school-based mental health careers and further shrinking the pipeline; they will also still be unable to fund internship opportunities, damaging their relationships with school districts and making it more difficult for students to receive mental health services. *See, e.g.*, Dkt. #12 ¶ 6; *Washington* (2025), Dkt. #208 at 17.

Grantees specifically provided dozens of declarations for Plaintiffs' second motion to enforce in *Washington* (2025) that explain the irreparable harm from not having a funding determination for the second half of the 2026 budget period. *See generally Washington* (2025),

[2] Plaintiffs submitted over 175 declarations in *Washington* (2025). *See Washington* (2025), Dkt. ##153, 251, 341, 402 (declaration indices). Plaintiffs filed two new declarations that are representative of MHSP grantees (Dkt. #12) and SBMH grantees (Dkt. #13), and that, combined with the "voluminous" record in *Washington* (2025), allow the Court to find the same irreparable harms that arose from Defendants' grant discontinuations, will also arise from Defendants' Termination Plan. *See* Dkt. #50 at 12-13.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Dkt. #367 at 8-9; *id*. Dkt. ##368-393, 395-96, 398-400. These harms are exacerbated now that it is past July 31, and grantees still do not have funding for the second half of 2026.

As this Court has repeatedly recognized, Plaintiff States experience these harms not only as grantees, but also as sovereigns whose mental healthcare systems will be strained if the Protected Grants are no longer funded and students no longer receive mental health services at school. *See Washington II,* 813 F. Supp. 3d at 1246-47; *Washington* (2025), Dkt. #208 at 18-19 (citing declarations). These harms also include increased costs through each state's share of Medicaid funding due to providing mental health services, and the higher costs of crisis care as students' mental health needs to go untreated. *Washington* (2025), Dkt. #208 at 18-19. Plaintiff States' education systems will also suffer, including more students with health problems, lower grades and graduation rates, and increased absenteeism, suspensions, and expulsions. *Id*. at 19-20. These consequences will lead to increased administrative and cost burdens to Plaintiffs. *Id*. at 20; *Washington II,* 813 F. Supp. 3d at 1246-47.

With Fall semester just around the corner, Defendants' termination of grants—even constructively (as through Defendants' failure to make additional funding determinations)—will exacerbate these harms until grantees hit a point of no return after which they will be unable to conduct grant activities during the 2026-27 school year.

## III. LEGAL STANDARD

Preliminary injunctions are warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65(c); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). All of these factors strongly favor injunctive relief.

## IV. ARGUMENT

Plaintiffs are likely to succeed on the merits of their claims. First, the Termination Plan and the Directives are subject to review under the APA and federal civil rights laws. Second,



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

they are each contrary to law. Third, they are arbitrary and capricious. Fourth, they violate the Spending Clause. Plaintiffs are likely to suffer irreparable harm if the Termination Plan and the Directives are not enjoined, and a preliminary injunction is in the public interest.

**A. The Tucker Act Does Not Bar this Court's Jurisdiction**

The APA provides an avenue to challenge "internal agency guidance." *NIH v. Am. Public Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring). "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded…upon' contract that only the [Court of Federal Claims (CFC)] can hear." *Id.* (quoting 28 U.S.C. § 1491(a)(1)). In *NIH*, the challenged directives changed NIH funding priorities and prohibited funding grants not aligned with these new priorities. *Id*. Here, the Tucker Act does not thwart this Court's jurisdiction because Plaintiff States similarly challenge internal agency policies. *See* Dkt. #1 ¶¶ 103-06 (describing final agency actions). And as in *NIH*, it does not matter that these policies have to do with grants and may inform grant termination decisions. *NIH*, 145 S. Ct. at 2661.

This lawsuit seeks prospective relief only, including an injunction to prevent the Department from terminating grants pursuant to its unlawful policies, and it is well within the jurisdiction of this Court. *See, e.g.*, *Washington III*, 161 F.4th at 1140 (holding that district court had jurisdiction because Plaintiffs seek "purely prospective relief regarding multiyear grant discontinuations"); *Washington v. DHS*, No. 2:25-cv-1401-BJR, 2026 WL 1469538 at *6 (W.D. Wash. May 26, 2026) (holding challenge to "[t]ermination [p]olicy" was properly before district court); *California v. Wright*, No. 3:26-cv-01417-RFL, 2026 WL 1915590, at *6 (N.D. Cal. July 2, 2026) (referencing federal agency's concession that injunctive relief to prevent re-termination of cooperative agreements would need to be sought in district court); *Illinois v. Vought*, 820 F. Supp. 3d 727, 731 (N.D. Ill. 2026) (concluding "final internal guidance articulating a basis to implement grant termination" was "reviewable under the APA");



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

*City of Chicago v. DHS*, 815 F. Supp. 3d 727, 747 (E.D. Ill. 2025) (allowing challenge to "enjoin[] the government from relying on its stated reasons to withhold payment").

As recognized by this Court, Defendants' reliance on *Thakur* is misplaced. *See* Dkt. #50 at 9. There, the district court purported to vacate upon issuance grant terminations—not to enjoin the application of an unlawful policy to effectuate terminations in the first place. *See Thakur v. Trump,* 787 F. Supp. 3d 955, 1005 (N.D. Cal. 2025), *aff'd in part, rev'd in part and remanded*, *Thakur v. Trump*, 176 F.4th 1187 (9th Cir. 2026) (ordering future grant terminations "vacated upon issuance"). The Ninth Circuit held this remedy was "'designed to enforce an obligation to pay money pursuant to the grants' at issue," and was barred under *NIH*. *Thakur*, 176 F.4th at 1199 (quoting *NIH*, 145 S. Ct. at 2658). But Plaintiff States do not seek the vacatur of a grant termination on retroactive, prospective, or any other basis. They seek an injunction against enforcement of an unlawful policy. That the policy governs grant termination itself does not "transform a challenge to that guidance into a claim 'founded…upon' contract that only the [Court of Federal Claims (CFC)] can hear," and Plaintiff State's lawsuit is not barred by the Tucker Act. *NIH*, 145 S. Ct. 2661 (Barrett, J., concurring); *see also* Dkt. #50 at 8-9.

Regardless, when, as here, Defendants are "terminating or refusing to grant or to continue financial assistance" based on requirements Defendants have imposed pursuant to federal civil rights law, *see supra* § II.B, the federal government waives sovereign immunity for challenges to such actions and permits review following APA standards. 42 U.S.C. § 2000d-2; 20 U.S.C. § 1683; *see, e.g.*, *Harvard*, 798 F. Supp. 3d at 106 (rejecting Tucker Act argument where Title VI "expressly authorizes 'judicial review' of agency action… in an Article III court"); *Colwell v. HHS*, 558 F.3d 1112, 1128 (9th Cir. 2009) ("Judicial review of any [Title VI] funding termination is available in an Article III court.").

**B. The Termination Plan and the Directives Are Subject to Review Under the APA**

The Termination Plan and the Directives are all "final agency actions" subject to review under the APA, 5 U.S.C. § 704. The APA defines "agency action" broadly, *see* 5 U.S.C. §



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

551(13), and the definition "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citation omitted).

Final agency actions (1) "mark the consummation" of agency decision-making, and (2) determine "rights or obligations...from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified). Courts consider "factors such as whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance...is expected." *Prutehi Litekyan: Save Ritidian v. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (quotation omitted). Finality is "interpreted in a pragmatic and flexible manner[,]" "focus[ing] on the practical and legal effects of the agency action." *Saliba v. SEC*, 47 F.4th 961, 967 (9th Cir. 2022) (quotation omitted). The Termination Plan and the Directives easily meet this test.

**1. The February and June Directives are final agency actions**

The February and June Directives, which instruct Department personnel to evaluate grants against new administration priorities to make termination and discontinuation decisions, are obviously subject to review under the APA. *See Nat. Insts. of Health v. Am. Public Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court or directly in the D.C. Circuit." (citing cases)). They set out new procedures that Department personnel are directed to follow, so they consummate the agency's decision making. *See* Dkt. ##11-3, 11-4. And legal consequences flow from them, namely that Program grantees (among others) are subject to discontinuation and termination for failure to align their grant projects *ab initio* with new administration priorities—and a new administration's interpretation of federal civil rights law—that sprang into existence long after the 5-year grants were awarded. *Id*.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

For exactly these reasons, this Court already held the February Directive is final agency action subject to APA review. *Washington II,* 813 F. Supp. 3d at 1237.[3] The June Directive is no different, as it apparently memorialized the procedure that was vacated and enjoined in *Washington* (2025), and Department staff clearly applied it to deny reconsideration requests for protected grantees that were subsequently vacated. *See id.* at 1246-49 (enjoining and vacating, among other things, denials of reconsideration). Moreover, the Department now appears to be applying both the February and June Directives to terminate Protected Grants after the Court declared unlawful, enjoined, and vacated the Department's initial application of the same Directives to discontinue the same grants. *See Washington* (2025), Dkt. #437 at 2; *supra* § II.D.

**2. The Termination Plan is final agency action**

As recognized by this Court, the Termination Plan is also final agency action subject to APA review. *See* Dkt. #50 at 9-12.

First, there is no doubt that the Termination Plan is consummated. Defendants communicated it to this Court, grantees, and the Ninth Circuit. *Washington* (2025), Dkt. #437 at 1-2 (announcing intent "to terminate some or all of the grants affected by the [*Washington*] injunction" and seeking clarification "so that the Department can commence grant agreement terminations on July 31, 2026"); *id.* #446 at 3-4 ("The Department's request plainly involves a concrete situation. The Department has informed the Court that it is planning to terminate some or all of the grants that are affected by its injunction pursuant to 2 C.F.R. § 200.340 on or after July 31, 2026. There is nothing abstract about the circumstances."); Dkt. #13-4 at 2 (notifying grantee that "[t]he Department. . . is considering terminating this grant" and citing *Washington* (2025), Dkt. #437); Dkt. #67 ¶¶2-3 (seeking stay of TRO so Defendants can cut off grant funding); *Appeal*, DktEntry #39.1 (explaining that the Department has a "plan to terminate some or all of the grants" protected by injunction). To the extent that the Department will take

[3] Since a court has already held the February Directive to be a final agency action in litigation between Plaintiff States and Defendants, any claim to the contrary here would be precluded. *See Montana v. United States*, 440 U.S. 147, 153 (1979).



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

additional steps to apply the Termination Plan to individual grantees is no obstacle to finality. "[A] federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence—for instance, a future site-specific application, a decision by another administrative agency, or conduct by a regulated party." *Prutehi Litekyan: Save Ritidian*, 128 F.4th at 1110.

Recent events further demonstrate the Department's plan to end the Protected Grants by hook or by crook. As part of the *Washington* (2025) matter, Defendants were supposed to provide continuation awards for the budget period, ending December 31, 2026. *See Washington II*, 813 F. Supp. 3d at 1249-50 (requiring lawful continuation awards under 34 C.F.R. § 75.253); 34 C.F.R. § 75.253(a) (contemplating continuation awards for the budget period). However, Defendants put up obstacles for grantees, providing only six months of funding and requiring mid-year check-ins before making additional funding determinations. Suppl. Chung Decl. Ex. D ¶¶ 2, 4 ("The Department intends to make additional funding determinations for the grantees affected by this litigation, at a time subsequent to the completion of their Mid-Year Check-In but no later than July 1, 2026."). Grantees completed mid-year check-ins in April and May, *id*. Ex. C at 2, yet the additional funding determinations have not materialized. *See id.* ¶ 7. When Plaintiff States asked about the additional funding determinations, Defendants refused to answer. *Id*. ¶ 8. This is at minimum "refusing to grant or to continue financial assistance" under 42 U.S.C. § 2000d-1 and without additional funding, grantees will be constructively terminated.

Second, legal consequences clearly flow from the Termination Plan. On top of the straightforward consequence that Protected Grants will be evaluated for termination according to Defendants' *new* priorities, instead of the published priorities that governed their grant applications, the Termination Plan implicates a host of other consequences that Defendants have explicitly communicated to grantees. The Department contends that "exclusive jurisdiction for challenges to grant terminations is in the United States Court of Federal Claims."



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Dkt. #13-4, at 2. This purported jurisdictional consequence is the very first statement in the Department's letter communicating the Termination Plan, showing that one primary aim is to divest this Court of jurisdiction and deprive grantees of procedural protections afforded under applicable civil rights laws and GEPA. *Id.*; *see also Washington* (2025), Dkt. #437 at 2.

It is no matter that *particular* grant-by-grant termination decisions have yet to be made. *See Illinois v. FEMA*, 801 F. Supp. 3d 75, 89 n.6 (D.R.I. 2025) (collecting cases); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) ("Respondents need not assume such risks while waiting for [the agency] to 'drop the hammer' in order to have their day in court."). It is customary in APA litigation to challenge policies separate from their application to individual circumstances. *E.g.*, *New York v. Trump*, 171 F.4th 1, 23 (1st Cir. 2026) (upholding preliminary injunction against "the immediate and categorical freezing of federal financial assistance"); *Illinois v. Vought*, 825 F. Supp. 3d 721, 729 (N.D. Ill. 2026) ("Plaintiffs' challenge is not to grant-by-grant, award-by-award terminations, but instead to agency-wide policies targeting states."); *cf. supra* § IV.A.

### C. Plaintiffs Are Likely to Show the Plan and the Directives Are Contrary to Law

#### 1. The Termination Plan and the Directives require the Department to review Protected Grants based on priorities not set through notice and comment

As this Court has held multiple times, "it is unlawful to make funding decisions for approved multi-year Grantees by evaluating their original grant applications against new unpublished priorities not in effect at the time that the Grants were approved." Dkt. #50 at 5-6 (citing *Washington v. U.S. Dept. of Educ.*, 813 F.Supp.3d 1222, 1245 (W.D. Wash. 2025)). Defendants' actions are contrary to law because they apply priorities not set through notice-and-comment rulemaking as criteria for funding decisions. Under GEPA, a "regulation" subject to notice and comment includes "[1] any generally applicable rule, regulation, guideline, interpretation, or other requirement that [2] is prescribed by the Secretary or the Department; and [3] has legally binding effect in connection with, or affecting, the provision of financial



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

assistance under any applicable program.'" *Washington IV*, 167 F.4th at 1245 (quoting 20 U.S.C. § 1232(a)); *see also* 20 U.S.C. § 1232e-4.

This Court has already held that Defendants' application of the February Directive's unpublished criteria to existing grants violated GEPA's rulemaking requirements. *See Washington II,* 813 F. Supp. 3d at 1244-45. Accordingly, Defendants are precluded from rearguing this issue. *See Montana*, 440 U.S. at 153. The same result applies to the June Directive, which imposes the same unpublished priorities. *See* Dkt. #11-4 at 2. As the Termination Plan appears to apply the unpublished criteria from the Directives as a basis for termination, it violates GEPA's rulemaking requirements too. *See* 20 U.S.C. § 1232(a); 20 U.S.C. § 1221e-4.

**2. Defendants cannot use 2 C.F.R. § 200.340(a)(4) to terminate existing grants based on new priorities**

The Termination Plan and the February Directive are also contrary to 2 C.F.R. § 200.340. They direct the termination of grant awards based on new agency priorities, but this regulation only contemplates termination based on, at most, the already-established agency priorities that apply to the grant. *Cf. New Jersey v. OMB*, No. 1:25-cv-11816-IT, 2026 WL 2069832, at *17 (D. Mass. July 17, 2026).

Starting with the plain language, Section 200.340 allows the termination of a grant award, in some circumstances, if the award "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4); *see Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005) (courts construe regulations by starting with the plain text). Generally, "the" is a "function word. . . indicating that a following noun or noun equivalent is definite or has been previously specified by context." *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (citation modified); *Gale v. First Franklin Loan Servs.*, 701 F.3d 1240, 1246 (9th Cir. 2012) (explaining "'the'. . . is a word of limitation"). So, "the" program goals or agency priorities means not just any goals or priorities that agencies identify whenever they wish, but rather, the specific goals and priorities applicable to the grant award. *New Jersey,* 2026 WL 2069832, at *11-12. Here, that means the

goals and priorities that went through notice-and-comment procedures and to which applicants tailored their applications. *See supra* § IV.A.

The language also makes clear that Section 200.340 can only be used to terminate when "*the award itself* no longer effectuates the program goals or agency priorities, and does not extend to *changes* in program goals or agency priorities." *Washington v. U.S. Dep't of Comm.*, 812 F. Supp. 3d 1169, 1183 (W.D. Wash. 2025) (emphasis added); *see also New Jersey,* 2026 WL 2069832, at *11-12. The phrase "no longer" implies "once did." *See No Longer*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/dictionary/english/no-longer (last visited July 9, 2026). Applied here, that an award "no longer effectuates" certain program goals or agency priorities means the award "once did effectuate" those goals and priorities. This straightforward reading only works if the goals or priorities are fixed at the start: a grantee clearly met existing program goals or agency priorities when the agency issued the award, and the grantee must continue to meet those same goals or priorities to satisfy the regulation's language. That reading is impossible, however, if the goals or priorities can be changed midstream, as Defendants claim: a grantee could never have met program goals that did not exist when the agency issued the award. *See New Jersey,* 2026 WL 2069832, at *11-12.

The broader regulatory scheme backs this reading. *Id.* at *13-14. It puts grantees "on notice, before applying, as to what the program goals and agency priorities are for any particular award." *Id.* at *14. The court in *New Jersey* concluded that it "would be contrary to this extensive scheme to interpret the Termination Clause to allow the termination of grants based on new priorities, including priorities not disclosed to the grantees," because: it would "obviate any need to notify parties of program goals and priorities, given that agencies could change goals and priorities at any time" and "undermine other requirements set forth by the regulatory scheme." *Id.* (citing *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008)).

Further confirmation is found in the regulation's rulemaking history. *Id.* at *14-15. OMB added this language in 2020 "to ensure that Federal awarding agencies prioritize *ongoing support*

to Federal awards that meet program goals." 85 Fed. Reg. 49506, 49507 (Aug. 13, 2020) (emphasis added). In response to comments "express[ing] a concern that [the language] will provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause," OMB firmly stated that the clause does *not* empower agencies "to terminate grants arbitrarily." *Id.* at 49509. But Defendants' interpretation, evinced in their February Directive and Plan, allows for the exact arbitrary, unchecked discretion they previously disavowed.

Defendants' interpretation violates other cannons of construction. It impermissibly renders superfluous the other provisions circumscribing when agencies can terminate existing grants. *See Fischer v. United States*, 603 U.S. 480, 498 (2024) (rejecting interpretation that "renders an unnerving amount of . . . text mere surplusage."); *New Jersey*, 2026 WL 2069832, at *12. Moreover, Defendants' interpretation would run afoul of the Spending Clause. *See infra* § IV.D; *New Jersey*, 2026 WL 2069832, at *16; *DeBartolo v. Fla. Gulf Coast Bldg. and Const. Trades Council,* 485 U.S. 568, 588 (1988) (avoiding an interpretation raising grave constitutional concerns).

In sum, 2 C.F.R. § 200.340's language contemplates termination only where an award "no longer effectuates" *established* agency priorities. Defendants' February Directive and their Termination Plan, requiring termination of grants "deemed inconsistent with" *new* agency priorities, are thus contrary to law.

**3. Defendants unlawfully deprive Protected Grantees of GEPA procedural protections**

As recognized by this Court, "[I]t is likely that the Department intends to terminate Grants without…any of the procedural protections to which Grantees are entitled under either GEPA or the federal civil rights statutes." *See* Dkt. #50 at 7.

GEPA applies to these Programs, because they were authorized under 20 U.S.C. § 7281, the Elementary and Secondary Education Act of 1965 (ESEA). *See* 20 U.S.C. § 1234i(2)*, see, e.g.*, 87 Fed. Reg. 60083, 60084 (Oct. 4, 2022) (program authority for MHSP); 87 Fed. Reg.

60092, 60093 (Oct. 4, 2022) (SBMH). Under GEPA procedures, the Department may "withhold from a recipient, in whole or in part, further payments" only *after* notice, an administrative hearing, and, should the grantee pursue it, appeal. *See* 20 U.S.C. §§ 1234d(a) and (c), 1234g(a). The Department's regulations implement these procedural requirements. *See* 34 C.F.R. §§ 81.1-.45.

Congress, the Department, and courts have interpreted a "withholding" under 20 U.S.C. § 1234d to include terminations for GEPA programs.[4] *See* 20 U.S.C. § 1232i(b) (listing terminations as a type of withholding); 34 C.F.R. § 75.903(c) (providing that termination is not effective until after a final decision under the GEPA hearing procedure); *Freeman v. Cavazos*, 923 F.2d 1434, 1440 (11th Cir. 1991) ("20 U.S.C. § 1234d describes the procedure for termination of assistance[.]"). However, following the February Directive, Administrative Law Judges have repeatedly rejected Defendants' attempts to terminate other ESEA grants under 2 C.F.R. § 200.340(a)(4), effective immediately, without complying with GEPA's procedural requirements. *See, e.g.*, *University of St. Thomas*, No. 25-09-GT, 2025 WL 2256477, at *7-8 (ED. O.H.A. July 10, 2025); *In re St. Louis University*, No. 25-11-GT, 2025 WL 2256478, at *5-7 (ED. O.H.A. July 10, 2025); *In re Cleveland State University*, No. 25-12-GT, 2025 WL 4740230, at *9-13 (ED. O.H.A. May 15, 2026).

Nonetheless, Defendants' February Directive fails to acknowledge these GEPA procedural protections, let alone direct Department staff to follow them. *See* Dkt. #11-3. The Termination Plan repeats this error. In their recent notice to grantees, Defendants asserted that grant terminations can only be challenged in the Court of Federal Claims. Dkt. #13-4 at 2. This flies in the face of the ALJ decisions retaining jurisdiction and ordering the Department to continue funding grants pending a final decision. *St. Thomas*, 2025 WL 2256477, at *13;

[4] This contrasts with grant discontinuances, which the Department has expressly determined are not afforded this relief. 34 C.F.R. § 75.253(i).



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

*St. Louis*, 2025 WL 2256478, at *7; *see also Cleveland,* 2025 WL 4740230, at *19 (granting petitioner's motion for summary judgment and reversing grant termination).

Additionally, it is clear, based on Defendants' briefing and recent practice, that the Termination Plan violates 20 U.S.C. § 1234d and 34 C.F.R. § 75.903(c), by making any grant terminations effective immediately. *See Washington* (2025), Dkt. #437 at 2 (representing that Grantees would only be funded through the date of the termination notice); *cf*. Dkt. #11-7 (TRIO grant terminations effective immediately).

**4. Defendants' actions terminate and refuse to fund grants for alleged discrimination without required procedure**

Similarly, although the Termination Plan and the Directives are rooted in Defendants' apparent belief that DEI activities violate federal civil rights law, they do not acknowledge the procedural requirements imposed by these laws, let alone direct Department staff to comply with them. *See* Dkt. ##11-3, 11-4. This violates Title VI and Title IX, which require agencies to first attempt to secure voluntary compliance and provide an opportunity for hearing before terminating a grant. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. The agency must also report to Congress thirty days before the terminations become effective. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682.

Defendants' recent practices show that Defendants intend to disregard these procedural protections, too. *See, e.g.*, *NYCPS*, 2026 WL 948205, at *6 (arguing they did not need to follow Title IX's procedures because they discontinued the grants for not being in the government's best interest under 34 C.F.R. § 75.253(a)(5)); *Harvard*, 798 F. Supp.3d at 126 (same, for Title VI and 2 C.F.R. § 200.340(a)(4)); *COE*, Dkt. #11-6 at 15 (terminating effective immediately). Defendants cannot rely on the guise of the termination regulation, 2 C.F.R. § 200.340, to ignore the notice and procedure requirements in Title VI and Title IX.

**D. The Termination Plan and the Directives Are Arbitrary and Capricious**

Defendants' actions are arbitrary and capricious because they rely on factors Congress did not intend them to consider. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Pursuant to the GEPA Equity Directive, Congress requires grant applicants to describe in their applications how they will ensure equity in their programs. 20 U.S.C. §1228a(b). Under federal civil rights laws, Congress also intended Defendants to consider what the grantees are doing, not what grantees said they would do in their applications. *See* 42 U.S.C. § 2000d-1 (requiring that agency attempt to secure voluntary compliance); 20 U.S.C. § 1682 (same). Yet, Defendants' actions require Department staff to consider the GEPA equity statements as a basis to end Protected Grants, as reflected in the June Directive. *See* Dkt. #11-4 at 3. Defendants already tried to do this once, *see* Suppl. Chung Decl. Ex. A, and now intend to terminate Protected Grants on this same basis under the Termination Plan. *Cf.* Dkt. #11-7. It is also arbitrary and capricious to terminate Protected Grants based on GEPA equity statements that Defendants themselves instructed the applicants to include, and that Defendants used to evaluate and select the Protected Grants. *See supra* § II.A; 34 C.F.R. § 75.210(d).

Additionally, the Termination Plan and the Directives are arbitrary and capricious because Defendants violated the "[t]he change-in-position doctrine," which "requires agencies to provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Wages & White Lion Invs.*, 604 U.S. at 544 (citation modified). The actions share two common changes in position. First, they instruct Department staff to end funding based on new priorities, rather than established priorities, as was its prior practice. *Cf. Washington II*, 813 F. Supp. 3d at 1237-38. Second, they also changed Department policy by not offering grantees an opportunity to come into compliance before ending funding. *See* Dkt. #11-1 at 38. In changing their position, Defendants provided the public with no explanation and issued the Directives in secret. Additionally, Defendants did not display



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

an awareness that they were changing their position, nor did they consider grantees' serious reliance interests when doing so.

**E. Defendants Retroactively Imposed New, Ambiguous Conditions on Awarded Grants in Violation of the Spending Clause**

The Spending Clause "does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). States must have fair notice, so they may "voluntarily and knowingly" accept conditions attached to federal spending. *See id.* at 17, 25; *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175, n.6 (9th Cir. 2019). States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). Thus, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17.

Defendants' actions impose new conditions that fail these requirements in three ways.

*First*, the new priorities of "merit, fairness, and excellence in education" announced in the Directives and imposed by the Termination Plan are impermissibly ambiguous. *See id*. These terms are so broad they are rife with vagueness and ambiguity. Nor have Defendants provided any clarifying guidance defining what is meant by these terms. Accordingly, the actions are "fatally ambiguous because [they] fail[] to clarify what conduct is proscribed." *See S.F. Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 746 (N.D. Cal. 2025) (quotation omitted).

*Second*, the Termination Plan and the Directives retroactively impose their new priorities. To give grantees sufficient notice of the applicable conditions for these awards, the Department published priorities, requirements, and definitions in the Federal Register. *See supra* § II.A. The new priorities are retroactive conditions which Defendants have directed staff to apply to terminate existing grants. This retroactive application of Defendants' new priorities violates the Spending Clause. *Cf. Barr*, 929 F.3d at 1175-76 (holding new priorities would not violate Spending



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Clause because government applied them only prospectively to new grants); *U.S. Dep't of Comm.*, 812 F. Supp. 3d at 1187 (applying new priorities to terminate grants likely violated Spending Clause).

*Third*, to the extent that the Department now seeks to eliminate equity measures, this anti-equity condition is impermissibly unrelated to purpose of the Programs, the GEPA Equity Directive, and the final rulemaking priorities governing the Programs. *See South Dakota v. Dole*, 483 U.S. 203, 207, 209 (1987).

### F. Injunctive Relief Is Necessary to Avoid Irreparable Harm and Is in the Public Interest

Defendants have never meaningfully disputed the harms that Plaintiff States, other Protected Grantees, mental health professionals, graduate students, universities, elementary and secondary schools, and students will experience if Defendants succeed in ending the Protected Grants. *See, e.g.*, Dkt. #50 at 13 (recognizing "voluminous" record of harm).

The same harms from discontinuation of grants in *Washington* (2025), will occur if the Termination Plan and the Directives are not enjoined and Defendants are allowed to terminate the Protected Grants. *See* Dkt. #12 ¶¶ 5-7; Dkt. #13 ¶¶ 7-9; *see generally supra* § II.F. Plaintiff States' Medicaid and educational systems will also suffer, and Plaintiffs will incur additional costs from the loss of the Protected Grants. *See supra* § II.F. This Court has repeatedly recognized these irreparable harms justify injunctive relief. *See* Dkt. #50 at 12-13; *Washington I,* 807 F. Supp. 3d at 1290; *Washington II,* 813 F. Supp. 3d at 1246-47.

Plaintiffs also presented ample evidence of the irreparable harm from Protected Grantees only receiving funding for the first half of the year. *See Washington* (2025), Dkt. #367 at 8-9; *id.* Dkt. ##368-393, 395-96, 398-400.

These harms outweigh any potential hardship to Defendants. *See Washington II,* 813 F. Supp. 3d at 1247. The remaining factors tip heavily in favor of an injunction.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

## V. CONCLUSION

The Court should preliminarily enjoin the Termination Plan and Directives and prohibit Defendants from implementing or enforcing them against Protected Grants.

DATED this 14th day of August 2026.

I certify that this memorandum contains 8386 words in compliance with Local Civil Rules.

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Jennifer K. Chung*
JENNIFER K. CHUNG, WSBA #51583
ELLEN RANGE, WSBA #51334
Assistant Attorneys General
Complex Litigation Division
WILLIAM MCGINTY, WSBA #41868
CYNTHIA ALEXANDER, WSBA #46019
Deputy Solicitors General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
Jennifer.Chung@atg.wa.gov
Ellen.Range@atg.wa.gov
William McGinty@atg.wa.gov
Cynthia.Alexander@atg.wa.gov

*Attorneys for State of Washington*

ROB BONTA
Attorney General of California

/s/ Crystal Adams
CRYSTAL ADAMS*
Deputy Attorney General
NELI PALMA*
Senior Assistant Attorney General
KATHLEEN BOERGERS*
Supervising Deputy Attorney General
KATHERINE MILTON*
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
916-210-7522
Crystal.Adams@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Katherine.Milton@doj.ca.gov

*Attorneys for State of California*

PHILIP J. WEISER
Attorney General of Colorado

/s/ Sarah H. Weiss
SARAH H. WEISS*
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
Sarah.Weiss@coag.gov

*Attorney for State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

/s/ Andrew Ammirati
ANDREW AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorney for State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

/s/ Ian R. Liston
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
Vanessa.Kassab@delaware.gov

*Attorneys for the State of Delaware*

KWAME RAOUL
Attorney General of Illinois

*/s/ Emily Hirsch*
EMILY HIRSCH*
Assistant Attorney General
ALEEZA STRUBEL*
Complex Litigation Counsel
Office of the Illinois Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-835-0148
Aleeza.Strubel@ilag.gov
Emily.Hirsch@ilag.gov

*Attorneys for State of Illinois*

AARON M. FREY
Attorney General of Maine

*/s/ Sarah A. Forster*
SARAH A. FORSTER*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Sarah.Forster@maine.gov

*Attorney for the State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Michael Drezner*
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us

*Attorney for State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Adelaide Pagano*
ADELAIDE PAGANO*
Assistant Attorney General
Office of the Massachusetts Attorney General
100 Cambridge Street
Boston, MA 02108
617-963-2122
Adelaide.Pagano@mass.gov

*Counsel for the Commonwealth of Massachusetts*

DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorney for the State of Michigan*

RAÚL TORREZ
Attorney General of New Mexico

*/s/ Aletheia V.P. Allen*
ALETHEIA V.P. ALLEN*
Solicitor General
LAWRENCE MARCUS*
Assistant Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
AAllen@nmdoj.gov
LMarcus@nmdoj.gov

*Attorneys for State of New Mexico*

LETITIA JAMES
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
MARK LADOV*
Special Counsel
28 Liberty Street
New York, NY 10005
212-416-8240
Rabia.Muqaddam@ag.ny.gov
Mark.Ladov@ag.ny.gov

*Attorneys for the State of New York*

DAN RAYFIELD
Attorney General of Oregon

*/s/ Leanne Hartmann*
LEANNE HARTMANN*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
971-673-1880
Leanne.Hartmann@doj.oregon.gov

*Attorney for State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Kyla Duffy*
KYLA DUFFY*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
Kduffy@riag.ri.gov

*Attorney for State of Rhode Island*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Frances Reynolds Colbert*
FRANCES REYNOLDS COLBERT*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-266-9226
Frances.Colbert@wisdoj.gov

*Attorney for State of Wisconsin*

**Admitted pro hac vice*