UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>Plaintiff(s),<br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, et al.,<br><br>Defendant(s). | CASE NO. C26-2409-KKE<br><br>ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION |

A group of 15 states ("Plaintiff States") filed this action challenging the Defendant United States Department of Education's plan to terminate a group of grants ("the Grants") that provide mental health services for public-school students in their states no earlier than July 31, 2026. Dkt. No. 1. Plaintiff States also moved for a temporary restraining order ("TRO") enjoining the Department from terminating the grants for allegedly unlawful reasons, which the Court entered. Dkt. Nos. 10, 22, 50.[1] Plaintiff States then moved for a preliminary injunction (Dkt. No. 72), and the Court will grant their motion because they have demonstrated that they are entitled to preliminary relief.

[1] This order refers to the parties' briefing by CM/ECF page number.

## I. BACKGROUND

Congress created two grant programs, the School-Based Mental Health Services Grant Program and the Mental Health Service Professional Demonstration Grant Program (collectively "the Programs"), in response to evidence revealing a mental health crisis in schools, particularly in rural, low-income, high-need areas. Dkt. No. 1 ¶¶ 5, 42–46. The Programs fund scholarships and clinical training for graduate students, as well as salaries for mental health professionals hired directly by state and local education agencies. *Id.* ¶ 44–45. The Department administers the Programs by awarding grants, including multi-year projects. *Id.* ¶¶ 47–49.

In February 2025, the Department issued guidance instructing agency personnel to review existing grants to ensure that their programs align with the new presidential administration's priorities, and stating that grants that do not meet the new priorities would be subject to termination under 2 C.F.R. § 200.340(a)(4). Dkt. No. 1 ¶ 61 (referencing Dkt. No. 11-3 ("the February 2025 directive")). The February 2025 directive identified the Department's new priority of "eliminating discrimination" by ensuring that Department grants "do not support or take part in diversity, equity, and inclusion ('DEI') initiatives" because such efforts "can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." Dkt. No. 11-3 at 2. After that re-review, many Program multi-year grantees received notices of non-continuation in April 2025. Dkt. No. 1 ¶ 64.

In early June 2025, the Department issued additional guidance instructing agency personnel to review grant awards—explicitly including the equity statement that grant applicants were required to include in their applications—for compliance with the priorities of the new administration. Dkt. No. 11-4 ("the June 2025 directive"). The June 2025 directive referenced the same priorities identified in the February 2025 directive. *Id.* at 2 ("The Department will review all grant awards to advance the Administration's priorities of ensuring Federal funds do not support

projects that: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.").

On June 30, 2025, a group of 16 states filed a lawsuit to challenge the Department's actions with respect to grants serving their states. *See Washington v. U.S. Dep't of Educ.,* No. C25-1228-KKE (W.D. Wash. 2025) ("*Washington* action"). The Court granted Plaintiff States' motion for a preliminary injunction, and later granted their motion for summary judgment and permanent injunction, finding that the Department's re-review procedure culminating in discontinuation decisions was arbitrary and capricious and contrary to law. *Washington* action, Dkt. Nos. 193, 269. The Court vacated the discontinuation notices, instructing the Department to issue new continuation decisions that comply with 34 C.F.R. § 75.253. *Id.*, Dkt. No. 269 at 34–36.

The Department issued new continuation decisions and has awarded funding to most grantees ("Grantees") through July 31, 2026. Dkt. Nos. 74-2, 74-3. In June 2026, the Department informed the Grantees and the Court that no earlier than July 31, 2026, the Department would issue notices terminating "some or all" of the Grants under 2 C.F.R. § 200.340. *Id.* ¶ 77. In response, Plaintiff States sued the Department,[2] asserting that the Department's termination plan (and the February 2025 and June 2025 directives that led to it) violates the Administrative Procedure Act ("APA") in multiple ways because the plan is arbitrary and capricious, contrary to law, violates notice-and-comment rulemaking requirements, violates the General Education Provisions Act ("GEPA"), violates statutory procedures for addressing alleged civil rights violations; is *ultra vires*; and violates the Spending Clause of the United States Constitution. Dkt. No. 1 ¶¶ 114–200.

---

[2] The Department's Secretary Linda McMahon is also a Defendant, but this order refers to Defendants collectively as "the Department."

Plaintiff States filed a motion for TRO, alleging they are likely to prevail on their APA claim (specifically the contrary to law and arbitrary and capricious theories) and Spending Clause claim. Dkt. No. 10. The Court granted Plaintiff States' TRO motion, temporarily prohibiting the Department from terminating the Grants without providing certain procedural protections or terminating the Grants by evaluating the Grants for alignment with new priorities that did not exist at the time the Grantee applied for the Grant. Dkt. No. 50 at 14. Although the Department denied that it had taken "final agency action" toward terminating the Grants, the Court found that "the documents that are already part of the record satisfy Plaintiff States' burden to show that it is likely that the Department's re-review has been planned and is intended to have legal consequences, and there may be internal Department guidance yet to be uncovered that explicitly describes the procedure in more detail." *Id*. at 12. The Court thus found that for purposes of a TRO, there was sufficient evidence of a "final agency action" to support judicial review. *Id*. at 9. The TRO was set to expire on August 24, 2026. *Id*. at 15.

In the days that followed the entry of the TRO, Plaintiff States requested expedited discovery, the Department appealed the TRO, and the Department requested a stay of the TRO pending appeal. Dkt. Nos. 57, 64, 66. The Court found good cause to extend the TRO's expiration until the preliminary injunction motion could be resolved, given the briefing schedules needed on the motions for expedited discovery and a stay pending appeal. Dkt. Nos. 60, 69. The Court ultimately granted in part and denied in part Plaintiff States' motion for expedited discovery, and denied the Department's motion for stay pending appeal. Dkt. Nos. 85, 90. The Ninth Circuit subsequently denied the Department's request for a stay pending appeal as well.

Briefing on Plaintiff States' amended motion for preliminary injunction is now complete, and the Department has filed an expedited administrative record and responded to Plaintiff States' discovery requests. Dkt. Nos. 72, 86, 94, 97. The Court heard oral argument on the motion on

September 8, 2026. Dkt. No. 99. For the following reasons, the Court finds that Plaintiff States have satisfied their burden to show that they are entitled to preliminary relief and will therefore grant their motion.

## II. ANALYSIS

### A. Legal Standards

"Preliminary injunctive relief is an extraordinary equitable remedy that is never awarded as of right." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024) (citation modified). "The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)).

To succeed on a motion for preliminary injunction or temporary restraining order, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 20 (2008). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).

With these standards in mind, the Court will address the *Winter* factors to determine whether Plaintiff States are entitled to preliminary relief.

**B. Plaintiff States are Likely to Succeed on the Merits.**

1. *Plaintiff States Are Likely to Succeed on the Merits of their APA (Arbitrary and Capricious and Contrary to Law) Claims.*[3]

Courts reviewing agency actions must "hold unlawful and set aside" actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are unconstitutional, violate a statute, or fail to follow the required procedures. 5 U.S.C. § 706(2)(A)–(D).

The record contains sufficient evidence to permit the Court to find that Plaintiff States are likely to prevail on their APA claims challenging the Department's actions as arbitrary and capricious and contrary to law.[4] Although the Department repeatedly argues that Plaintiff States merely speculate but cite "no evidence" of the challenged actions, the Court disagrees. Rather, when viewed in combination, the February 2025 directive, the June 2025 directive, the June 2026 notices sent to Grantees, the Department's second status report issued in the *Washington* action, the Department's briefing on its motion for clarification in the *Washington* action, the declaration of Murray Bessette filed in the *Washington* action, the Department's public description of its grant review process on its website, and internal Department memoranda describing the July 2026 Grant funding confirm the Department's plan to re-review Grants for termination based on the current Executive's priorities and to terminate them without providing required procedural protections. *See* Dkt. Nos. 11-3, 11-4, 13-4, 83-1, 98-2, 98-3; *Washington* action, Dkt. Nos. 437, 445, 446, 447.

---

[3] Because the Court finds that Plaintiff States are likely to succeed on the merits of their arbitrary and capricious and contrary to law APA claims, it need not address whether Plaintiff States are likely to succeed on other claims to find that the first *Winter* factor has been satisfied. *See, e.g.*, *Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, 793 F. Supp. 3d 166, 189 n.6 (D.D.C. 2025).

[4] The Department does not meaningfully contest Plaintiff States' APA arguments on the merits, rather the Department's primary argument in opposition to a preliminary injunction is that the Court lacks jurisdiction to hear this case. Dkt. No. 87 at 6–15. The Court will address the Department's jurisdictional argument in the next subsection of this order.

Indeed, the Department has repeatedly informed this Court and the Ninth Circuit that the TRO is preventing it from carrying out its planned terminations in order to align this Executive's funding decisions with its new priorities. *See, e.g.*, *State of Washington v. U.S. Dep't of Educ.*, No. 26-5098 (9th Cir. 2026) ("*Washington II* appeal"), Dkt. No. 10.1 at 24–25. The Department has, moreover, informed the public that it is re-reviewing grants for alignment with the Executive's priorities, and describes a termination process that likely does not account for required procedural protections because the grant funding is terminated the same day the grantee receives notice of the termination. *See* Dkt. No. 83-1 (hereinafter "DEPARTMENT WEBSITE").

As the Court explained in the *Washington* action, it is unlawful to make funding decisions for approved multi-year Grantees by evaluating their original grant applications against new unpublished priorities not in effect at the time that the Grants were approved. *See* 813 F. Supp. 3d at 1245. The Ninth Circuit confirmed, in an appeal of that case, that terminating a grant based on unpublished priorities likely violates GEPA's notice-and-comment rulemaking requirement. *Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1246 (9th Cir. 2026). The Department's termination plan here is based on such an unlawful evaluation because the Department has described it in these terms itself. *Washington II* appeal, Dkt. No. 10.1 at 25; DEPARTMENT WEBSITE ("The Department has been reviewing grants that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration[.] … As part of this review, some grants have been terminated."). The Court previously enjoined a similar if not substantively identical procedure in the *Washington* action used to discontinue the Grants, and the procedure is no more lawful in the termination context here than it was there.

It is also unlawful for the Department to withhold payments from Grantees without first providing the notice and an opportunity for administrative and/or judicial review required under

GEPA.[5] *See* 20 U.S.C. §§ 1234(a)(2), 1234d, 1234g, 1234i(1)–(2); 34 C.F.R. § 75.903. The Department's regulations implement these procedural requirements. 34 C.F.R. §§ 81.1–8.45. Payments cannot be withheld on GEPA grants without first providing notice and an opportunity for an administrative hearing. *See* 20 U.S.C. § 1234d(b)–(c).

Although the Department (Dkt. Nos. 89-1, 89-2) has recently taken the position that a grant "termination" does not amount to a payment "withholding," and thereby a GEPA grant may be terminated without following the GEPA administrative hearing process, this interpretation is not persuasive and need not be credited. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402–03 (2024) (explaining that "Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch[,]" and that courts should not delegate "ultimate interpretive authority to agencies"). The Department's position is inconsistent with the plain meaning of "withholding payments" as used in 20 U.S.C. § 1234d: a grant termination is certainly a form of a payment withholding, as the Eleventh Circuit has confirmed. *Freeman v. Cavazos*, 923 F.2d 1434, 1440 (11th Cir. 1991) (describing 20 U.S.C. § 1234d as "the procedure for termination of assistance"); *see also In re Cleveland State Univ.*, No. 25-12-GR, 2025 WL 4740230, at *10 (ED. O.H.A. May 15, 2026) (explaining that because under the statute, "withholding" can be "in whole or in part[,]" and a termination constitutes a withholding in whole, a withholding for purposes of 20 U.S.C. § 1234d includes a termination). The Court therefore

[5] The Department has not directly disputed that the Grants at issue are subject to GEPA procedural protections, or that certain procedural protections apply when a grant is terminated for violating federal civil rights law. Dkt. No. 87 at 18–19. The Department stresses that because terminations have not yet occurred, the Court should not assume that they would fail to provide whatever procedural protections apply, but has not explained how an "effective immediately" termination could account for any notice or hearing protections. *Id.*

rejects the Department's recent[6] assertion of termination authority under 2 C.F.R. § 200.340(a)(4), outside of GEPA's enforcement provisions.

And although the June 2025 directive instructs Department personnel to consider whether Grants violate federal civil rights law (Dkt. No. 11-4 at 2–3), an agency must first attempt to secure voluntary compliance and provide an opportunity for a hearing before terminating a grant on that basis, and must report the violation to Congress 30 days before a termination can be effective. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682; 34 C.F.R. §§ 100.8–.11, 106.81. Given that the Department has stated that terminations will "usually" occur on the date of a termination notice (DEPARTMENT WEBSITE at 2), it is likely that the Department intends to terminate Grants without advance notice and without waiting to comply with procedural protections to which Grantees are entitled under GEPA or federal civil rights statutes.

Plaintiff States have submitted evidence that before February 2025, the Department provided such protections to grantees and did not re-review grant applications for alignment with Executive priorities. Dkt. No. 98-4; *In re Cleveland State Univ.*, 2025 WL 4740230, at *9. Because the Department's termination plan likely reflects an unexplained change in Department policy, and the Department's plan likely violates its own regulations or the statutes identified in this section, and bases terminations on factors Congress did not intend the Department to consider, the Department's termination plan is likely arbitrary and capricious and contrary to law and thus violates the APA. *See Mont. Wildlife Fed. v. Haaland*, 127 F.4th 1, 39 (9th Cir. 2025) ("A change in policy or in a planned agency action may nevertheless be arbitrary and capricious if the agency fails to provide a "reasoned explanation" for the change."); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (defining agency action as "arbitrary

[6] Apparently no GEPA grants were ever terminated pre-2025, whether in compliance with GEPA enforcement procedures or otherwise. *In re Cleveland State Univ.*, 2025 WL 4740230, at *9.

and capricious if the agency has relied on factors which Congress has not intended it to consider"); *Doe v. Noem*, 778 F. Supp. 3d 1151, 1160 (W.D. Wash. 2025) ("It is contrary to law for an agency to disregard its own regulations and policies."). The Department has not identified any evidence suggesting that it has acknowledged its change in position—indeed it denies that it has changed its position—or that it considered the Plaintiff States' and/or Grantees' serious reliance interests before directing Department personnel to re-review the Grants for termination. It is likely that the Department's termination plan violates the change-in-position doctrine in this way as well. *Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025) ("Under the [change-in-position] doctrine, agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." (citation modified)).

*2. The Court Has Jurisdiction to Preliminarily Enjoin Unlawful Terminations.*[7]

As part of its assessment that Plaintiff States are likely to succeed on the merits of their APA claims, the Court also considers its jurisdiction to hear those claims. The APA waives sovereign immunity for suits "seeking relief other than money damages" against a federal agency, so long as no other statute "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Even if (as here) an APA action does not seek money damages, it may nonetheless contain a contract claim mischaracterized as an APA claim, which would fall outside the APA's waiver of sovereign immunity. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. __, 2025 WL

[7] The Department filed a combined opposition to Plaintiff States' amended preliminary injunction motion and a cross-motion to dismiss for lack of jurisdiction. Dkt. Nos. 86, 87. The Court asked Department counsel at a scheduling conference whether the motion to dismiss should be decided in conjunction with the preliminary injunction motion, and counsel indicated no objection to the Court resolving the preliminary injunction motion first. Dkt. Nos. 92, 93. Thus, at this stage, the Court will determine whether jurisdiction is likely for purposes of a preliminary injunction, and resolve the Department's jurisdictional arguments in a subsequent order resolving the motion to dismiss.

2415669 (2025) ("*NIH*"); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025). Per the Tucker Act, the exclusive jurisdiction for such claims is found in the Court of Federal Claims:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act likewise deprives district courts of jurisdiction to hear contract claims disguised as constitutional claims. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647–48 (9th Cir. 1998). Courts, including those in the Ninth Circuit, look to factors first identified in *Megapulse*, *Inc. v. Lewis* to determine whether a claim against the United States is a contract claim in disguise: "(1) 'the source of the rights upon which the plaintiff bases its claims' and (2) 'the type of relief sought (or appropriate).'" *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

For purposes of the first *Megapulse* prong, the Court notes at the outset that the mere fact that the Grantees have a contractual relationship with the Department does not transform any claim between these parties into a contract claim. *See Ass'n of Am. Univs. v. Dep't of Def.*, 806 F. Supp. 3d 79, 93–94 (D. Mass. 2025) (rejecting the Government's argument that "wrongly assumes that any claim between contracting parties arises in contract" (citing, among other things, *Megapulse*, 672 F.2d at 967–68; *NIH*, 606 U.S. __, 2025 WL 2415669, at *2 (2025) (Barrett, J., concurring))). Plaintiff States do not contend that the Grant terms themselves prohibit termination or seek to compel the Department to extend the Grants (Dkt. No. 1 at 35–52), but instead seek to enjoin the enforcement of an unlawful agency policy against the Grantees. *See id*. at 52–53. Plaintiff States' claims here are similar to those brought in the *Washington* action, and the Ninth Circuit found that the Department was not likely to prevail on its argument that the claims there fell within the Tucker

Act's scope. *See Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1139 (9th Cir. 2025). Under the circumstances, the Court is satisfied that Plaintiff States' claims do not sound in contract.

The second *Megapulse* prong asks whether an action seeks contractual relief. Here, as noted earlier in this order, the complaint's prayer for relief does not seek contractual remedies (extension of the grants or money damages): Plaintiff States seek declaratory relief and an injunction against the agency policies that violate the APA and the Constitution. *See* Dkt. No. 1 at 52–53. This form of relief distinguishes this case from *Thakur v. Trump*, where the Ninth Circuit found that a suit seeking vacatur of termination notices *and reinstatement* of terminated grants fell within the scope of the Tucker Act. 163 F.4th 1198, 1204 (9th Cir. 2025). Plaintiff States seek only prospective relief. *See* Dkt. No. 1 at 52–53. Under these circumstances, the Court thus concludes that Plaintiffs do not seek contract remedies. *See Washington*, 161 F.4th at 1140 (finding the Department had not made a strong showing on the merits of its Tucker Act argument "[b]ecause Plaintiff States' claims seek purely prospective relief regarding multiyear grant discontinuations that do not take effect until December 31, 2025"); *State of California v. U.S. Dep't of Educ.*, No. 25-CV-10548-AK, 2025 WL 3165713, at *16 (D. Mass. Nov. 13, 2025) ("*California*") (finding that a suit seeking to vacate the February 2025 directive seeks prospective relief only, and thus "cannot properly be brought under the Tucker Act in the Court of Federal Claims").

Because both *Megapulse* prongs favor the Court's exercise of jurisdiction, the Court finds that it likely retains jurisdiction to consider Plaintiff States' claims.

3. *There is Sufficient Evidence of a "Final Agency Action" to Support Preliminary Relief.*

The APA provides that only "final" agency actions "for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Only "final" agency actions may be reviewed under the APA, meaning that (1) "the action must mark the 'consummation' of

the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)).

Plaintiff States challenge the Department's termination plan to, as instructed in as the Department's February 2025 directive and the June 2025 directive, and as contemplated in the review process described on the Department's website, re-review existing grants for alignment with new administration priorities and make funding decisions accordingly. Dkt. No. 72 at 16–19. Plaintiff States argue that the February 2025 directive and the June 2025 directive, as well as the Department's stated plan to re-review the Grants in accordance with those directives to terminate some or all of them, are final agency actions subject to judicial review under the APA.[8] *Id*.

The Department contends that because no agency plan has resulted in a single grant termination, there has been no final agency action here. Dkt. No. 87 at 10. The Department's counsel acknowledged that "the Department was pursuing the concept of terminating" the Grants, attempting to distinguish the pursuit of a "concept of terminating" from a final plan to terminate. Dkt. No. 102 at 43. This argument does not account for the notices provided to the Grantees, this Court, and the public stating that grants will be re-reviewed for alignment with new administration priorities and would be terminated effective immediately under 2 C.F.R. § 200.340. *See* Dkt. No. 13-4; *Washington* action, Dkt. No. 447; DEPARTMENT WEBSITE. Indeed, in the *Washington* action,

[8] This Court and another have found the February 2025 directive constitutes final agency action. *See Washington v. U.S. Dep't of Educ.*, 813 F. Supp.3d at 1235; *California*, 2026 WL 2754968, at *16.

in support of its motion for clarification, the Department rebuffed Plaintiff States' suggestion that its termination plan was not "concrete" and thus insufficiently particular to allow the Court to determine whether it violates the injunction in that case. *See Washington* action, Dkt. No. 443 at 11, Dkt. No. 446 at 4. "The mere fact that the February 2025 Directive was issued prior to the final grant terminations does not render it immune from judicial review." *California*, 2026 WL 2754968, at *17.

Nor does the Department account for the fact that it has not funded the Grants beyond July 31, 2026, in anticipation of imminent termination. *See* Dkt. No. 102 at 31–33, 46. Consequences have already begun to flow from the Department's termination plan, and apparently the only reason why the plan has not been effectuated is the Court's TRO. *See* Dkt. No. 102 at 43 (the Department's counsel's statement at oral argument that the Department "has gotten no farther than pursuing [its] intent" to terminate the grants, and "then basically got stopped in its tracks, [and] has proceeded no further"). Although the Department argues that the Court lacks jurisdiction because no final agency action (read: termination) has yet occurred, it also argues the Court will lose jurisdiction to enjoin terminations under the Tucker Act after they occur. As previously noted in the Court's TRO order, the Court rejects the Department's efforts to evade APA review via this catch-22 framing.

Plaintiff States have thus met their burden to show that it is likely that the Department's re-review has been planned and is intended to have legal consequences. Plaintiff States need not wait until the Department carries out terminations to challenge the Department's plan to do so. *See, e.g.*, *Illinois v. Vought*, 820 F. Supp. 3d 727, 732 (N.D. Ill. 2026) (preliminarily finding jurisdiction and granting emergency TRO because "plaintiffs have made a sufficient showing that defendants issued internal guidance to terminate public-health grants for unlawful reasons; that guidance is enjoined as the parties develop a record"). No Department directive, notice, or

website—nor anything in the Department's briefing or argument in this litigation—suggests that the Department's intention to terminate the Grants was interlocutory or tentative, although it has been to date prevented by this Court from realizing its intention. Plaintiff States need not simply wait out the termination clock "in order to have their day in court." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 600 (2016) (explaining that a plaintiff may challenge a final agency action before it has been enforced against them).

For these reasons, the Court finds that Plaintiff States are likely to prevail on the merits of their claims, which are amenable to judicial review and fall within the scope of the Court's jurisdiction.

### C. The Remaining *Winter* Factors Are Also Satisfied.

The Department does not meaningfully dispute that Plaintiff States are likely to suffer irreparable harm without injunctive relief. Plaintiff States have submitted evidence from representative Grantees describing the harms their Programs will suffer without federal funding. Dkt. Nos. 12, 13. The record before the Court in the *Washington* action on this topic is voluminous. *See Washington*, 813 F. Supp. 3d at 1246–48 (summarizing and citing Grantee declarations detailing harm). This evidence permits the Court to find that Plaintiff States are likely to suffer irreparable harm if the Department's termination plan is not enjoined.

Similarly, the balance of the equities favors Plaintiff States and the public interest is served by enjoining unlawful agency decisions. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). Although the Department complains that "any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed" (Dkt. No. 87 at 22), Plaintiff States do not ask this Court to order the Department to pay out any funds. Instead, Plaintiff States request that the Court preliminarily enjoin the implementation of

an unlawful termination plan. *See* Dkt. No. 97 at 30. Moreover, given that the Grants currently have no budget plan through the remainder of 2026 (Dkt. No. 102 at 31–32), and as a result Grantees lack assurance that their expenditures will be reimbursed (*id*. at 46), it is not clear that the Executive is in fact expending money on the Grants, regardless of this Court's orders.

Because the Court finds that Plaintiff States have made sufficient showings on all of the *Winter* factors, the Court will grant their motion for a preliminary injunction.

**D. No Bond Is Required.**

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation modified).

The Court waives the imposition of any bond on Plaintiff States. "In public-interest litigation where the court enjoins unlawful agency action, a nominal bond is appropriate, especially where, as here, the government-defendant fails to provide any evidence that an injunction would impose a substantial cost." *Washington v. U.S. Dep't of Transp.*, 792 F. Supp. 3d 1147, 1193–94 (W.D. Wash. 2025) (citation modified). Because, as Plaintiff States note, the Department has obligated no funds beyond July 31, 2026, and Plaintiff States do not request that the Court order the Department to fund the Grants beyond that date, there is no evidence that granting preliminary relief would require the Department to disburse funds to which Plaintiff States are not entitled.

**E. A Stay Pending Appeal Is Not Warranted.**

The Department requests that "[i]f this Court issues a further preliminary injunction, … it be stayed for a sufficient time to permit the Solicitor General to determine whether to appeal and

for the Ninth Circuit to consider any motion to stay the injunction." Dkt. No. 87 at 22. Defendants do not explain why this relief is warranted, nor address any of the factors that would impact the Court's analysis of the issue. *Id*.

In the face of this cursory request, along with the Court's previous denial of the Department's request to stay the TRO pending appeal and the Ninth Circuit's denial of a similar request, the Court will deny Defendants' request for a stay of the preliminary injunction pending appeal.

## III. CONCLUSION

For the reasons explained in this order, the Court GRANTS Plaintiff States' amended motion for preliminary injunction (Dkt. Nos. 10, 72) and ORDERS as follows:

1. Defendants and all their respective officers, agents, servants, employees and attorneys, and any person in active concert or participation with them who receive actual notice of this order are hereby fully enjoined from the following:

   a. withholding, in whole or in part, payments from Protected Grants[9] without first providing any procedural protections to which Protected Grantees are due under the General Education Provisions Act and its implementing regulations, including those provided by 20 U.S.C. §§ 1234d, 1234g; 34 C.F.R. §§ 81.1–.45;

   b. terminating or refusing to grant or continue federal funding assistance, including withholding additional funding determinations or continuation decisions, as to any Protected Grant without first providing any procedural protections to which Protected Grantees are due under federal civil rights statute or regulation, including those provided by 20 U.S.C. §§ 1221(d),

[9] "Protected Grants" are those grants protected by the permanent injunction in *Washington*, 803 F. Supp. 3d at 1249–50. "Protected Grantees" are Grantees who were awarded Protected Grants.

1682, 1683; 34 C.F.R. §§ 100.8–.11, 106.81; and 42 U.S.C. §§ 2000d-1, 2000d-2;

c. implementing or enforcing through any means the February 2025 directive, the June 2025 directive, or the termination plan,[10] or any materially similar policy, against Protected Grantees, including by failing to provide any procedural protections to which Protected Grantees are due as stated in Paragraphs 1(a) and (b);

d. reinstituting the February 2025 directive, the June 2025 directive, or the termination plan based on the same or similar reasons, including considering new priorities that did not exist at the time the grantee applied for a Protected Grant, for purposes of evaluating whether to withhold funds from a Protected Grantee.

2. The Department must immediately take every step necessary to effectuate this order, including clearing any administrative, operational, or technical hurdles to implementation, and notifying the Grantees protected by this injunction.

3. The Department's counsel shall provide written notice of this order within 48 hours to all Defendants, and their employees, contractors, and grantees.

4. The Department's counsel shall file a status report no later than September 25, 2026, documenting the actions that they have taken to comply with this order, including a copy of the notice and an explanation as to whom the notice was sent.

5. A bond is not necessary under these circumstances and the Court exercises its discretion not to require one.

[10] The "termination plan" refers to the Department's plan to stop funding grants without first complying with the procedural protections outlined in Paragraphs 1(a) and (b), and/or based on a re-review against new, unpublished priorities.

6. This preliminary injunction remains in effect pending further orders from this Court.

Dated this 22nd day of September, 2026.

Kymberly K. Evanson
United States District Judge